UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI ASGHARI, DANIEL TRAN, YUNG KIM, and ARA DERSARKISSIAN, individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN AG, and AUDI AG,<br><br>        Defendants. | CASE NO. CV 13-02529 MMM (VBKx)<br><br>ORDER CERTIFYING SETTLEMENT CLASS; GRANTING  PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; DENYING OBJECTOR MICHAEL GHOZLAND'S MOTION TO INTERVENE; AND GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS |

On May 1, 2012, Ali Asghari filed this action on his own behalf and on behalf of a nationwide class of similarly situated individuals, against Volkswagen Group of America, Inc. ("VW Group"), Volkswagen AG, and Audi AG (collectively "defendants") in the United States District Court for the Northern District of California.[1]  On June 5, 2012, pursuant to Northern District Local Rule 3-12, the case was transferred from the calendar of Magistrate Judge Jacqueline Scott Corley to that of Judge Claudia Wilken because it was related to an earlier action – *Kim v. Volkswagen Group of America, Inc., et al.*, No. C 12-01156 CW.[2]  On August 10, 2012, Asghari filed a first amended complaint, adding

[1]Complaint, Docket No. 1 (May 1, 2012).

[2]Order Relating Case, Docket No. 7 (June 5, 2012).

Augustino Lamia, Barbara Calver, Supalak Prasobratana, and Daniel Tran as named plaintiffs.[3]

Following the filing of the first amended complaint, defendants filed a motion to transfer and a motion to dismiss the complaint.[4]  On March 25, 2013, Judge Wilken granted defendants' motion to transfer and the *Asghari* and *Kim* actions were transferred to the Central District; they were assigned to Judge Dolly M. Gee.[5]  On May 8, 2013, the actions were transferred to this court under General Order 08-05.[6] On November 4, 2013, after hearing oral argument,[7] and reviewing extensive briefing,[8] the court granted in part and denied in part defendants' motion to dismiss.[9]

On November 25, 2013, plaintiffs Ali Asghari, Yung Kim, and Daniel Tran filed a second amended complaint.[10]  One month and five days later, the court ordered the parties to show cause why

---

[3]First Amended Complaint, Docket No. 17 (Aug. 10, 2012).

[4]First Motion to Transfer Case, Docket No. 23 (Oct. 3, 2012); First Motion to Dismiss First Amended Complaint, Docket No. 25 (Oct. 3, 2012).

[5]Order Granting Motion to Transfer, Docket No. 62 (Mar. 26, 2013); see also Notice of Receipt of Case Transferred In, Docket No. 66 (Apr. 10, 2013); Minute Order (In Chambers) Transfer of Case to Judge Gee, Docket No. 71 (Apr. 11, 2013).

[6]Order Re: Transfer Pursuant to General Order 08-05-Related Case, Docket No. 77 (May 8, 2013).

[7]Minutes of Motions to Dismiss and Scheduling Conference, Docket No. 110 (July 29, 2013).

[8]See, e.g., First Motion to Dismiss First Amended Complaint, Docket No. 25 (Oct. 3, 2012); Response re: First Motion to Dismiss First Amended Complaint, Docket No. 35 (Nov. 6, 2012); Reply re: First Motion to Dismiss First Amended Complaint, Docket No. 41 (Dec. 11, 2012); Notice of Motion and Motion to Dismiss Case, Docket No. 80 (May 16, 2013); Opposition to Motion to Dismiss Case, Docket No. 102 (July 8, 2013); Request for Judicial Notice re: Motion to Dismiss Case, Docket No. 103 (July 8, 2013); Reply in Support of Motion to Dismiss Case, Docket No. 107 (July 15, 2013); Exhibit, Docket No. 109 (July 18, 2013); Supplement to Defendants' Motion to Dismiss the First Amended Complaint, Docket No. 116 (Aug. 8, 2013); Request for Judicial Notice re: Defendants' Motion to Dismiss the First Amended Complaint, Docket No. 117 (Aug. 8, 2013); Statement of Plaintiffs in Response to Defendants' Supplemental Brief in Support of Its Motion to Dismiss Case, Docket No. 119 (Aug. 19, 2013).

[9]Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Docket No. 121 (Nov. 4, 2013).

[10]Second Amended Complaint Against Defendants Audi AG, Volkswagen AG, and Volkswagen Group of America, Inc., Docket No. 123 (Nov. 25, 2013).

the *Asghari* action should not be consolidated with a later-filed action also pending before the court – *Ara Dersarkissian et al. v. Volkswagen Group of America, Inc., et al.*, No. CV 13-08105 MMM (VBKx).[11]  In response, the parties filed a stipulation to dismiss the *Dersarkissian* action and to file a third amended complaint in this case.[12]  The court entered an order on the stipulation, dismissed the *Dersarkissian* action, and granted plaintiffs leave to file a third amended complaint on January 30, 2014.[13]  Only plaintiffs Asghari, Tran, Kim, and Ara Dersarkissian filed a third amended complaint against defendants.[14]  Defendants answered that complaint on March 27, 2014.[15]

On April 18, 2014, the parties advised the court that they had reached a tentative settlement of the consolidated action.[16]  They filed a joint stipulation seeking leave to file a fourth amended complaint and set a hearing on plaintiffs' anticipated motion for preliminary approval of the settlement on July 7;[17] the court entered an order on the stipulation ten days later.[18]

The fourth amended complaint names Asghari, Tran, Kim, Dersarkissian, and Katrina Noble (collectively, "plaintiffs") as plaintiffs and pleads causes of action for: (1) violation of the California

---

[11]In Chambers Order to Show Cause Why Actions Should Not Be Consolidated, Docket No. 126 (Dec. 30, 2013).

[12]Stipulation for Leave to Dismiss the Dersarkissian Action and Granting the Asghari Plaintiffs Leave to File a Third Amended Complaint, Docket No. 129 (Jan. 10, 2014).

[13]Order Re: Dismissal of the Dersarkissian Action and Granting the Asghari Plaintiffs Leave to File a Third Amended Complaint, Docket No. 132 (Jan. 30, 2014).

[14]Third Amended Complaint, Docket No. 133 (Feb. 26, 2014).

[15]See Answer to Amended Complaint by Defendant Volkswagen Group of America, Inc., Docket No. 138 (Mar. 27, 2014); Answer to Amended Complaint by Defendant Volkswagen AG, Docket No. 139 (Mar. 27, 2014); Answer to Amended Complaint by Defendant Audi AG, Docket No. 140 (Mar. 27, 2014).

[16]Text Only Entry (In Chambers) Order Vacating Scheduling Conference In Light of Parties' Tentative Settlement, Docket No. 142 (Apr. 18, 2014).

[17]Joint Stipulation for Leave to File Fourth Amended Complaint and Set Hearing Date for the Motion for Preliminary Approval of the Class Action Settlement, Docket No. 143 (July 7, 2014).

[18]Order Granting Joint Stipulation for Leave to File Fourth Amended Complaint and Set Hearing Date for the Motion for Preliminary Approval of the Class Settlement, Docket No. 144 (July 17, 2014).

Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*,  against all defendants;[19] (2) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.*, against all defendants;[20] (3) breach of implied warranty under the Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*, against all defendants;[21] (4) breach of written warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, against VW Group;[22] (5) breach of express warranty under various, unidentified state statutes against VW Group;[23] (6) breach of implied warranty under various, unidentified state statutes against all defendants;[24] and (7) violation of various, unidentified state consumer protection statutes against all defendants.[25]  On August 15, 2014, defendants answered the fourth amended complaint.[26]

On September 22, 2014, plaintiffs filed a motion seeking preliminary approval of the class settlement;[27] the court entered an order provisionally certifying the settlement class and preliminarily approving the settlement on October 16, 2014.[28]  The court set a fairness and final approval hearing for

---

[19]Fourth Amended Complaint ("FAC"), Docket No. 143-1 (July 7, 2014), ¶¶ 73-86.

[20]*Id.*, ¶¶ 87-98.

[21]*Id.*, ¶¶ 99-105.

[22]*Id.*, ¶¶ 106-117.

[23]*Id.*, ¶¶ 118-125.

[24]*Id.*, ¶¶ 126-131.

[25]*Id.*, ¶¶ 132-145.

[26]Answer to Fourth Amended Complaint by Defendant Volkswagen Group of America, Inc., Docket No. 146 (Aug. 15, 2014); Answer to Fourth Amended Complaint by Defendant Audi AG, Docket No. 147 (Aug. 15, 2014); Answer to Fourth Amended Complaint by Defendant Volkswagen AG, Docket No. 148 (Aug. 15, 2014).

[27]Notice of Motion and Motion for Settlement Approval of Class Action Settlement (Preliminary Approval), Docket No. 153 (Sept. 22, 2014).

[28]Order Granting Preliminary Approval of Class Action Settlement, Preliminarily Certifying Class, Appointing Class Counsel, Setting a Settlement Fairness Hearing, Setting Hearing for Final Approval of Settlement, and Directing Notice to the Class ("Prelim. Approval Order"), Docket No. 156 (Oct. 16, 2014).

May 4, 2015, at 10:00 a.m.[29]  On February 27, 2015, plaintiffs filed a motion for final approval of the class settlement.[30]  The same day, they filed a motion for attorneys' fees, expenses, and incentive awards.[31]  On March 23, 2015, Michael Ghozland filed an objection to the proposed settlement,[32] and a motion to intervene in the action as of right.[33]

Plaintiffs and defendants separately opposed Ghozland's motion to intervene on April 13, 2015.[34]  The same day, they filed supplemental briefs addressing various written objections to the settlement that were submitted by class members following their receipt of notice.[35]

## I.  FACTUAL BACKGROUND

### A.    Facts Alleged in the Complaint

Plaintiffs are California and Nevada citizens who leased or purchased allegedly defective Audi

---

[29]Id.

[30]Notice of Motion and Motion for Settlement Approval of Class Action (Final Approval) ("Motion"), Docket No. 158 (Feb. 27, 2015).

[31]Notice of Motion and Motion for Attorneys' Fees ("Fees Motion"), Docket No. 159 (Feb. 27, 2015).

[32]Notice of Objection to Final Approval of Class Settlement, Docket No. 162 (Mar. 23, 2015); Memorandum in Opposition to Motion for Settlement Approval of Class Action (Final Approval) ("Ghozland Objection"), Docket No. 163 (Mar. 23, 2015).

[33]Notice of Motion and Motion to Intervene ("MTI"), Docket No. 167 (Mar. 23, 2015).  See also Reply in Support of Motion to Intervene ("MTI Reply"), Docket No. 175 (Apr. 20, 2015).

[34]Memorandum of Law in Opposition to Objector Michael F. Ghozland's Motion to Intervene by Defendants ("Def.'s MTI Opp."), Docket No. 168 (Apr. 13, 2015); Memorandum in Opposition to Motion to Intervene by Plaintiffs ("Pl.'s MTI Opp."), Docket No. 170 (Apr. 13, 2015).

[35]Memorandum of Law in Response to Objections to, and in Support of, Plaintiffs' Motion for Final Approval of the Proposed Settlement of Class Action (Final Approval) ("Def.'s Response"), Docket No. 169 (Apr. 13, 2015); Response to Objections to Motion for Final Approval of Class Action Settlement and/or Motion for Attorneys' Fees, Expenses, and Incentive Awards ("Pl.'s Response"), Docket No. 171 (Apr. 13, 2015).

A4 and A5 vehicles designed, manufactured, distributed, marketed, sold and/or leased by defendants.[36] Plaintiffs bring this suit on their own behalf and on behalf of a nationwide class of all current and former owners or lessees of any 2007-2013 model year Audi or Volkswagen vehicle equipped with a 2.0-liter turbocharged engine (the "class vehicles").[37]

Plaintiffs allege that defendants have known since at least 2009 of the following design and/or manufacturing defects in the class vehicles: (1) that the engine is unable to utilize engine oil properly; and (2) that the engine improperly burns off and consumes "abnormally high amounts of oil" (collectively "the oil consumption defect").[38]   Plaintiffs assert that an appropriate amount of oil is essential for the engine to function properly and safely, and that the oil consumption defect prevents the engine from maintaining the proper level of oil.[39]  They also allege that the defect creates a safety risk because it can cause engine failure while the vehicle is in operation.[40]   Because the engine can purportedly fail at any time, under any driving conditions, and at any speed, plaintiffs assert the defect creates a serious risk of injury.[41]

Plaintiffs contend that the rate of oil consumption can be as high as one quart every 500 miles.[42] This rate purportedly requires that the engine receive "substantial amounts of oil" between scheduled oil changes.[43]  As a result, many consumers have allegedly reported that they  carry an extra supply of oil in their vehicles at all times.[44]

---

[36]FAC, ¶ 1; *id.*, ¶¶ 13-37.  Asghari, Tran, Kim, and Dersarkissian are California citizens (see *id.*, ¶¶ 13, 20, 27, 31); Noble is a Nevada citizen.  (See *id.*, ¶ 34.)

[37]*Id.*, ¶¶ 2, 66.

[38]*Id.*, ¶ 3.

[39]*Id.*, ¶ 4.

[40]*Id.*, ¶ 5.

[41]*Id.*, ¶ 6.

[42]*Id.*

[43]*Id.*

[44]*Id.*

Plaintiffs assert that the oil consumption defect was not reasonably foreseeable to the named plaintiffs or to class members,[45] and that consumers reasonably expected there would be no such defect.[46]  They also contend that defendants (1) knew or should have known of the defect;[47] (2) knew about and concealed the defect, and its attendant safety hazards, from plaintiffs and class members at the time they purchased or leased their vehicles and thereafter;[48] and (3) did not recall class vehicles despite receiving notice of the defect from internal sources.[49]

Based on complaints filed with the National Highway Transportation Safety Administration ("NHTSA") and posted on the internet, "[h]undreds, if not thousands, of purchasers and lessees of the Class Vehicles have [purportedly] experienced the oil consumption defect."[50] Notwithstanding customer complaints made directly to defendants and to their dealers, defendants allegedly denied that the oil consumption defect was a known problem and told customers that "losing abnormally high amount[s] of oil [wa]s [ ] normal."[51]

**B.     The Provisionally Certified Class and Class Representatives**

As noted, on October 16, 2014, the court issued an order preliminarily approving the proposed class settlement.[52]  The order provisionally certified the following settlement class:

"All United States purchasers and/or lessees of any 2009 model year Audi A4 vehicle, 2010 model year Audi A4 and Audi A5 vehicle, and 2011 model year Audi A4, Audi A5, and Audi Q5 vehicle, originally equipped with a factory-installed 2.0 liter TFSI

---

[45]*Id.*, ¶¶ 7-8.

[46]*Id.*

[47]*Id.*, ¶ 9.

[48]*Id.*, ¶ 10.

[49]*Id.*, ¶ 11.

[50]*Id.*, ¶ 52

[51]*Id.*, ¶¶ 53-54.

[52]See generally Prelim. Approval Order.

longitudinal engine bearing Audi internal engine code CAEB [ ], imported and distributed by Defendant Volkswagen Group of America, Inc., for sale or lease in the United States of America or Puerto Rico."[53]

The court also preliminarily appointed plaintiffs as class representatives.[54]  Although plaintiffs' specific interactions with defendants regarding the alleged defect vary, each is a current or former owner or lessee of a class vehicle and complained about excessive oil consumption.  The plaintiffs are:

- Ali Asghari, a California citizen and resident of Los Angeles, who leased a new 2010 Audi A5 from an Audi dealer, Atlantic Imports, Inc., d/b/a Atlantic Audi West, in West Islip, New York, on December 29, 2009;[55]

- Daniel Tran, a California citizen, who leased a new 2010 Audi A4 from an Audi dealership in California in August 2009;[56]

- Yung Kim, a California citizen and resident of Los Angeles, who leased a new 2010 Audi A4 from a Los Angeles Audi dealership on June 14, 2010;[57]

- Ara Dersarkissian, a California citizen and resident of Los Angeles, who leased a new 2010 Audi A5 from a Los Angeles Audi dealership on May 13, 2010;[58] and

---

[53]*Id.* at 1-2.  Specifically excluded from the settlement class are: "(a) anyone claiming personal injury, property damage and/or subrogation; (b) all Judges who have presided over the Actions and their spouses; (c) all current employees, officers, directors, agents and representatives of Defendants; (d) any affiliate, parent or subsidiary of Defendants and any entity in which Defendants have a controlling interest; (e) anyone acting as a used car dealer; (f) anyone who purchased a Settlement Class Vehicle for the purpose of resale; (g) anyone who purchased a Settlement Class Vehicle with salvaged title and/or any insurance company who acquired a Settlement Class Vehicle as a result of a total loss; (h) any insurer of a Settlement Class Vehicle; (i) insurers of extended vehicle warranties and service contracts; (j) any Settlement Class Member who, prior to the date of this Agreement, settled with and released Defendants or any Released Parties from any Released Claims; and (k) any Settlement Class Member who files a timely and proper Request for Exclusion from the Settlement Class."  (*Id.* at 2.)

[54]*Id.* at 3.

[55]FAC, ¶¶ 13-19.

[56]*Id.*, ¶¶ 20-26.

[57]*Id.*, ¶¶ 27-30.

[58]*Id.*, ¶¶ 31-33.

- Katrina Noble, a Nevada citizen, who purchased a used 2009 Audi A4 in February 2012 from an authorized Audi dealer in Nevada.[59]

At the time settlement negotiations began, and at the time the motion seeking preliminary approval of the settlement was filed, three of the named plaintiffs – Asghari, Kim, and Dersarkissian – no longer leased or owned their respective class vehicles.[60]

## C. The Parties' Investigation and Discovery

Both prior to and following the commencement of the consolidated actions, plaintiffs' counsel conducted extensive investigation and propounded substantial discovery. Prior to filing the actions, counsel solicited inquiries from prospective class members and reviewed and corresponded with putative class members.[61] They also retained and consulted with automotive experts; researched publicly available materials and information provided by NHTSA concerning consumer complaints about oil consumption in the class vehicles; reviewed and researched consumer complaints and discussions about the oil consumption defect in online articles and forums; reviewed manuals and technical service bulletins; and conducted research regarding available causes of action.[62]

After the actions were filed, plaintiffs' counsel continued to investigate the alleged oil consumption defect. They hired experts to test a class vehicle and obtain information concerning the

---

[59]Id., ¶¶ 34-37.

[60]See Supplemental Declaration of Ali Asghari in Support of Plaintiffs' Response to Objections to Final Approval of Class Action Settlement ("Asghari Supp. Decl."), Docket No. 171-1 (Apr. 13, 2015), ¶ 6; Supplemental Declaration of Ara Dersarkissian in Support of Plaintiffs' Response to Objections to Final Approval of Class Action Settlement ("Dersarkissian Supp. Decl."), Docket No. 171-2 (Apr. 13, 2015), ¶ 6; Supplemental Declaration of Yung Kim in Support of Plaintiffs' Response to Objections to Final Approval of Class Action Settlement ("Kim Supp. Decl."), Docket No. 171-3 (Apr. 13, 2015), ¶ 4.

[61]See, e.g., Declaration of Payam Shahian in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Shahian Decl."), Docket No. 158-3 (Feb. 27, 2015), ¶ 17; Declaration of Hovanes Margarian in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Margarian Decl."), Docket No. 158-7 (Feb. 27, 2015), ¶¶ 8-9.

[62]Shahian Decl., ¶ 17

defect.[63]   They also propounded extensive discovery; as a result of their discovery requests, counsel received and reviewed more than 80,000 lines of warranty claims data and more than 100,000 pages of documents.  They also deposed defendants' corporate representative in New York City.[64]

### D.       The Settlement Agreement

#### 1.       Settlement Negotiations

The parties first began to discuss settlement in July 2013 when counsel met and conferred prior to the July 29, 2013, Rule 26 scheduling conference.[65]  The parties were unable to reach an agreement during this first meeting, but continued to negotiate informally as they conducted discovery.[66]  After the court issued a tentative ruling denying in substantial part defendants' motion to dismiss on July 29, 2013, the parties began settlement negotiations in earnest.[67]

To that end, the parties met in New Jersey in October 2013 to discuss the terms of a possible settlement; over next several months, they had numerous telephone conferences while simultaneously propounding discovery and consulting with automotive experts.[68] As a result of their negotiations, the parties were able to reach an agreement on certain of the forms of relief outlined in the settlement agreement; they were not able to reach complete agreement, however.[69]  As a result, they participated in a mediation before the Honorable Howard B. Wiener, a retired Justice of the California Court of

---

[63]*Id.*, ¶ 19; Declaration of Jordan Lurie in Support of Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs, and Enhancement Awards ("Lurie Decl."), Docket No. 158-2 (Feb. 27, 2015), ¶ 3.

[64]Shahian Decl., ¶¶ 18-19; Lurie Decl., ¶¶ 3-4.

[65]Shahian Decl., ¶ 21.

[66]*Id.*

[67]*Id.*, ¶¶ 21-22.

[68]*Id.*, ¶ 22; Lurie Decl., ¶ 6.

[69]Shahian Decl., ¶ 22; Lurie Decl., ¶ 6.

Appeal, Fourth Appellate District, in San Diego, California.[70]  In advance of the mediation, the parties submitted confidential mediation briefs and extensive pleadings, documents, and information supporting their respective positions.[71]  At the mediation, plaintiffs and defendants advocated their respective positions vigorously; following extensive negotiations, and consideration of the strengths and weaknesses of their respective positions, the parties reached an agreement on all material terms and on the relief to be afforded class members.[72]  After the parties agreed on the parameters of the settlement, they negotiated and resolved attorneys' fees, expenses, and incentive awards for the class representatives.[73]  The parties report that the negotiations were arm's length at all times, and that the relief the class was to receive was decided before and without reference to any agreement concerning attorneys' fees, expenses, and incentive awards.[74]

Following the mediation before Justice Wiener, the parties spent a significant amount of time formalizing a settlement agreement, a notice to the class and a claim form.[75]  Plaintiffs filed a motion for preliminary approval of the settlement on September 22, 2014.[76]

### 2.   The Terms of the Settlement Agreement

The settlement agreement provides that settlement class members will release all claims against defendants arising from or related to the alleged oil consumption defect, except personal injury and

---

[70]Shahian Decl., ¶ 23; Lurie Decl., ¶ 7; see also Declaration of Howard B. Wiener in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees and Costs, and Incentive Awards ("Wiener Decl."), Docket No. 158-1 (Feb. 27, 2015), ¶ 3.

[71]Wiener Decl., ¶¶ 4-5.

[72]*Id.*, ¶¶ 5-6; see also Shahian Decl., ¶ 23; Lurie Decl., ¶ 7.

[73]Wiener Decl., ¶¶ 7-8; Shahian Decl., ¶ 23; Lurie Decl., ¶ 7.

[74]Shahian Decl., ¶ 23; Lurie Decl., ¶¶ 6-7; see also Wiener Decl., ¶ 9 ("The agreement reached with respect to the proposed settlement terms was negotiated in good faith by the parties based on their careful investigation, informed judgments, and zealous advocacy.  Moreover, my involvement in guiding the arms'-length negotiations ensured that the terms negotiated would serve the interest of the Class").

[75]Shahian Decl., ¶ 24; Lurie Decl., ¶ 8.

[76]Notice of Motion and Motion for Settlement Approval of Class Action Settlement (Preliminary Approval), Docket No. 153 (Sept. 22, 2014).

property damage claims.[77]  In exchange for the release, defendants agree to provide three types of relief for class members.  First, all settlement class members – both current and former owners or lessees of class vehicles – who paid an authorized Audi dealer out-of-pocket for a service adjustment[78] on their class vehicle will be fully reimbursed for all costs associated with the service adjustment that have not previously been reimbursed.[79]  To qualify for reimbursement, a class member must submit a timely, properly completed claim form together with "proof of repair expense," i.e., "an original or legible copy of a receipt, invoice or other record, or some combination thereof, identifying the date of repair, the make and model of the vehicle, the vehicle identification number of the Settlement Class Vehicle, the mileage of the vehicle at the time of repair, the facility that performed the repair, a description of the work performed, . . . and proof of the sum of money paid by (or on behalf of) the Settlement Class Member."[80]  So long as class members file a timely claim form with this information, and records reflect that the service adjustment was "not performed as a result of engine damage due to abuse, alteration or modification, a collision or crash, vandalism and/other impact," they will be reimbursed.[81]

The claims administrator will pay class members who are entitled to a full reimbursement by the later of seventy-five days after receipt of the claim or sixty days after the entry of final judgment approving the settlement.[82]  Within the same time period, the claims administrator must provide a written explanation of claims that are partially or fully rejected, which identifies the amount of the

_____

[77]See Supplemental Declaration of Payam Shahian In Support Of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Docket No. 155 (Oct. 2, 2014), Exh. A ("Settlement Agreement"), §§ I.E., I.N.

[78]A "Service Adjustment" is defined in the settlement agreement as "(1) replacement of the crankcase pressure regulating valve, front crankshaft seal and front crankshaft bolt and (2) updating the Engine Control Module (ECM) software to match the new part(s) referred to in (1) above, consistent with any applicable Audi Technical Service Bulletin that is in effect at the time the Service Adjustment is performed."  (Settlement Agreement, § I.K.)

[79]Settlement Agreement, § II.A.

[80]Settlement Agreement, § II.A; see also Settlement Agreement, § I.M.

[81]See Settlement Agreement, § II.A.2.

[82]Settlement Agreement, § III.A.1.

proposed reimbursement, the reasons for rejection of the reimbursement sought, the class member's right to a second review of the claim administrator's decision, and his or her right to attempt to cure the deficiency.[83]

Second, the settlement agreement provides that all class members who are current owners or lessees of class vehicles and who did not previously receive a service adjustment, will receive a free service adjustment.[84] To receive a free service adjustment, the class member must make an appointment within eighteen months of the date that class notice was delivered and receive the service adjustment within ninety days of making the appointment.[85] Class members must also submit proper documentation, i.e., service or maintenance records and/or invoices from Audi dealers, demonstrating that they complied with the oil and oil filter maintenance requirements and schedule set forth in the class vehicle's warranty and maintenance booklet and owner's manual.[86]

Third, and finally, the settlement agreement extends the new vehicle limited warranty for all current owners and lessees of class vehicles.[87] The extended warranty covers engine repairs by an authorized Audi dealer that were needed to correct engine oil consumption during the later of: "(i) either eight (8) years or eighty thousand (80,000) miles (whichever occurs first) from the In-Service Date of the Settlement Class Vehicle; or (ii) one (1) year or 12,000 miles (whichever occurs first) from the date the Service Adjustment . . . is performed."[88] Class members seeking engine repairs under the extended warranty must submit documentation that they complied with the oil and oil filter maintenance requirements and schedule, as set forth in the vehicle's warranty and maintenance booklet and owner's

---

[83]Settlement Agreement, §§ III.A.2 & 3.

[84]Settlement Agreement, § II.B.

[85]*Id.*

[86]*Id.*

[87]See Settlement Agreement, § II.C.

[88]*Id.*

1   manual.[89]

2       All expenses associated with administering the settlement, including the fees charged by the

3   claims administrator and the cost of all notices to the class, will be borne by defendants.[90]  The

4   settlement agreement also provides that defendants will not oppose an application for, and will pay,

5   attorneys' fees and expenses up to $2.4 million – $2.3 million in attorneys' fees and $100,000 in

6   expenses.[91]  Defendants also will not oppose an application for, and will pay, incentive awards to the

7   named plaintiffs of up to $2,500 each.[92]  Plaintiffs' motion for attorneys' fees seeks fees of $2.3 million

8   and expenses of $100,000, as well as incentive awards of $2,500 for each named plaintiff.[93]

9       **3.**    **Notice to the Class of the Proposed Settlement**

10       After the court preliminarily approved the proposed settlement, defendants gave the claims

11   administrator, Rust Consulting, Inc. ("Rust"), the names and last known addresses of 229,851 purchasers

12   and lessees of class vehicles.[94]  Rust mailed court-approved notice packets to class members on January

13   28, 2015, which advised class members they had until March 23, 2015, to opt out of the proposed

14

15

16       [89]*Id.*

17       [90]Settlement Agreement, § II.D ("Defendants shall be responsible for the costs of class notice
18   and settlement administration.  In no event shall Class Counsel be responsible for any costs associated
     with class notice or settlement administration.  The parties retain the right to audit and review the claims
19   handling by the Claim Administrator, and the Claim Administrator shall report to both parties jointly").
     Class counsel represents that as of March 2015, the claims administrator has incurred expenses of
20   $385,443.80 administering the settlement and handling class member claims.  (See Supplemental
     Declaration of Jordan L. Lurie in Support of Plaintiffs' Motion for Final Approval of Class Action
21   Settlement and/or Motion for Attorneys' Fees, Expenses, and Incentive Awards ("Second Lurie Supp.
22   Decl."), Docket No. 179 (Apr. 29, 2015), ¶ 9.)

23       [91]Settlement Agreement, § VIII.C.

24       [92]*Id.*

25       [93]See Fees Motion at 23-25.

26       [94]See Lurie Decl., ¶ 11; see also Declaration of Jordan L. Lurie in Support of Plaintiffs' Response
27   to Objections to Motion for Final Approval of Class Action Settlement and/or Motion for Attorneys'
     Fees, Expenses, and Incentive Awards ("Supp. Lurie Decl."), Docket No. 171-4 (Apr. 13, 2015), ¶ 2 n.
28   1.

settlement class.[95]  Rust received 326 undeliverable class notices that reported a forwarding address, and immediately forwarded the notices to the new addresses.[96]  Rust also received 10,181 undeliverable class notices with no forwarding address.[97]  After performing an advanced address search to locate a new address for these class members, Rust remailed 5,581 of the undeliverable notices to an updated address; only 398 have been returned as undeliverable.[98]

In addition to mailing class notice, Rust also caused class notice to be published in the national edition of *USA Today*.[99]  Rust also created a website at www.oilconsumptionsettlement.com on which it posted the class notice as well as general information about the case.[100]  Finally, Rust set up a toll-free support line, 1-888-591-7231, which provided recorded information regarding the proposed settlement; class members were able to leave questions and requests for notice packages on the line as well.[101]

Rust reports that it has answered 2,742 calls seeking information concerning the settlement, and that the website has had 6,475 unique visits.[102]  As of April 24, 2015, Rust had received more than 1,700 claims,[103] and 395 elections to opt out of the class.[104]  Class counsel reports that, between January 28 and April 18, 2015, service adjustments have been performed on 5,974 class vehicles.[105]

---

[95]*Id.*

[96]Declaration of Melissa D. Eisert Re: Mailing of Notice of Pendency and Proposed Settlement of Class Action, Settlement Claim Form, and Request for Exclusion Form to Class Members ("Eisert Decl."), Docket No. 179-1 (Apr. 29, 2015), ¶¶ 5-7.

[97]*Id.*, ¶ 8.

[98]*Id.*

[99]*Id.*, ¶ 10.

[100]*Id.*, ¶ 14.

[101]*Id.*, ¶ 11.

[102]*Id.*, ¶¶ 11, 14.

[103]*Id.*, ¶ 12.

[104]*Id.*, ¶ 13.

[105]Second Lurie Supp. Decl., ¶ 3.

## II. DISCUSSION

### A.    Certification of the Proposed Settlement Class

"In order to approve a class action settlement, a district court must first make a finding that a class can be certified." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 485-86 (E.D. Cal. 2010) (citing *Molski v. Gleich*, 318 F.3d 937, 943, 946-50 (9th Cir. 2003)); see also *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 848-49 (1999) ("When a district court, as here, certifies for class action settlement only, the moment of certification requires heightened attention to the justifications for binding the class members" (citation omitted)); *Staton v. Boeing Co.*, 327 F.3d 938, 952-53 (9th Cir. 2003) ("Especially in the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement.  First, the district court must assess whether a class exists; '[s]uch attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'  Second, the district court must carefully consider 'whether a proposed settlement is fundamentally fair, adequate, and reasonable,' recognizing that '[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness . . . ,'" quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997), and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which provides that a district court may certify a class only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.PROC. 23(a).

Parties seeking to maintain a suit as a class action must make a *prima facie* showing that each of these requirements is met, and must demonstrate that appropriate grounds for pursuing a class recovery exist. See *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  The burden of proving that maintenance of the suit as a class action is appropriate rests on the proponent of the class.  *In re*

*Northern District of California Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 854 (9th Cir. 1982).  Failure to satisfy any one of the Rule 23 requirements precludes certification of the class. *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

In addition to satisfying the prerequisites to certification under Rule 23, plaintiffs must also show that the class is sufficiently "definite" that class members are "ascertainable."  See, e.g., *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977); *In re ConAgra Foods, Inc.*, __ F.Supp.3d __, 2015 WL 1062756, *23 (C.D. Cal. Feb. 23, 2015) ("Although not specifically mentioned in Rule 23, plaintiffs must, in addition to showing numerosity, commonality, typicality, and adequacy, demonstrate that the members of the class are ascertainable" (citations omitted)); *Lukovsky v. San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)).  The representative plaintiff "must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962); *Black Faculty Ass'n of Mesa College v. San Diego Community College District*, 664 F.2d 1153, 1157 (9th Cir. 1981).

### 1.    Rule 23(a) Requirements

#### a.    Whether Plaintiffs Have Proposed an Ascertainable Class

A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998); accord *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 347 (S.D. Ga. 1996) ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D. Fla. 1989)).

As noted, the parties seek to have the court certify a settlement class of "[a]ll United States purchasers and/or lessees of any 2009 model year Audi A4 vehicle, 2010 model year Audi A4 and Audi A5 vehicle, and 2011 model year Audi A4, Audi A5, and Audi Q5 vehicle, originally equipped with a

factory-installed 2.0 liter TFSI longitudinal engine bearing Audi internal engine code CAEB [ ], imported and distributed by Defendant Volkswagen Group of America, Inc., for sale or lease in the United States of America or Puerto Rico."[106]  Excluded from the class are:

> "(a) anyone claiming personal injury, property damage and/or subrogation; (b) all Judges who have presided over the Actions and their spouses; (c) all current employees, officers, directors, agents and representatives of Defendants; (d) any affiliate, parent or subsidiary of Defendants and any entity in which Defendants have a controlling interest; (e) anyone acting as a used car dealer; (f) anyone who purchased a Settlement Class Vehicle for the purpose of resale; (g) anyone who purchased a Settlement Class Vehicle with salvaged title and/or any insurance company who acquired a Settlement Class Vehicle as a result of a total loss; (h) any insurer of a Settlement Class Vehicle; (i) insurers of extended vehicle warranties and service contracts; (j) any Settlement Class Member who, prior to the date of this Agreement, settled with and released Defendants or any Released Parties from any Released Claims; and (k) any Settlement Class Member who files a timely and proper Request for Exclusion from the Settlement Class."[107]

"The court has discretion to modify class definitions where appropriate." *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM (RZx), 2013 WL 6531177, *5 (C.D. Cal. Nov. 23, 2013) (citations omitted); see also *Armstrong v. Davis*, 275 F.3d 849, 871 n. 28 (9th Cir. 2001) ("Where appropriate, the district court may redefine the class," citing *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 467 (9th Cir. 1987)); *Legge v. Nextel Communications, Inc.*, No. CV 02–8676 DSF (VBKx), 2004 WL 5235587, *17 (C.D. Cal. June 25, 2004) ("While the Court recognizes that it has the authority to redefine the putative classes, or create subclasses, it declines to do so on this record"); *Poulos v. Caesars World, Inc.*, No. CV–S–94–1126–RLH–RJJ, 2002 WL 1991180, *3 (D. Nev. June 25, 2002) ("Even if the district court decides that certification is proper, it is not bound by the plaintiff's description of the class").

The court does not believe that redefinition is necessary in this case as the proposed class is

---

[106]Settlement Agreement, § I.E.

[107]*Id.*

18

1    sufficiently definite and ascertainable.  See, e.g., *Keegan v. American Honda Motor Co., Inc.*, 284

2    F.R.D. 504, 521-22 (C.D. Cal. 2012) (concluding that a class was ascertainable because the definition

3    "rel[ied] on objection criteria that [were] verifiable through documentation of a purchase or lease of a

4    class vehicle"); *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593-94 (C.D. Cal. 2008) (finding

5    that a class of "current [or] former owner[s] or lessee[s] of a manual-transmission 2003 Tiburon GT,

6    produced on or before April 1, 2003, who paid for a replacement to the flywheel assembly, clutch disc

7    assembly, clutch cover assembly, or clutch release bearing within the applicable warranty period" was

8    ascertainable because, *inter alia*, it "identifie[d] a particular make, model, and production period for the

9    class vehicle").  The court thus finds that plaintiffs have satisfied the ascertainability requirement and

10   turns to the requirements of Rule 23.

11                       **b.     Numerosity**

12        Before a class can be certified under the Federal Rules of Civil Procedure, the court must

13   determine that it is "so numerous that joinder of all members is impracticable."  See FED.R.CIV.PROC.

14   23(a)(1).  "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or

15   inconvenience in joining all members of the class."  *Harris v. Palm Springs Alpine Estates, Inc.*, 329

16   F.2d 909, 913-14 (9th Cir. 1964) (internal quotation marks omitted).  There is no set numerical cutoff

17   used to determine whether a class is sufficiently numerous; courts must examine the specific facts of

18   each case to evaluate whether the requirement has been met.  See *General Tel. Co. v. EEOC*, 446 U.S.

19   318, 329-30 (1980).  "As a general rule, [however,] classes of 20 are too small, classes of 20-40 may

20   or may not be big enough depending on the circumstances of each case, and classes of 40 or more are

21   numerous enough."  *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B

22   J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)).

23        The parties have adduced evidence that the settlement class has approximately 225,000

24   members.[108]  Consequently, plaintiffs have satisfied the numerosity requirement.

25

26

27        ───────────────

28        [108]Lurie Supp. Decl., ¶ 2 ("Based on information provided by the Settlement Administrator, the
     settlement class consists of approximately 225,000 members").

                                     19

### c.      Commonality

Commonality requires "questions of law or fact common to the class."  See FED.R.CIV.PROC.
23(a)(2).  The commonality requirement is construed liberally, and the existence of some common legal
and factual issues is sufficient.  *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir. 1982);
see *Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less rigorous than
the companion requirements of Rule 23(b)(3).  Indeed, Rule 23(a)(2) has been construed permissively");
see also *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989)
("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class
movant show that a common question of law or fact exists; the movant need not show, at this stage, that
the common question overwhelms the individual questions of law or fact which may be present within
the class").  As the Ninth Circuit has noted: "All questions of fact and law need not be common to
satisfy the Rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as
is a common core of salient facts coupled with disparate legal remedies 'within the class.'"  *Hanlon*, 150
F.3d at 1019.

That said, the putative class's "claims must depend upon a common contention – for example,
the assertion of discriminatory bias on the part of the same supervisor.  That common contention,
moreover, must be of such a nature that it is capable of classwide resolution – which means that the
determination of its truth or falsity will resolve an issue that is central to the validity of each one of the
claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).  Although for
purposes of Rule 23(a)(2) even a single common question will do, *id*. at 2556, "'[w]hat matters to class
certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of
a classwide proceeding to generate common answers apt to drive the resolution of the litigation.
Dissimilarities within the proposed class are what have the potential to impede the generation of
common answers.'"  *Id*. at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of
Aggregate Proof*, 84 N.Y.U.L.REV. 97, 132 (2009)).  As the Ninth Circuit recently articulated by way
of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs
passed over for promotion?'  Instead, they must pose a question that 'will produce a common answer
to the crucial question why was I disfavored.'"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th

1    Cir. 2011) (quoting *Dukes*, 131 S.Ct. at 2552).

2    The fourth amended complaint alleges several questions of fact and law common to all class

3    members' claims – i.e., "[w]hether the Class Vehicles and their engines are defectively designed or

4    manufactured such that they are not suitable for their intended use"; "whether the fact that the Class

5    Vehicles suffer from an oil consumption defect would be considered material by a reasonable

6    consumer"; "whether as a result of Defendants' concealment or failure to disclose material facts,

7    Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by

8    Defendants"; and "[w]hether Defendants were aware of the oil consumption defect."[109]  Plaintiffs also

9    assert that common questions of law exist as to whether defendants' conduct breached VW Group's

10   express warranties and defendants' implied warranties.[110]  Because several of these questions are capable

11   of generating a common answer that will drive resolution of the claims, the court finds that the

12   commonality requirement is satisfied. See, e.g., *Weeks*, 2013 WL 6531177 at *6 ("The Fourth Amended

13   Complaint alleges several questions of fact and law common to all class members' claims – e.g.,

14   whether defendants' immunity claims were false and misleading, and whether they were likely to

15   deceive a reasonable consumer.  The court thus finds that the commonality requirement is satisfied"

16   (citations omitted)); *Keegan*, 284 F.R.D. at 523 (concluding that the commonality requirement was

17   satisfied where "[p]laintiffs contend[ed] that all class members' claims involve[d] the same design

18   defect, the same warranty, and the same class vehicles," and plaintiffs "also identif[ied] a number of

19   purportedly common issues, including whether the class vehicles suffer[ed] from the defect in question,

20   whether Honda knew about the defect, whether Honda breached its express warranty, and whether

21   Honda violated the consumer protection laws of various states"); *True v. American Honda Motor Co.*,

22   749 F.Supp.2d 1052, 1064 (C.D. Cal.2010) ("Here, the FAC alleges several common questions of fact

23   and law: (1) whether Defendant's advertising was false and misleading; (2) whether Defendant's claims

24   about fuel economy were material to class members' decision to purchase HCH vehicles; (3) whether

25   the class members suffered damages as a result of Defendant's conduct; (4) whether Defendant knew

26

27       [109]FAC, ¶¶ 70 (a)-(d).

28       [110]See, e.g., *id.*, ¶¶ 70 (e)-(l).

1   or should have known its advertising was false or misleading; (5) whether Defendant knew or should

2   have known the class members would experience significantly less fuel economy than advertised; and

3   (6) whether Defendant concealed or failed to tell class members about material facts regarding fuel

4   economy.  Due to these common questions, the class satisfies the commonality requirement").

5                       **d.      Typicality**

6          Typicality requires a determination as to whether the named plaintiff's claims are typical of those

7   of the class members she seeks to represent.  See FED.R.CIV.PROC. 23(a)(3).  "[R]epresentative claims

8   are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be

9   substantially identical."  *Hanlon*, 150 F.3d at 1020; see also *Schwartz v. Harp*, 108 F.R.D. 279, 282

10  (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course

11  of conduct that gives rise to claims of other class members and the claims are based on the same legal

12  theory").

13         "The test of typicality is whether other members have the same or similar injury, whether the

14  action is based on conduct which is not unique to the named plaintiffs, and whether other class members

15  have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508

16  (9th Cir. 1992) (citation and internal quotation marks omitted).  Typicality, like commonality, is a

17  "permissive standard[ ]."  *Hanlon*, 150 F.3d at 1020.  Indeed, in practice, "[t]he commonality and

18  typicality requirements of Rule 23(a) tend to merge."  *General Telephone Co. of Southwest v. Falcon*,

19  457 U.S. 147, 157-58 & n.13 (1982).  See also *Dukes*, 131 S.Ct. at 2551 n. 5 ("We have previously

20  stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge.

21  Both serve as guideposts for determining whether under the particular circumstances maintenance of

22  a class action is economical and whether the named plaintiff's claim and the class claims are so

23  interrelated that the interests of the class members will be fairly and adequately protected in their

24  absence.  Those requirements therefore also tend to merge with the adequacy-of-representation

25  requirement, although the latter requirement also raises concerns about the competency of class counsel

26  and conflicts of interest,'" citing *Falcon*, 457 U.S. at 158 n. 13).

27         Typicality may be lacking, however, "if 'there is a danger that absent class members will suffer

28  [because] their representative is preoccupied with defenses unique to it.'"  *Hanon*, 976 F.2d at 508

1    (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 903 F.2d 176,

2    180 (2d Cir. 1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir.

3    1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class

4    may destroy the required typicality of the class as well as bring into question the adequacy of the named

5    plaintiff's representation").  To be typical, a class representative need not prove that she is immune from

6    any possible defense, or that her claim will fail only if every other class member's claim also fails.

7    Instead, she must establish that she is not subject to a defense that is not "typical of the defenses which

8    may be raised against other members of the proposed class."  *Hanon*, 976 F.2d at 508*.*; see also *Ellis*,

9    657 F.3d at 984.

10          The named plaintiffs in this case are each current or former owners of class vehicles who allege

11   that they were injured by the oil consumption defect and by defendants' purported misrepresentations

12   and omissions regarding the same.[111]  This is the same injury that all members of the settlement class

13   purportedly suffered.  There also has been no contention or evidence to suggest that the named

14   plaintiffs' claims would be subject to unique defenses.  Accordingly, the court concludes that the named

15   plaintiffs' claims are typical of those of the settlement class, and that the typicality requirement is

16   satisfied.  See, e.g., *Keegan*, 284 F.R.D. at 525 ("The named plaintiffs in this case are all owners or

17   lessees of class vehicles, who assert that they have experienced premature tire wear as alleged in the

18   complaint. . . .  Consequently, the court concludes that the typicality requirement is satisfied"); *True*,

19   749 F.Supp.2d at 1064 ("The representative plaintiffs' claims are typical of the settlement class

20   members in that they arise from the same alleged course of events: (1) AHM's misrepresentations

21   regarding the fuel economy of the HCH; (2) customers' reliance on these misrepresentations when

22   purchasing or leasing HCHs; and (3) the HCH's failure to achieve the advertised fuel economy").

23                          **e.    Adequacy**

24          The final prerequisite to certification under Rule 23(a) is that the named plaintiff be able "fairly

25   and adequately to protect the interests" of all class members.  FED.R.CIV.PROC. 23(a)(4).  The Ninth

26   Circuit has held that representation is "adequate" when class counsel is qualified and competent, the

27

28          [111]See FAC, ¶¶ 13-37.

                                                      23

representative's interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive. *Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d at 855. In addition, the class representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy. See *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986). Whether the adequacy requirement is met thus turns on two questions: "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 462 (9th Cir. 2000).

Here, the named plaintiffs' interests are consistent with those of the absent class members. When the court is asked to certify a settlement class, however, issues of possible collusion merit special consideration. Often, there is a concern that a lead plaintiff will structure a settlement that favors her interests by maximizing current payments and minimizing the funds available to future claimants. The Supreme Court addressed this issue in *Amchem Products*, 521 U.S. at 591, which involved a proposed global resolution of suits against asbestos manufacturers. The interests of class members who had already suffered injury as a result of asbestos exposure, and who sought generous immediate payments, conflicted with the interests of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future. *Id.* at 591. Unlike *Amchem*, members of the proposed settlement class here "are not divided into conflicting discrete categories," and there is no similar "allocation dilemma." *Hanlon*, 150 F.3d at 1020–21.

Nor is there any evidence suggesting that the settlement is collusive. See *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 667 (C.D. Cal. 2009) ("As to the first prong of the Ninth Circuit test for the Rule 23(a)(4) adequacy of representation requirement, the Court is not aware of any conflict of interest between Wiener and the proposed class members, as Wiener's interests in proving Dannon's alleged false advertising certainly align with those of other class members. . . . '[Wiener] understands [her] duties and is currently willing and able to perform them. [Rule 23(a)(4) ] does not require more,'" quoting *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001)).

The court also finds that class counsel, Strategic Legal Practices, APC; Capstone APC; Choi &

Associates, PC; Diversity Law Group, P.C.; The Margarian Law Firm; EcoTech Law Group P.C.; and the Law Offices of Mark Yablonovich, are qualified to handle this type of litigation, and able to prosecute the action vigorously on behalf of the class.  See *Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987) ("Factors involved in an examination of the adequacy of counsel include . . . counsel's experience in handling the type of litigation involved"); see also *Esler v. Northrop Corp.*, 86 F.R.D. 20, 37 (W.D. Mo. 1979) ("The central inquiry is whether counsel is experienced with the type of class litigation involved in the case, and generally able to conduct the proposed litigation"); *Carpenter v. Hall*, 311 F.Supp. 1099, 1114 (S.D. Tex. 1970) ("By the Plaintiff's attorneys being experienced is meant that he or they are experienced in the type of litigation involved in this cause").

Class counsel have proffered evidence that they have extensive experience litigating consumer claims and class actions.[112]  The court therefore finds that class counsel are able adequately to protect the interests of all members of the class.  See *Wiener*, 255 F.R.D. at 667–68 ("As to the second prong of the adequacy of representation test, Wiener has retained counsel with significant experience litigating consumer fraud class actions in federal and state courts across the country.  As such, 'Plaintiffs are represented by qualified and competent counsel,' satisfying the second prong of the adequacy of representation requirement" quoting *Dukes v. Wal–Mart, Inc.*, 509 F.3d 1168, 1185 (9th Cir. 2007)); *True*, 749 F.Supp.2d at 1066 ("In connection with their motion for preliminary approval, Plaintiffs submitted substantial evidence of class counsel's experience with class action, complex, and other large-scale litigation, including substantial trial experience. . . .  Based on the evidence submitted in

---

[112]Shahian Decl., ¶¶ 5-9; Declaration of Rebecca Labat in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Attorneys' Fees, Expenses, and Costs ("Labat Decl."), Docket No. 158-4 (Feb. 27, 2015), ¶¶ 4-8; Declaration of Edward Choi in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Attorneys' Fees, Expenses, and Costs ("Choi Decl."), Docket No. 158-5 (Feb. 27, 2015), ¶¶ 7-9; Declaration of Larry W.Lee in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Attorneys' Fees, Expenses, and Costs ("Lee Decl."), Docket No. 158-6 (Feb. 27, 2015), ¶¶ 7-9; Margarian Decl., ¶¶ 2-6; Declaration of Mark Yablonovich in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Attorneys' Fees, Expenses, and Costs ("Yablonovich Decl."), Docket No. 158-8 (Feb. 27, 2015), ¶¶ 2-4; Declaration of Dara Tabesh in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Attorneys' Fees, Expenses, and Costs ("Tabesh Decl."), Docket No. 158-9 (Feb. 27, 2015),¶¶ 2-5.

connection with the motion for preliminary approval, and its own observation of their work throughout the case, the Court concludes Plaintiffs' counsel have made an adequate showing of their qualifications," citing FED.R.CIV.PROC. 23(g)).[113]

### 2.   Rule 23(b) Requirements

Once the prerequisites of Rule 23(a) have been satisfied, one of the criteria set forth in Rule 23(b) must also be met before a class can be certified. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("In order for a class action to be certified, the plaintiffs must establish the four prerequisites of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)"). Here, the action satisfies Rule 23(b)(3). That rule provides, in pertinent part:

"A class action may be maintained if Rule 23(a) is satisfied and if: . . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action." FED.R.CIV.PROC. 23(b)(3).

### a.   Predominance of Common Questions

The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Products*, 521 U.S. at 623-24. If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and

---

[113]Objector Michael Ghozland challenges the adequacy of representation provided by class counsel and the class representatives in his motion to intervene. The court addresses these arguments *infra* and, for the reasons there stated, find that the named class representatives and class counsel are adequate.

the predominance test is satisfied. *Hanlon*, 150 F.3d at 1022. "'[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.'" *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1178, at 535-39 (1986)). This is because, *inter alia*, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.* at 1190.

Here, it is clear that common questions of fact and law predominate over issues individual to class members. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022. Here, the common questions discussed above, i.e., whether the class vehicles were defectively designed, whether defendants were aware of the design defects, whether defendants had a duty to disclose those facts, and whether such facts were material to a reasonable consumer, "present . . . significant aspect[s] of the case" that can be answered on a classwide basis. Although there may be slight variations in the proof required and damages available under various states' laws, moreover, "[s]uch variation is routine . . . and ordinarily is insufficient to derail class certification." *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, No. C 09-05418 RS, 2012 WL 10277179, *4 (N.D. Cal. Jan. 9, 2012).

Indeed, courts faced with motions for class certification in automobile design defect cases routinely find that common questions such as those present here suffice to satisfy the predominance requirement. See, e.g., *Banks v. Nissan North America, Inc.*, 301 F.R.D. 327, 335 (N.D. Cal. 2013) ("In *Wolin*, the Ninth Circuit held that '[c]ommon issues predominate such as whether Land Rover was aware of the existence of the alleged defect, whether Land Rover had a duty to disclose its knowledge and whether it violated consumer protection laws when it failed to do so.' While the defendant in *Wolin* argued that 'the evidence will demonstrate that the prospective class members' vehicles do not suffer from a common defect, but rather, from tire wear due to individual factors such as driving habits and weather,' the court rejected that argument, finding that '[a]lthough individual factors may affect premature tire wear, they do not affect whether the vehicles were sold with an alignment defect.' The

27

same rationale applies in this case, because while it is true that some vehicles' defects may have manifested in different ways, the issues of (1) whether Nissan was aware of the alleged defect, (2) whether Nissan had a duty to disclose its knowledge, and (3) whether Nissan violated consumer protection laws when it failed to do so, are common to the class and predominate over any individual issues," citing *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010)); *Milligan*, 2012 WL 10277179 at *4 ("Here, a common nucleus of operative fact dominates the case. Granted, to the extent class members may possess slightly different claims or remedial options under state substantive law, plaintiffs' counsel must be prepared to show that the class is protected by a relatively homogenous body of product liability, contract, and consumer protection laws. Such variation is routine, however, and ordinarily is insufficient to derail class certification. The same is true for variation within the class as far as damages are concerned. Accordingly, the first element of Rule 23(b)(3) is met" (citations omitted)); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 526-27 (N.D. Cal. 2004) ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis.' Here, common questions include whether the design of the plastic intake manifold was defective, whether Ford was aware of the alleged design defects, whether Ford had a duty to disclose its knowledge, whether it failed to do so, whether the facts that Ford allegedly failed to disclose were material, and whether the alleged failure to disclose violated the CLRA. Common questions thus predominate over individual questions in this case" (citations omitted)). The court thus finds Rule 23(b)'s predominance requirement satisfied.

### b. Superiority

"Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action."

1  *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D. Cal. 2006) (quoting *Leuthold v.*

2  *Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

3      Given the limited damages that each class member might recover if he or she sued

4  independently, class members' interest in controlling their own cases is minimal.  See, e.g., *Milligan*,

5  2012 WL 10277179 at *5 ("As for the 'superiority' requirement, this is plainly a case where recovery

6  on an individual basis would be infeasible due to litigating costs.  Plaintiffs' counsel emphasizes the

7  familiar array of risks, and heavy costs, attendant to litigation of individual claims.  The non-exhaustive

8  factors identified by Rule 23(b)(3) support the same conclusion: the interests of class members in

9  individually controlling the litigation in the form of separate actions is clearly outweighed by the

10  administrative efficiency of the class action mechanism," citing *Zinser*, 253 F.3d at 1190 ("[w]here

11  damages suffered by each putative class member are not large, this factor weighs in favor of certifying

12  a class action")); *True*, 749 F.Supp.2d at 1066 ("Plaintiffs also have shown that a class action is a

13  superior method of resolving this controversy, as each class member has a relatively small and uniform

14  injury, and the costs of litigation would make individual cases impracticable").

15      The only actions concerning the class vehicles of which the court is aware have been

16  consolidated in this action.  The court, moreover, can discern no reason why it would be undesirable to

17  concentrate all the litigation in this forum.  While there are undoubtedly a large number of class

18  members, given defendants' records regarding the class vehicles, it does not appear that the class will

19  be especially difficult to manage.  For these reasons, the court concludes that the proposed settlement

20  class satisfies the superiority requirement.

21              **3.      Conclusion Regarding Class Certification**

22      Having found that the requirements of both Rule 23(a) and Rule 23(b)(3) are met, the court

23  certifies the settlement class proposed by the parties.

24          **B.      Final Approval of the Proposed Class Action Settlement**

25      Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure requires that the court "approve any

26  settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."

27  Approval under Rule 23(e) is a two-step process "in which the [c]ourt first determines whether a

28  proposed class action settlement deserves preliminary approval and then, after notice is given to class

members, whether final approval is warranted." *National Rural Telecommunications Cooperative v. DIRECTV, Inc.* ("*NRTC*"), 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.14, at 236-37 (1995)).  The Ninth Circuit has noted that, in considering whether finally to approve a class settlement, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Synocor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008); see *id.* ("This policy is also evident in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Central District of California, which encourage facilitating the settlement of cases"); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation"), cert. denied, 459 U.S. 1217 (1983).

### 1.     Notice Requirements

Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs."  FED.R.CIV.PROC. 23(e).  The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply with the spirit of [Rule 23(e)], it is necessary that the notice be given in a form and manner that does not systemicly leave an identifiable group without notice").

The court's role in reviewing a proposed settlement is to represent those class members who were not parties to the settlement negotiations and agreement.  See *San Francisco NAACP v. San Francisco Unified School District*, 59 F.Supp.2d 1021, 1027 (N.D. Cal. 1999) ("The purpose of Rule 23(e) is to protect 'unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are unable to secure satisfaction of the individual claims by compromise,'" quoting *Amchem Products*, 521 U.S. at 623).  One aspect of the court's role is to ensure that all class members receive adequate notice of the proposed settlement.

Defendants worked with Rust Consulting, Inc., the court-appointed claims administrator, to coordinate the mailing of notice packets to 229,851 current and former owners or lessees of class vehicles throughout the United States.[114]   On January 28, 2015, Rust mailed court-approved notice packets to the last known addresses of all class members.[115]   Of the 229,851 notices mailed, 10,181 were returned as undeliverable with no forwarding address.[116]   Rust performed a skip trace, found a forwarding address for 5,581 of these class members and immediately remailed notice to the forwarding addresses.[117]   Only 398 of the remailed notices have been returned.[118]

In addition to mailing notice and claim forms, Rust established and has maintained a toll-free telephone number class members can call to obtain information concerning the settlement and has received calls from 2,742 class members seeking information regarding the settlement.[119]   Finally, Rust established and has maintained a settlement website at www.oilconsumptionsettlement.com, which gives class members access to the settlement agreement, the notice of settlement, answers to frequently asked questions, and other pleadings and information concerning the case and the settlement.   Rust states that the website has received 6,475 unique visits since class notice was disseminated.[120]   Class counsel reports that, following dissemination of the class notice, they have received more than one hundred telephone calls from class members asking how they can participate in the settlement and the scope of benefits available under the settlement.[121]

The court is satisfied that these efforts have been effective in providing notice of the settlement to potential class members.   See *Mullane*, 339 U.S. at 318-19 (stating that "the mails today are

---

[114]Lurie Decl., ¶ 11.

[115]*Id.*

[116]Eisert Decl., ¶¶ 5-8.

[117]*Id.*, ¶ 8.

[118]

[119]Eisert Decl., ¶ 11.

[120]*Id.*, ¶ 14.

[121]Lurie Supp. Decl., ¶¶ 12-13.

recognized as an efficient and inexpensive means of communication" that is reasonably calculated to provide notice). Rust not only mailed notice to a comprehensive list of known class members, but resent notices to class members for whom it was able to obtain a forwarding address. It also established a toll-free telephone line class members could call to pose questions concerning the settlement, as well as a website they could visit to access information concerning the case, the proposed settlement, and the steps they had to take to opt out of or object to the settlement. The notice form that was mailed to class members clearly apprised them of the action and their legal options. Consequently, the court finds that unnamed class members had adequate notice of the settlement and adequate opportunity to file a valid claim form, opt out, or object. The notice requirement of Rule 23(e) has thus been satisfied.

## 2.    Fairness of the Proposed Settlement

"The role of a court . . . reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and comport with due process and to examine the settlement for fairness and adequacy." *Vaughns v. Board of Education of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998). The district court's role, in reviewing "what is otherwise a private consensual agreement negotiated between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

The parties assert the settlement is presumptively fair because it is the result of an arms-length negotiation.[122] See *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution"); *NRTC*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiations is presumed fair," citing *City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1043 (1st Cir. 1996)). The parties negotiated the settlement over a period of eight months; their negotiations included a full-day session with experienced mediator Justice Howard Wiener, many

---

[122]Motion at 13-14.

telephone conferences, and an in-person meeting between counsel.[123]  Additionally, the parties agreed on the relief the class would receive before negotiating attorneys' fees, expenses, and incentive awards.[124]  It appears, therefore, that the agreement was reached in good faith after a well-informed, arms-length negotiation, and that it is entitled to a presumption of fairness.

Nonetheless, the court must examine the terms of the settlement, considering relevant factors, to determine whether the settlement is indeed fair.  In making this assessment, the court balances:

"(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."  *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

This list of factors is not exclusive, "and different factors may predominate in different factual contexts." *Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  See also *Churchill Village*, 361 F.3d at 576 n. 7 ("Because the settlement evaluation factors are non-exclusive, discussion of those factors not relevant to this case has been omitted"); *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007) (adding as relevant factors "(9) the procedure by which the settlements were arrived at, see MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.6 (2004), and (10) the role taken by the plaintiff in that process").

### a.    Strength of Plaintiffs' Case

While plaintiffs maintain that their claims are strong on the merits, they recognize certain weaknesses that might have limited or precluded recovery had the litigation proceeded.[125]  Plaintiffs would have been required to prove that the CAEB engines that were factory installed in class vehicles

---

[123]Shahian Decl., ¶¶ 22-23; Lurie Decl., ¶¶ 6-7; Wiener Decl., ¶¶ 4-8.

[124]Wiener Decl., ¶¶ 7-8; Shahian Decl., ¶ 23; Lurie Decl., ¶ 7.

[125]Motion at 18.

consumed excessive oil, i.e., used oil at a faster rate than the schedule set forth in the vehicle maintenance and owner's manuals.  Defendants, for their part, would have argued that plaintiffs could not prove causation because "oil consumption varies based on various driving and environmental factors," an argument a jury might have accepted.  Defendants also raised a number of other defenses that might have made recovery on the merits unlikely.[126]  In addition to asserting that it had no duty to disclose the defect to consumers, defendants contend that (1) no oil consumption defect exists because all internal combustion engines, not just the class vehicles,  require supplemental oil between oil changes; (2) oil consumption is a "maintenance issue" that is not an actionable defect; and (3) plaintiffs cannot show that the alleged defect constitutes a serious safety concern because the engine warning light illuminates before the alleged defect manifests itself.[127]

The court had no opportunity to evaluate the sufficiency of the evidence developed during discovery regarding these issues because the parties settled before a motion for summary judgment was filed.  The fact, however, that causation and defendants' duty to disclose – required elements of plaintiffs' claims – were contested favors a finding that the settlement is fair.  See *In re Portal Software, Inc. Securities Litigation*, No. C-03-5138 VRW, 2007 WL 4171201, *3 (N.D. Cal. Nov. 26, 2007) ("Factor (1), the strength of plaintiffs' case, somewhat favors settlement because plaintiffs' remaining claims are tenuous.  Plaintiffs assert that establishing liability and damages at trial would be difficult because of the uncertainties associated with proving its claims, which are 'exacerbated by the unpredictability of a lengthy and complex jury trial'").  The court therefore concludes that this factor weighs in favor of final approval of the settlement.

---

[126]*Id.*

[127]*Id.*; see generally Answer to Fourth Amended Complaint by Defendant Volkswagen Group of America, Inc., Docket No. 146 (Aug. 15, 2014); Answer to Fourth Amended Complaint by Defendant Audi AG, Docket No. 147 (Aug. 15, 2014); Answer to Fourth Amended Complaint by Defendant Volkswagen AG, Docket No. 148 (Aug. 15, 2014).

b.     **The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

The parties contend that, had the case not been resolved through settlement, continued litigation would have been expensive and lengthy, and would have required the retention of costly expert witnesses by both parties.[128] As a result, they assert this factor weighs in favor of approval.[129] The court agrees. Given the technical complexity of the issues central to plaintiffs' claims, both discovery and trial would have consumed significant time. Moreover, given the hotly contested issues and defendants' numerous defenses, it is likely that the parties would have engaged in substantial motion practice before the case reached trial. As the court stated in *Glass v. UBS Financial Services, Inc.*, No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007):

> "In light of the above-referenced uncertainty in the law, the risk, expense, complexity, and likely duration of further litigation likewise favors the settlement. Regardless of how this Court might have ruled on the merits of the legal issues, the losing party likely would have appealed, and the parties would have faced the expense and uncertainty of litigating an appeal. 'The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement.' See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d . . . 458. . . . Here, the risk of further litigation is substantial." *Id.* at *4.

See also *Aarons v. BMW of North America, LLC*, No. CV 11-7667 PSG (CWx), 2014 WL 4090564, *11 (C.D. Cal. Apr. 29, 2014) ("Plaintiffs would face significant risks and expenses if this case were to

---

[128]Motion at 19-20 ("Indeed, the risk of continuing litigation, including the risk of new adverse case law, increased costs, and expiration of a substantial amount of time, weigh heavily in favor of settlement. In particular, Plaintiffs shoulder exceedingly high financial risks in pursuing this action. A class action against a major automotive manufacturer, where Plaintiffs allege that tens of thousands of vehicles suffer a serious defect, has the strong potential to engulf plaintiffs and attorneys in protracted, resource-draining court battles. Plaintiffs would likely need to supply multiple experts' testimony and analyses, including an expert on engine design and engineering, an expert on the relative oil consumption of different engines, an expert on consumer expectations, and a damages expert. These hefty costs would have to be advanced by Plaintiffs and Class Counsel, and add significantly to the risks of proceeding in litigation").

[129]*Id.*

35

proceed.  Plaintiffs would have to persuade the Court that it would be appropriate to certify a class for litigation, and would likely face a substantial motion for summary judgment.  Ultimately, Plaintiffs would have to overcome the testimony of BMW's experts and BMW's potentially significant defenses at trial.  Finally, even if Plaintiffs were able to establish liability, they might have difficulty adequately establishing monetary damages on a class-wide basis.  Aggressively litigating class certification, fending off summary judgment, and taking this case to trial would consume significant time and resources.  Moreover, there is a considerable risk that Plaintiffs would come away from this case empty-handed.  In light of the 'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned,' the Court find that this factor weighs in favor of approval of the settlement" (citations omitted)); *Kearney v. Hyundai Motor America*, No. SACV 09-1298-JST (MLGx), 2013 WL 3287996, *5 (C.D. Cal. June 28, 2013) ("Undoubtedly the expense incurred by Plaintiffs and the purported class will increase as the case progresses.  This action has ensued for over three years, and neither side has brought dispositive motions.  Thus, if settlement were not reached, Plaintiffs and potential class members would likely incur additional costs in conducting further discovery, defending or bringing dispositive motions, and, if applicable, preparing for and participating in trial.  As this is a nationwide class, the expense of further litigation would be substantial, and high expert costs alone would be expected.  The Court finds that this factor favors approval of the Settlement Agreement"); *Browne v. American Honda Motor Co., Inc.*, No. CV 09–06750 MMM (DTBx), 2010 WL 9499072, *11 (C.D. Cal. July 29, 2010) ("The parties argue that this factor also weighs in favor of approval of the settlement because they would have incurred significant expenses preparing for and trying the case.  In particular, they contend there would have been substantial costs associated with expert analysis of Honda's braking system and whether it was defective due to the force the system applied to the rear brakes.  Plaintiffs would also have been required to conduct extensive discovery to develop evidence suggesting that Honda knew of problems with the braking system.  Because of the technical complexity of the issues central to plaintiffs' claims, both discovery and trial would have consumed significant time.  Plaintiffs' counsel note, in this regard, that they have spent more than four years litigating similar automotive defect cases.  Had the parties aggressively litigated class certification and tried the case, it could have consumed substantial party and court resources.  There is a 'strong judicial policy that favors

settlements, particularly where complex class action litigation is concerned.' The court thus concludes that this factor weighs in favor of approving the settlement," quoting *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1238 (9th Cir. 1998)); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (in weighing the risk of future litigation, "a court may consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation" (internal quotation marks omitted)); *Young*, 2007 WL 951821 at *3 ("Because this litigation has terminated before the commencement of trial preparation, factor (2) also militates in favor of the settlement"); see also *Officers for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of this settlement").

Because both plaintiffs and defendants would have had to engage in extensive, expensive pretrial activities, because both faced the prospect that they would not prevail, and because any outcome would likely have been appealed, this factor supports approval of the settlement. See *In re Portal Software, Inc. Securities Litigation*, 2007 WL 4171210 at *3 (recognizing that the "inherent risks of proceeding to . . . trial and appeal also support the settlement").

### c.   The Risk of Maintaining Class Action Status Throughout Trial

Whether or not the action would have been tried as a class action is also relevant in assessing the fairness of the settlement. Although the court has certified a class for settlement purposes, plaintiffs would have faced significant challenges establishing that driving patterns or other factors unique to individual class members did not affect the rate at which the engine of a class vehicle used oil. This would have impacted whether plaintiffs could have shown commonality under Rule 23(a)(2) and predominance under Rule 23(b)(3). See FED.R.CIV.PROC. 23(a)(2) (one prerequisite to certification is a finding that there are questions of fact and law common to the class); FED.R.CIV.PROC. 23(b)(3) (before a damages class is certified, the court must find that "the questions of fact and law common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy").

Had the court determined it was not appropriate to certify a class, unrepresented class members

might have lost their chance to recover from defendants for alleged problems with their engine's oil consumption. See *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1041 (N.D. Cal. 2008) ("If the Court were to refuse certification, the unrepresented potential plaintiffs would likely lose their chance at recovery entirely. Even if the Court were to certify the class, there is no guarantee the certification would survive through trial, as Defendants might have sought decertification or modification of the class"). Therefore, the court finds that this factor weighs in favor of approving the proposed settlement. See, e.g., *Aarons*, 2014 WL 4090564 at *11 ("Plaintiffs recognize that they would face significant risks in attempting to certify a litigation class for trial, and would bear the risk of defending certification through trial. Among other things, BMW's argument that CVTs fail for a number of individualized reasons could pose a continuing threat to certification. If the Court determined that decertification was appropriate, absent Class members could very well lose any realistic chance of obtaining a recovery from BMW. Accordingly, the Court finds that this factor weighs in favor of approval of the settlement"); *Browne*, 2010 WL 9499072 at *11 (concluding that the risk of maintaining class action status throughout trial weighed in favor of approving a class action settlement where plaintiffs "faced significant challenges establishing that individualized driving patterns did not affect the brake wear experienced by class members," and it was unclear whether they could satisfy the commonality and predominance requirements of Rule 23).

### d.    The Amount Offered in Settlement

As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n. 2 (2d Cir. 1974)). Estimates of a fair settlement figure are tempered by factors such as the risk of

losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

As noted, defendants have agreed to provide three forms of relief to class members: (1) full reimbursement of out-of-pocket expenses to all current and former owners or lessees who obtained a service adjustment on their class vehicle from an Audi dealer;[130] (2) a free service adjustment for all class members who are current owners or lessees of class vehicles and who have not previously received a service adjustment;[131] and (3) an extended new vehicle limited warranty for all current owners or lessees of class vehicles covering engine repairs by an Audi dealer that are needed to correct engine oil consumption.[132] There is no cap on the amount defendants must pay to provide these forms of relief. They will provide service adjustments and reimbursements for as many class members as are entitled to them under the terms of the settlement and will extend the new vehicle limited warranty for all current owners or lessees. The value of a service adjustment is estimated at $395.29 to $412.95 – the cost to defendants of performing a service adjustment is approximately $395.29, while the average cost, including parts and labor, to consumers is $412.95.[133] Defendants represent that there are approximately 126,168 class vehicles and that, as of January 2015, they have performed an oil consumption service adjustment on 66,285 of the vehicles.[134] Based on these numbers, plaintiffs assert the free service adjustment has a value of approximately $23,671,151.[135]

This calculation, moreover, does not take into account the value of the service adjustment

---

[130]Settlement Agreement, § II.A.

[131]Settlement Agreement, § II.B.

[132]Settlement Agreement, § II.C. The extended warranty covers engine repairs by an authorized Audi dealer that are needed to correct engine oil consumption within the later of: "(i) either eight (8) years or eighty thousand (80,000) miles (whichever occurs first) from the In-Service Date of the Settlement Class Vehicle; or (ii) one (1) year or 12,000 miles (whichever occurs first) from the date the Service Adjustment . . . is performed." (*Id.*)

[133]See Declaration of Colin Johns in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards ("Johns Decl."), Docket No. 159-2 (Feb. 27, 2015), ¶ 17.

[134]*Id.*, ¶¶ 14-16.

[135]59,883 class vehicles x $395.29 = $23,671,151.

reimbursements or the extended warranty.[136] When these forms of relief are considered, it is likely that the actual value of the settlement is in fact higher.   Indeed, although it is unclear how many class members paid for a service adjustment out-of-pocket, rather than having defendants provide it under warranty and free of charge, it is reasonable to believe that the owners of some percentage of the 66,285 class vehicles that have received a service adjustment will be eligible for reimbursement.  Assuming only ten percent of service adjustments already performed are eligible for reimbursement, the total value of the settlement would increase by $2,737,032.60.[137]   By any measure, the settlement agreement provides substantial benefits to the class.

Although plaintiffs did not achieve all of the relief they sought in their complaint, as the fourth amended complaint also sought statutory damages and punitive damages, and "full restitution to [p]laintiffs and [c]lass [m]embers" of the sale price of their class vehicles,[138] the provision of free service adjustments and an extended warranty covering further engine repairs provides the primary forms of relief sought.[139]   Moreover, the reimbursement remedy will fully compensate class members who previously paid for a service adjustment addressing the alleged oil consumption defect.   While it is possible that going to trial might have resulted in additional compensation for class members in the form of statutory and punitive damages, plaintiffs and the class might well have recovered less – or nothing at all.   The settlement offers guaranteed recovery for eligible class members without the risk of further expense or litigation.

Defendants, moreover, have already begun to perform service adjustments and reimburse eligible class members.  Defendants have performed nearly 6,000 service adjustments as of April 18, 2015, and the claims administrator reports that, as of April 24, 2015, it has received over 1,700 claims for

---

[136]Johns Decl., ¶¶ 19-22.

[137](66,285 service adjustments x .10) x $412.95.

[138]See FAC at 30-31.

[139]*Id.*

reimbursement.[140]  Those class members eligible for reimbursement will receive a check from the claims administrator by the later of seventy-five days following receipt of their claim or sixty days following entry of a final judgment approving the settlement agreement;[141] service adjustments must be provided within ninety days after the class member contacts Audi to make an appointment;[142] and the extended warranty applies immediately to all eligible vehicles.[143]  The immediacy of the relief afforded by the settlement eliminates the possibility that class members might have to wait years to receive compensation.  The claims process, moreover, is fairly straightforward.  Class members need only bring their vehicle to an Audi dealer and provide appropriate documentation to receive a free service adjustment.  Similarly, class members seeking reimbursement need only complete a claim form and provide appropriate documentation.  This procedure eliminates the need for each class member to adduce evidence of actual damage following a finding of liability.

Although former owners and lessees of class vehicles may receive only limited benefits under the settlement agreement – as the service adjustment and extended warranty are limited to current owners and lessees – the fact alone does not compel the conclusion that the settlement agreement provides insubstantial benefits to the class as a whole.  While some former owners[144] disagree with the terms of the agreement because it does not provide compensation to former owners for diminution in the value of their vehicles or incidental expenses – i.e., buying additional oil – the fact that plaintiffs were not able to secure all relief prayed for in their complaint and that some class members may not directly benefit under the settlement agreement does not compel a finding that a settlement is unfair.  See, e.g., *Milligan*, 2012 WL 10277179 at *6 ("In addition, because prior owners and lessees receive no benefit from the agreed-upon warranty extension, the only concrete benefits provided by the settlement are: (1) reimbursement for out-of-pocket repair expenses incurred by prior owners and lessees

---

[140]Second Lurie Supp. Decl., ¶ 3; Eisert Decl., ¶ 12.

[141]Settlement Agreement, § III.A.1.

[142]Settlement Agreement, § II. B.

[143]Settlement Agreement, § II.C.

[144]This is discussed further in addressing the reaction of class members to the settlement.

1    (current owners and lessees were covered by the CARB MOU), and (2) certain procedural protections,

2    including the appeals process overseen by the class administrator, attendant to the settlement process.

3    That said, to the extent that the benefits of the proposed settlement agreement are overshadowed by the

4    preexisting CARB MOU, the representative parties certainly bear no fault.   Toyota entered into

5    negotiations with CARB after plaintiffs[ ] filed this action, and without plaintiffs' immediate knowledge.

6    Recognizing these significant limitations on the value conferred by the settlement on the class, it is

7    nonetheless clear that the settlement represents a fair, reasonable, and adequate resolution of the class'

8    claims. As plaintiffs' counsel emphasizes, if the settlement were rejected and litigation were to proceed,

9    the case could take years to resolve, and to an uncertain end").

10   Indeed, "[s]ettlement is a *compromise*, which balances the possible recovery against the risks

11   inherent in litigating further.  The possibility that the [s]ettlement does not provide for a payout to every

12   conceivable [class member] who in some way may have been affected by the [purported defect] does

13   not establish that the [s]ettlement is unfair or unreasonable."   *In re TD Ameritrade Account Holder*

14   *Litigation*, Nos. C 07-2852 SBA, C 07-4903 SBA, 2011 WL 4079226, *9 (N.D. Cal. Sept. 13, 2011)

15   (emphasis original).

16   The compensation and benefits contemplated by the settlement represent a compromise reached

17   following extensive arms-length negotiation, and take into account the risks the class faced.  For these

18   reasons, the court finds that the settlement amount is fair and adequate, and will provide more immediate

19   relief to the class than continuing the litigation.  See *In re Mego Financial Corp. Securities Litigation*,

20   213 F.3d at 459 (holding that, given the difficulties inherent in complex securities litigation, one-sixth

21   of the potential recovery was fair and adequate); *Officers for Justice*, 688 F.2d at 628 ("It is well-settled

22   law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render

23   the settlement inadequate or unfair"); *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL

24   346417, *9 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not

25   obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties,

26   risks, and costs that come with litigating a case to trial").  The court therefore finds that this factor

27   weighs in favor of approving the settlement.

28

          **e.**      **The Stage of the Proceedings and Extent of Discovery Completed**

"'The extent of discovery may be relevant in determining the adequacy of the parties' knowledge of the case.'" *NRTC*, 221 F.R.D. at 527 (quoting MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42 (1995)). "'A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case.'" *Id.* (quoting 5 W. Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d ed.)). The more the discovery completed, the more likely it is that the parties have "'a clear view of the strengths and weaknesses of their cases.'" *Young*, 2007 WL 951821 at *4 (quoting *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985)).

The parties admittedly engaged in settlement negotiations early in the litigation. Plaintiffs' counsel state, however, that they expended significant time investigating the nature of the oil consumption defect that allegedly exists in class vehicles, as well as the extent of damages class members suffered as a result of the purported defect.[145] Prior to filing the actions, plaintiffs' counsel solicited inquiries from prospective class members, and reviewed and corresponded with them.[146] They also retained and consulted automotive experts; researched publicly available materials and information provided by NHTSA concerning consumer complaints regarding oil consumption issues affecting the class vehicles; reviewed and researched consumer complaints and discussions about the oil consumption defect in online articles and forums; reviewed manuals and technical service bulletins; and conducted research concerning the claims that might be asserted on behalf of the class.[147] After filing the actions, counsel continued to investigate the alleged defect. They hired experts to conduct tests on a class vehicle related to the purported defect.[148] They also propounded substantial discovery. They received and reviewed more than over 80,000 lines of warranty claims data, and more than 100,000 pages of

---

[145]Shahian Decl., ¶¶ 17-19; Lurie Decl., ¶¶ 2-5.

[146]Shahian Decl., ¶ 17; Margarian Decl., ¶¶ 8-9.

[147]Shahian Decl., ¶ 17

[148]*Id.*, ¶ 19; Lurie Decl., ¶ 3.

1 documents. They also deposed defendants' corporate representative in New York City.[149]

2 While the parties did not take many depositions, "[i]n the context of class action settlements,

3 'formal discovery is not a necessary ticket to the bargaining table' whe[n] the parties have sufficient

4 information to make an informed decision about settlement." *In re Mego Financial Corp.*, 213 F.3d at

5 459 (quoting *Linney*, 151 F.3d at 1239). Here, the evidence reflects that the parties worked to identify

6 and confirm the technical issues surrounding the alleged oil consumption defect in the class vehicles.

7 "Class counsel investigated and also conducted formal discovery. The court therefore concludes that

8 counsel had sufficient information to make an informed decision about the adequacy of the settlement.

9 This factor, therefore, also weighs in favor of approval of the parties' agreement." *Browne*, 2010 WL

10 9499072 at *14.

### f. The Presence of a Governmental Participant

12 This factor does not apply because no government entity participated in this case. The court

13 notes, however, that despite notice of the settlement to relevant federal and state authorities as required

14 by the Class Action Fairness Act, 28 U.S.C. § 1715, none objected to the settlement or submitted

15 adverse comments concerning it. If the court were to consider this factor, therefore, it would conclude

16 that it favored a finding that the settlement is fair and reasonable. See *Browning v. Yahoo! Inc.*, No. C

17 04-01463 HRL, 2007 WL 4105971, *12 (N.D. Cal. Nov. 16, 2007) ("Because numerous governmental

18 agencies . . . were given notice of the settlement and have not objected, this factor weighs in favor of

19 the settlement").

### g. The Experience and Views of Counsel

21 "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."

22 *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations omitted). "Parties represented

23 by competent counsel are better positioned than courts to produce a settlement that fairly reflects each

24 party's expected outcome in litigation." *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 378

25 (9th Cir. 1995).

26 The class is represented by co-lead counsel, Payam Shahian of Strategic Legal Practices, APC

27

28 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[149]Shahian Decl., ¶¶ 18-19; Lurie Decl., ¶¶ 4-5.

and Jordan L. Lurie and Rebecca Labat of Capstone Law APC.[150]  Lead counsel have significant experience litigating consumer class actions, including actions against auto industry defendants.[151]  Together, the attorneys have negotiated more than forty court-approved class settlements.[152]  Lead class counsel recommend the settlement without reservation, asserting that it provides fair compensation to the class that would likely not improve if further litigation ensured.[153]  The recommendation of experienced class counsel weighs in favor of approval.  See *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008).  Counsel's recommendation, however, must be evaluated in light of "their obvious pecuniary interest in seeing the settlement approved."  *Young*, 2007 WL 951821 at *5.  Consequently, while this factor favors approval, the court accords it little weight.

### h.    Class Members' Reaction to the Proposed Settlement

All of the named plaintiffs support the settlement.[154]  To gauge the reaction of other class members, it is appropriate to evaluate the number of requests for exclusion, as well as the objections submitted.  See *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors," quoting *Pallas v. Pacific Bell*,

---

[150]The class is also represented by Edward W. Choi of Choi & Associates, PC; Larry W. Lee of Diversity Law Group, P.C.; Hovanes Margarian of The Margarian Law Firm; Dara Tabesh of EcoTech Law Group P.C.; and Mark Yablonovich of the Law Offices of Mark Yablonovich.

[151]Shahian Decl., ¶¶ 5-9; Declaration of Rebecca Labat in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Attorneys' Fees, Expenses, and Costs ("Labat Decl."), Docket No. 158-4 (Feb. 27, 2015), ¶¶ 4-8.

[152]Shahian Decl., ¶ 6; Labat Decl., ¶ 6.

[153]Shahian Decl., ¶ 30; Lurie Decl., ¶ 10.

[154]See Declaration of Ali Ashgari in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Asghari Fee Decl."), Docket No. 159-10 (Feb. 27, 2015), ¶¶ 5-10; Declaration of Ara Dersarkissian in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Dersarkissian Fee. Decl."), Docket No. 159-11 (Feb. 27, 2015), ¶¶ 10-13; Declaration of Daniel Tran in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Tran Fee Decl."), Docket No. 159-12 (Feb. 27, 2015), ¶¶ 7-10; Declaration of Katrina Noble in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Noble Fee Decl."), Docket No. 159-13 (Feb. 27, 2015), ¶¶ 7-10; Declaration of Yung Kim in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Kim Fee Decl."), Docket No. 159-14 (Feb. 27, 2015), ¶¶ 7-10.

No. C-89-2373 DLJ, 1999 WL 1209495, *6 (N.D. Cal. July 13, 1999) ("The greater the number of objectors, the heavier the burden on the proponents of settlement to prove fairness")).

The claims administrator mailed information concerning the proposed settlement to the last known address of 229,851 purchasers and lessees of class vehicles on January 28, 2015; it notified class members that they had until March 23, 2015, to opt out of the proposed class or object to the proposed settlement.[155] Rust received 326 undeliverable class notices with a forwarding address and immediately forwarded notices to the new addresses.[156] It also received 10,181 undeliverable notices with no forwarding address.[157] After performing an advanced address search to locate a new address for the class members, Rust remailed 5,581 of these notices to an updated address; only 398 have been returned as undeliverable  Thus, a total of 224,853 class notices were mailed and not returned.

By March 23, 2015 – the deadline to opt out of the settlement or to postmark an objection – the claims administrator had received 395 valid opt-out requests and 15 objections.[158] The 395 opt-outs represent 0.0017 percent of eligible class members (or 0.0018 percent of class members who received notice packets that were not returned).  The 15 objectors represent 0.000065 percent of eligible class members (or 0.000066 percent those who received notice packets that was not returned).  The comparatively low number of opt-outs and objectors indicates that generally, class members favor the proposed settlement and find it fair.  Cf. *Garner v. State Farm Mut. Auto. Ins*., No. CV 08 1365 CW (EMC), 2010 WL 1687832, *15 (N.D. Cal. April 22, 2010) (an opt-out rate of 0.4 percent supported "the

---

[155]Lurie Decl., ¶ 11; Lurie Supp. Decl., ¶ 2 n. 1.

[156]Declaration of Melissa D. Eisert Re: Mailing of Notice of Pendency and Proposed Settlement of Class Action, Settlement Claim Form, and Request for Exclusion Form to Class Members ("Eisert Decl."), Docket No. 179-1 (Apr. 29, 2015), ¶¶ 5-7.

[157]*Id.*, ¶ 8.

[158]See Declaration of Jordan L. Lurie in Support of Plaintiffs' Response to Objections to Motion for Final Approval of Class Action Settlement and/or Motion for Attorneys' Fees, Expenses, and Incentive Awards, Docket No. 171-4 (Apr. 13, 2015), Exh. 1 ("Cirillo Objection"); Exh. 2 ("Whynot Objection"); Exh. 3 ("King Objection"); Exh. 4 ("Koehn Objection"); Exh. 5 ("Voris Objection"); Exh. 6 ("Bliss Objection"); Exh. 7 ("Boettger Objection"); Exh. 8 ("Onylah Objection"); Exh. 9 ("Salem Objection"); Exh. 10 ("Knott Objection"); Exh. 11 ("Garg Objection"); Exh. 12 ("Jordan Objection"); Exh. 13 ("Ritchey Objection"); Exh. 14 ("Hammett Objection"); see also Ghozland Objection.

fairness of the Settlement"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill.2001) (finding that an opt-out rate of 0.10614 percent and an objection rate of 0.0052 percent represented "overwhelming support" for the settlement and "strong circumstantial evidence supporting the fairness of the Settlement").  See also *Churchill Village*, 361 F.3d at 577 (affirming approval of a class settlement where 90,000 class members received notice, and 45 objections were received); *In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 175 (S.D.N.Y. 2000) (finding a small number of objectors "indicative of the adequacy of the settlement").

Moreover, the claims administrator has received more than 1,700 claims for reimbursement – approximately 3 percent of the current and former owners and lessees potentially eligible to receive a reimbursement.  Defendants have performed 5,974 service adjustments – this represents approximately 10 percent of class members eligible for a free service adjustment.[159]  These facts, and the comparatively low rate of opt-outs and objectors, indicate that class members have reacted positively to the settlement. See *Browne*, 2010 WL 9499072, *14 ("The fact that 5 percent of class members have already submitted claims for compensation, and the comparatively low rate of opt-outs and objectors indicate that class members have reacted positively to the settlement," citing *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 967 (9th Cir. 2009)).

When considering class members' objections, however, the district court must evaluate the reasons they identify for objection, as this bears on whether the proposed settlement is unfair.  See *Bennett v. Behring Corp.*, 737 F.2d 982, 988 (11th Cir. 1984) (affirming approval of a class settlement despite significant objections by class members because "the reasons for that opposition [were] thoroughly considered and ultimately rejected by the district court"); *Californians for Disability Rights, Inc. v. Cal. DOT*, No. C 06–5125 SBA, 2010 WL 2228531, *2 (N.D. Cal. June 2, 2010) ("If objections are filed, the district court is to evaluate whether they suggest serious reasons why the settlement proposal might be unfair"); *Boyle v. Arnold–Williams*, No. C01–5687JKA, 2006 U.S. DIST. LEXIS 91920, *10–11 (W.D. Wash. Dec. 20, 2006) ("T]he fact that there is opposition does not necessitate

---

[159]Class counsel notes that 59,883 class vehicles had not received a service adjustment as of the notice date.  (See Second Lurie Supp. Decl., ¶ 2.)

1   disapproval of the settlement.  Instead, the court must independently evaluate whether the objections

2   being raised suggest serious reasons why the proposal might be unfair").

3       The objectors in this case make a number of arguments that fall into four primary categories:

4   (1) that the settlement does not provide sufficient benefits; (2) that the limited warranty extension is

5   inadequate; (3) that the documentary requirements for obtaining settlement benefits are unreasonable;

6   and (4) that the attorneys' fees sought by class counsel are unreasonable.  The court considers each

7   objection in turn.

8               **(1)       Adequacy of Settlement Benefits**

9       The majority of the objections – seven of fifteen – challenge the adequacy of the benefits

10  provided under the settlement.  The crux of these objections is that the settlement agreement does not

11  provide sufficient relief to make the class members "whole."  Specifically, the objectors argue that: (1)

12  the settlement agreement should take into account and provide compensation for the diminution in value

13  of class vehicles attributable to the oil consumption defect;[160] and (2) the settlement agreement does not

14  provide for reimbursement of certain incidental damages, including out-of-pocket expenses to purchase

15  additional oil between oil changes.[161]

16

17      [160]See Knott Objection at 1; Ghozland Objection at 1, 6-8; Salem Objection at 1.  The parties
18  contend that Ghozland's objection is procedurally defective because he failed to attach sufficient proof
    that he owned/leased a class vehicle as required by the court-approved notice.  (See Pl.'s Response at
19  5-6; Def.'s Response at 8 n. 5; see also Settlement Agreement, § V.I.B.)  Specifically, they note that
    Ghozland attached only a service invoice from an Audi dealership, which is insufficient under the terms
20  of the settlement agreement to show proof of ownership.  (See id.)  Class counsel also assert that
    Ghozland did not receive class notice; instead, notice was sent to his wife, Jennifer Ghozland, who has
21  not objected to the settlement.  (Lurie Supp. Decl., ¶ 18.)

22      In reply, Ghozland attached a lease agreement that shows he and his wife were joint lessees of
    a class vehicle.  (See Declaration of Objector Michael F. Ghozland in Support of Motion for
23  Intervention ("Ghozland Reply Decl."), Docket No. 175-10 (Apr. 20, 2015), Exh. A.)  After reviewing
    Ghozland's declaration and the lease agreement attached thereto, the court is satisfied that Ghozland is
24  a member of the class and may properly object to the proposed settlement, notwithstanding plaintiffs'
    objection to his standing.  (Plaintiffs' Evidentiary Objections to Michael Ghozland's Reply in Support
25  of Motion to Intervene, Docket No. 177 (Apr. 29, 2015).)

26      [161]See King Objection at 1; Knott Objection at 1; Onyiah Objection at 1; Jordan Objection at 1;
27  Ghozland Objection at 1, 6-8; Ritchey Objection at 1; Salem Objection at 1.  In addition to these
    objections, Ghozland also argues that the named plaintiffs are inadequate class representatives.
28  (Ghozland Objection at 8-10.)  He contends that because none of the named plaintiffs are former owners

As an initial matter, the mere fact that the benefits provided under the settlement agreement will not make all class members "whole," and/or the possibility that a "better" settlement might have been reached, do not provide a sufficient basis upon which to conclude that the settlement agreement is unfair.  See, e.g., *Hanlon*, 150 F.3d at 1027 ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better.  But this possibility does not mean the settlement presented was not fair, reasonable or adequate.  Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"); *Browne*, 2010 WL 9499072 at *18 ("While the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any . . . settlement of the claims of a class of more than 740,000 members would achieve such a result.  Despite the reasonable concerns raised by the objectors, the settlement represents a compromise that fairly compensates class members who chose to remain in the class"); *Glass*, 2007 WL 221862 at *6 ("Settlements by their very nature are not intended to provide full compensation for the claimed losses and consequently cannot be calculated with the same precision as actual damages"); see also *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) ("As our precedents have made clear, whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court" (citation omitted))..

The court disagrees with the objectors' first argument – that the settlement is unfair because it does not compensate class members for the diminution in value of the vehicles attributable to the purported oil consumption defect.  As plaintiffs' note in their response,[162] diminution in value damages pose great difficulties in a class action context, particularly when considering the challenge of proving such damages on a classwide basis.  Plaintiffs assert that, although they sought such damages in the complaint, they abandoned their effort to obtain them during protracted negotiations with defendants, particularly given the difficulties that a prayer for such damages posed at the class certification and trial

---

or lessees of a class vehicle, they are inadequate to represent former owners or lessees who are members of the class.  (*Id.*)  This argument is identical to an argument raised in his motion to intervene (see MTI at 5-7), and, as discussed *infra*, the court finds it unavailing.

[162]Pl.'s Response at 12-13.

stages.[163]  Considering the attendant difficulty of proving and recovering such damages on a classwide basis, the court believes plaintiffs' decision not to pursue such damages as part of the settlement was neither unfair nor unreasonable.[164]  See, e.g., *Aarons*, 2014 WL 4090564 at *13 ("Finally, the Court is not persuaded by objections that the settlement does not compensate owners who did not repair or replace their CVTs, and did not sell their vehicles.  Owners or lessors who have not paid to fix their CVTs and who have not sold their vehicles would likely find it difficult to prove their damages without resorting to speculation.  To the extent those individuals believe the settlement is unfair, they could have opted out of the Class" (citation omitted)); *Eisen v. Porsche Cars of North America, Inc.*, No. 2:11-cv-09405-CAS (FFMx), 2014 WL 439006, *8 (C.D. Cal. Jan. 30, 2014) ("Some objectors assert that the settlement should provide compensation for the alleged diminished value of vehicles as a result of the risk of future IMS-related damage.  They assert that the resale value of their vehicles must have been negatively impacted by the fact that certain owners had experienced IMS-related damage and others may in the future.  A few objectors, including Ms. Weitzner, also assert that former owners allegedly received depressed prices because the IMS issue was known at the time of resale.  These objectors have not taken into account the difficulties of establishing classwide diminution in value damages in light of the twelve-year vehicle in-service period (as exists here), with owners buying and selling different [vehicles] at different times and in different circumstances.  Although some class settlements have provided compensation for diminished value, courts have rejected the notion that class action settlements must provide compensation for diminished value.  Here, there is no expert testimony or other evidence showing that publicity about the alleged defect resulted in any diminished resale value.

---

[163]*Id.*

[164]Objectors' own submissions underscore this.  None of the objectors who contends the settlement should compensate class members for diminution in value damages proffers evidence that he or she sold a class vehicle for less than market value.  Instead, objectors simply assume that the value of their vehicle had diminished by the time it was resold.  Speculation, however, is not sufficient.  See, e.g., *In re Imprelis Herbicide Marketing*, 296 F.R.D. 351, 368 (E.D. Pa. 2013) (finding unpersuasive an objection that a settlement failed fairly to compensate former owners because the objectors failed to adduce evidence that they had suffered a loss in property value).  Further exemplifying the difficulty of proving such damages on a classwide basis, both Asghari and Dersarkissian suffered no diminution in value; rather, they sold their vehicles, which purportedly had the oil consumption defect, for a profit.  (See Asghari Supp. Decl., ¶¶ 6-7; Dersarkissian Supp. Decl., ¶¶ 6-7.)

Class[wide] evidence of diminished value cannot be shown based on anecdotal claims of the experiences of individual class members.  It is therefore reasonable to decline to provide compensation for diminished value" (citations omitted)); *Vaughn v. American Honda Motor Co.*, 627 F.Supp.2d 738, 749 (E.D. Tex. 2007) ("It does not make the settlement unfair or unreasonable that the class has to release speculative claims for diminution in value").

The remaining objections – that the settlement is unfair because it does not provide compensation for incidental damages related to the purported oil consumption defect –[165] the court finds it similarly unpersuasive.  In their response to the objections, plaintiffs assert that "compensating [c]lass [m]embers for extra oil purchasers would be [a form of relief that would be] highly impractical to administer" given the need to require proof of oil purchases and the fact that other conditions unrelated to the purported defect might make it difficult for class members to prove that the oil purchases were caused by the defect.[166]  The court agrees.  The objectors who seek incidental damages for extra oil purchases fail to appreciate the challenges inherent in obtaining such relief.  Apart from the individualized proof required to compensate class members for purchases of extra oil, the class members would have demonstrate that they had to purchase extra oil because of the purported defect and not because of such things as their driving habits, weather conditions, the car's load, and/or normal maintenance of the vehicle.[167]  Class members would also have to show that such damages are not precluded by VW Group's express warranty, which disclaims any obligation to reimburse such damages.[168]  Recognizing the impact such damages might have on class certification and the difficulty of proving them following trial, class counsel opted to negotiate compensation for actual repairs and

---

[165]See King Objection at 1; Knott Objection at 1; Onyiah Objection at 1; Jordan Objection at 1; Ghozland Objection at 1; Ritchey Objection at 1; Salem Objection at 1

[166]Pl.'s Response at 15-17.

[167]*Id.* at 16; see also Declaration of Robert A. Arturi in Support of Defendants' Memorandum of Law in Response to Objections to Plaintiffs' Motion for Final Approval of the Proposed Settlement ("Arturi Decl."), Docket No. 169-1 (Apr. 13, 2015), ¶ 7.

[168]See Lurie Decl., ¶ 17; *id.*, Exh. 15 at 8.

other "concrete, provable costs."[169]  Given counsel's strategic concerns and the extensive arms-length

negotiation of the settlement, the court concludes that neither it nor the objectors should "substitute

[their] own judgment for that of the parties who were [the] ones engaging in the negotiations."  *In re*

*Netflix Privacy Litigation*, No. 5:11–CV–00379 EJD, 2013 WL 1120801, *12 (N.D. Cal. Mar. 18, 2013).

Given the substantial benefits achieved for the class, directed at addressing and repairing the purported

defect, and given that they were achieved after vigorous litigation and negotiation, the court cannot say

that the failure to provide reimbursement for incidental damages raises serious concerns regarding the

fairness of the settlement.[170]  The court therefore overrules these objections.[171]

---

[169]Pl.'s Response at 16-17.

[170]To the extent objectors contend that the settlement deprived them of benefits because it does
not provide for reimbursement of these expenses, they "could have simply opted out of the settlement."
*Milligan*, 2012 WL 10277179 at *7 ("The settlement also does not provide compensatory damages for
those class members who suffered incidental losses, in the form of a replacement vehicle or the loss of
employment.  Objectors who raised these concerns could have simply opted out of the settlement").

[171]At the hearing, Ghozland appeared through counsel and reiterated the arguments set forth in
his written objection to the settlement agreement; these have been discussed above.  For the reasons
stated, the court finds Ghozland's contention that the class action settlement is inadequate because it
does not provide compensation for out-of-pocket expenses class members incurred to purchase
replacement oil and for diminution in value caused by the alleged oil consumption defect unpersuasive.
The court offers two additional observations, however.  First, at the hearing, Ghozland's attorney argued
at length that the purported "subclass" of former owners and lessees who did not incur out-of-pocket
expenses associated with a service adjustment was "sizeable" and constituted approximately half of the
estimated 229,000 class members.  When asked whether Ghozland had evidence of this, his lawyer
conceded he did not.  The settling parties likewise do not know how many class members fall within the
purported subclass.  The size of the "subclass," however, is highly relevant in evaluating whether
Ghozland has raised a serious objection that undermines the fairness of the settlement.  Indeed, his
lawyer admitted at the hearing that if the subclass is not large, the fact that the settlement does not call
for the payment of diminution in value damages or for reimbursement of the cost of replacement oil
would not render it unfair.  There is simply no credible evidence that the settlement agreement provides
no benefit to 100,000 class members; indeed, the only *evidence* supporting Ghozland's objection is the
fact that *one class member* who is within the purported subclass – Cirillo – objected to the settlement.
While Ghozland asserted that the settling parties adduced no evidence regarding the size of the subclass,
he did not argue that he asked class counsel or defendants to provide such information.  "Keeping in
mind that objectors to a class action settlement bear the burden of proving any assertions they raise
challenging the reasonableness of a class action settlement," *In re Google Referrer Header Privacy
Litigation*, __ F.Supp.3d __, 2015 WL 1520475, *11 (N.D. Cal. Mar. 31, 2015) (citing *United States v.
Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) ("In this circuit, we have usually imposed the burden on the
party objecting to a class action settlement.  Likewise, other circuits have held that once the court is

### (2)   Adequacy of the Limited Warranty Extension

Four members of the settlement class – Lars Boettger, William Hammett, Deborah Bliss, and Anthony Cirillo – object to the terms of extended limited warranty provision.[172]  Boettger and Hammett each own a class vehicle that currently has more than 80,000 miles; they object because they believe they will not be entitled to a limited warranty extension.[173]  This, however, does not appear to be the case.  As defendants and plaintiffs note in their respective responses,[174] as of notice date, neither Boettger nor Hammett had received a service adjustment by an Audi dealer.  Under the terms of the settlement, they will not only be entitled to a service adjustment performed free of charge by an authorized Audi dealer, but will also be entitled to an extended limited warranty for one year or 12,000 miles following the date of the service adjustment.[175]  Far from being denied an extended limited warranty, therefore, both Boettger and Hammett will be able to obtain a service adjustment following by an extended limited warranty.

---

satisfied that the decree was the product of good faith, arms-length negotiations, a negotiated decree is presumptively valid and the objecting party 'has a heavy burden of demonstrating that the decree is unreasonable,'" citing *Moore v. City of San Jose*, 615 F.2d 1265, 1272 (9th Cir. 1980))), the court concludes that Ghozland did not satisfy this burden as he proffered only speculative assertions concerning the size of the subclass.

Second, Ghozland argued that the settlement impermissibly excluded a subset of class members from obtaining any relief.  Putting aside Ghozland's failure to proffer any evidence regarding the size of the purported subclass, the settlement does *not*, by its terms, exclude any group of class members or preclude them from receiving benefits.  As defense counsel noted at the hearing, the settlement provides that class members purportedly in the subclass – i.e., former owners and lessees – can obtain full reimbursement of out-of-pocket expenses they incurred to obtain a service adjustment. While it is likely that some class members are in Ghozland's position – in that they received a free service adjustment – the fact that they will not receive compensation does not render the settlement agreement unfair.  Class members like Ghozland received the main relief provided by the settlement, i.e., a service adjustment, while their vehicles were under warranty.  The fact that they will not now be reimbursed for out-of-pocket oil replacement expenses or purported diminution in value does not render the settlement unfair given difficulties associated with proving the amount of such damages.

[172]Cirillo Objection at 1; Boettger Objection at 1; Hammett Objection at 1; Bliss Objection at 1.

[173]Boettger Objection at 2; Hammett Objection at 1-2.

[174]Pl.'s Response at 20-21; Def.'s Response at 19-20.

[175]Settlement Agreement, § II.C.

Deborah Bliss objects that it is unclear what vehicle repairs will be covered by the extended limited warranty.  As plaintiffs note,[176] however, the settlement agreement specifies what repairs the extended limited warranty covers.  It states that the extended warranty will cover "engine repairs needed to correct engine [o]il [c]onsumption" and "any oil consumption tests performed by Audi dealers."[177] Although Bliss would prefer greater detail as to the specific type of repairs that will be covered,[178] given the technical complexity of the purported defect and the automotive parts involved, it is not unreasonable to use a general definition to explain the coverage of the extended warranty.  "Audi dealerships are [certainly] capable of diagnosis and repair" and can identify repairs that are related to an oil consumption defect.  See *Sadowska v. Volkswagen Group of America, Inc.*, No. CV 11-00665-BRO (AGRx), 2013 WL 9600948, *6 n. 7 (C.D. Cal. Sept. 25, 2013).  If Bliss has concerns, she can question the Audi dealer before having the repairs made.

Finally, Anthony Cirillo notes that he received a service adjustment in July 2013 and that his odometer shows he has driven the car 97,000 miles; this places the vehicle outside the extended warranty period specified in the settlement agreement.[179]  While it thus appears that Cirillo will receive no benefit from the settlement agreement, the fact that some class members will not obtain relief does not compel the conclusion that the settlement is unreasonable or unfair.  "[S]ettlement involves some line-drawing, and 'full compensation is not a prerequisite for a fair settlement.'"  *Milligan*, 2012 WL 10277179 at *7 (citing *Dewey v. Volkswagen of America*, 728 F.Supp.2d 546, 579 (D.N.J. 2010)).

To the extent Cirillo believes the settlement does not adequately address his individual situation, he could have opted out.  See, e.g., *Aarons*, 2014 WL 4090564 at *12 ("The Court is also not moved by the objections to the reimbursement rates provided by the settlement, or by the objections that BMW should be required to recall and repair all affected Class Vehicles.  The Court is conscious that the

---

[176]Pl.'s Response at 21-22.

[177]Settlement Agreement, § II.C.

[178]Bliss Objection at 1 ("The settlement states that Audi will extend the warranty to 8 years/80,000 miles, but there is no specific description as to what is warranted").

[179]Cirillo Objection at 1.

settlement will not make most Class members completely whole.  But that is the nature of a settlement.  BMW denies any liability, but will nonetheless pay millions of dollars to Class members.  In turn, the Class members will discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation"); see also *Milligan*, 2012 WL 10277179 at *7 ("Admittedly, the settlement provides no benefit to those who lost or sold their vehicle – even if they can document the ECM failure and the sale or trade-in price.  The settlement also does not provide compensatory damages for those class members who suffered incidental losses, in the form of a replacement vehicle or the loss of employment.  Objectors who raised these concerns could have simply opted out of the settlement").

In sum, the court concludes that the objections regarding the extended limited warranty do not raise serious concerns about the fairness of the settlement.

### (3)     Documentation Requirements for Settlement Benefits

Two class members object to settlement terms that require class members to document their compliance with the oil maintenance schedule set forth in the warranty maintenance booklet and owner's manual.[180]  Boettger contends the requirement is prejudicial to owners of used class vehicles because they cannot document the prior vehicle owner's compliance with the oil maintenance schedule.  As plaintiffs note,[181] however, the settlement does not require that class members proffer evidence that a prior owner maintained the vehicle in the manner set forth in the manuals.  It merely requires a class member seeking a service adjustment or extended warranty service demonstrate that *he or she* has complied with the maintenance requirements.[182]

More fundamentally, courts frequently approve settlements that require class members to submit receipts or other documentation; they conclude such a requirement is reasonable and fair given the defendant's need to avoid fraudulent claims.  See e.g., *Browne*, 2010 WL 9499072 at *5 (approving a settlement that required class members to submit a receipt or other documentation reflecting out-of-

---

[180]Salem Objection at 2; Boettger Objection at 2-3.

[181]Pl.'s Response at 22.

[182]Settlement Agreement, § II.B.

pocket costs to the claims administrator); *In re Lawnmower Engine Horsepower Mktg & Sales Practices Litig.*, 733 F.Supp.2d 997, 1010 (E.D. Wis. 2010) (finding a requirement that class members seeking reimbursement include the serial number of their lawnmower and lawnmower engine on their claim form reasonable, despite the fact that it presented a difficulty for some class members, because it was necessary to prevent fraudulent claims). The court does not find requiring proof of compliance with the oil maintenance schedule unduly burdensome. Indeed, dealerships and service centers routinely maintain such records; thus, to the extent that class members do not have an invoice in their possession, it is likely that they would be able to secure such documentation. For these reasons, the court concludes that these objections also do not raise serious concerns regarding the fairness of the settlement.

### (4)    Class Counsel's Attorneys' Fees and Expenses

Finally, several objectors take issue with the amount of attorneys' fees and expenses – up to $2.4 million – defendants have agreed to pay in the settlement agreement.[183] The objections, however, do not articulate why the requested fees are excessive or unreasonable; this is true notwithstanding the fact that once plaintiffs' counsel filed their fee motion on February 27, 2015, Rust posted it on the settlement website. Instead, the objectors conclusorily assert that the fees are too high as compared to the benefits class members will receive.[184]

The generalized objections ignore the fact that, while individual recoveries by the more than 229,000 class members may not be substantial, the total value of the settlement is significant. As discussed, the estimated value of the free service adjustments – which is only one of three types of relief afforded the class – is more than $20 million. The objectors request that the court "substantially reduce"

---

[183]See Voris Objection at 1-2; Koehn Objection at 1; King Objection at 1; Jordan Objection at 1.

[184]See, e.g., Koehn Opposition at 1 ("Attorney fees of $2.3 million are truly excessive when only some car owners will benefit (minimally) from the narrowly-defined awards"); Voris Objection at 2 ("This is truly a country by and for the lawyers. In this case, class counsel gets paid an outlandish amount, defense counsel has obviously billed Volkswagen Group of America, and the court is assured of full employment. [The class representatives] get $2,500 (and who knows what else) and the rest of us schmucks get a quart of oil put in our car").

the fees sought;[185] the court must conduct an independent analysis of the reasonableness of the fees guided by Ninth Circuit law. The court undertakes this analysis below. Simply because plaintiffs' counsel secured defendants' agreement to pay up to $2.4 million in fees and costs does not mean that that is the amount the court will award. See, e.g., *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA (WWC), 2012 WL 5392159, *12 (S.D. Cal. Nov. 5, 2012) ("Objectors next challenge the amount of attorneys' fees and aver that 'attorneys fees must be linked to [the] actual value of settlement.' However, Objectors' position ignores that two methods exist for calculating attorneys' fees, and, as discussed below, that the lodestar – rather than the 'percentage of the common fund' – method is the most appropriate in cases like the one at bar. The Objectors further do not acknowledge that, even under the common fund approach – which, again, the Court does not apply here – the Court is not required to compare requested attorneys' fees against the actual settlement payouts"); see also *In re Netflix Privacy Litigation*, 2013 WL 1120801 at *13 ("A sizeable number of Objections challenge the Settlement Agreement's provisions with regard to attorneys' fees for Class Counsel and incentive awards to the Named Plaintiffs and Class Representatives. These objections amount to generalized quarrels with the law regarding such fees and awards in class action settlements, the processes used to calculate such fees, and whether the fees and awards are justified in light of Settlement Agreement. These arguments ignore the well-established Ninth Circuit law regarding attorneys' fees and incentive awards, which have been addressed above. Because the Court has found that the fees and awards are reasonable and proper under the law, these objections are rejected"). To the extent the court concludes that the attorneys' fees and costs sought agreement are unreasonable, it has discretion to adjust the award downward. Given its discretion to adjust attorneys' fees as necessary to ensure that they reflect a reasonable approximation of the effort expended by counsel and the results obtained for the class, the court does not find persuasive objections that the settlement is unfair due to the amount of attorneys' fees sought.

### (5) Conclusion Regarding Class Member Reactions to the Proposed Settlement

The low percentage of opt-outs and objections indicate that class members largely favor the

---

[185]*Id.*

proposed settlement and find it fair.  See *Rodriguez*, 563 F.3d at 967.  For the reasons discussed, moreover, the objections raised by class members do not cause the court to conclude that the settlement is unfair.  While the settlement does not perfectly compensate every member of the class, it is unlikely that any settlement of the claims of a class of more than 225,000 members would achieve such a result. Despite the reasonable concerns raised by the objectors, the settlement represents a compromise that fairly compensates those who chose to remain in the class.  See *Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.  In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.  There was no disparate treatment between class members; all stood to benefit equally, a fact which lessens the likelihood that the named plaintiffs and their attorneys colluded with Chrysler to increase their own recovery at the expense of the unnamed plaintiffs who[m] class counsel had a duty to represent.  No objector stepped forward and suggested that his or her personal claim was being sacrificed for the greater good – and if any thought that was the case, they had the right to opt-out of the class").

### i.   Other Factors

As noted, the *Young* court considered two additional factors: the process by which settlement was achieved and the involvement of the named plaintiffs in that process.  The parties here reached agreement after intensive arms-length negotiations facilitated by a neutral mediator.  The process by which settlement was achieved therefore weighs in favor of approval.

Class counsel do not provide information regarding the named plaintiffs' involvement in the settlement process; they merely proffer statements by the plaintiffs that they reviewed the proposed settlement, discussed it with their attorneys, and agree with it.[186]  As it lacks sufficient information concerning the named plaintiffs' involvement in the settlement process to determine whether this factor weighs in favor of approving the settlement, the court finds it neutral.

---

[186]See Asghari Fee Decl., ¶¶ 5-9; Dersarkissian Fee. Decl., ¶¶ 10-12; Tran Fee Decl., ¶¶ 7-8; Noble Fee Decl., ¶¶ 7-8; Kim Fee Decl., ¶¶ 7-8.

1    **j.**    **Signs of Collusion**

2        The Ninth Circuit has explained that, in addition to evaluating the fairness of the settlement

3    terms, the district court should be watchful for "subtle signs" that class counsel and the class

4    representatives have permitted self-interest to trump their obligation to ensure a fair settlement for the

5    class as a whole. *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir.

6    2011).  In *Bluetooth*, the Ninth Circuit identified three possible signs of collusion:

7            "(1) when the settlement terms result in class counsel receiving a disproportionate share

8            of the settlement, or when the class receives no monetary compensation but counsel

9            receive an ample award of attorneys' fees;

10           (2) the presence of a clear sailing agreement that carries the potential of enabling a

11           defendant to pay class counsel excessive fees and costs in exchange for . . . accepting an

12           unfair settlement; and

13           (3) when the parties arrange for fees not awarded to revert to defendants, rather than

14           being paid into the class fund."

15   *Id.* (citations and quotation marks omitted).  The Ninth Circuit noted that this list is not exclusive, but

16   felt it offered some guidance to lower courts regarding the type of provisions that require "greater

17   scrutiny than ordinarily demanded" in assessing the overall fairness of the settlement.  *Id.* at 949.

18       The first and third signs of collusion are absent in this case.  First, the attorneys' fees sought,

19   while substantial, are not nearly as disproportionate as was the fee award at issue in *In re Bluetooth*.

20   There, "the amount awarded was 83.2% of the total amount defendants were willing to spend to settle

21   the case."  *Id.* at 945.  The agreement here specifies that defendants will not object to a fees and costs

22   award of $2,400,000 or less.[187]  As noted, plaintiffs estimate that the value of service adjustments alone

23   is $23,671,151.[188]  This figure does not include the value of any reimbursements current or former

24   owners or lessees who paid for service adjustments out-of-pocket can obtain,[189] nor does it include the

25   ─────────────

26       [187]Settlement Agreement, § VIII.C.

27       [188]Johns Decl., ¶¶ 15-18.

28       [189]Which, as the court noted *supra*, may exceed $2 million.

value of the extended warranty. Rather, it is based on class counsel's belief that the remaining 59,883

class vehicles will receive a service adjustment. Assuming the value of the settlement is $23.67 million,

class counsel's requested fees and expenses of $2.4 million represents 10.14% of the total value.

Because predictions about defendants' future liability under the settlement are admittedly

uncertain, however, it is possible that the total value of the settlement may be less than $23.67 million.

Because class counsel have not provided any evidence of the number of service adjustments that have

been performed since the dissemination of class notice or how many reimbursement claim forms have

been received, the court cannot extrapolate from such data to approximate the value of the settlement

more exactly. Even if only 75% of those eligible for service adjustments avail themselves of this form

of relief the value of the settlement would be approximately $17.75 million. Counsel's requested fees

and costs represent approximately 13.52% of this total. Similarly, if only 50% of those eligible for the

service adjustments avail themselves of this form of relief, the value of the settlement would be

approximately $11.84 million; the represented fees and costs represent approximately 20.27% of that

total. Class members are also likely to request reimbursement for some of the 66,285 service

adjustments performed to date; this will increase the amount of money defendants are required to pay

class members and decrease the percentage of fees to settlement value. Consequently, the court does

not believe that the fees counsel seek are disproportionate to the benefit class members will receive.

Any fees paid, moreover, will not reduce the settlement amount available to class members. For

this reason as well, the settlement does not present a situation in which the fee award is so

disproportionate to the class's recovery that it suggests collusion. Moreover, as there is no cap on

defendants' liability and defendants will perform service adjustments and provide reimbursements to

eligible class members throughout the claims period, the settlement agreement does not contain a

reversion provision. Consequently, the third sign of collusion is also absent.

The second of the signs of collusion noted in *Bluetooth* is present, however. The settlement

agreement contains an explicit "clear sailing" provision.[190] "In general, a clear sailing agreement is one

where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court

---

[190]Settlement Agreement, § VIII.C.

so long as the award falls beneath a negotiated ceiling." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991).  The parties' agreement states:

> "The parties agree that Class Counsel may apply to the Court for an award of reasonable attorneys' fees up to, but not to exceed, the total combined sum of $2,300,000 . . . and expenses, inclusive of costs, incurred up to, but not to exceed, the total combined sum of $100,000 . . . .  Defendants will not oppose Class Counsel's application for attorneys' fees and expenses up to and not exceeding the above amounts, and Class Counsel may not be awarded, and shall not accept, any amount for attorneys' fees and expenses in excess of the above amounts."[191]

Clear sailing provisions are troubling on several levels.  "[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *In re Bluetooth*, 654 F.3d at 948 (citation omitted)*; see also Malchman v. Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J., concurring) ("It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without obtaining something in return.  That something will normally be at the expense of the plaintiff class"), abrogated on other grounds in *Amchem Products*, 521 U.S. at 619.  "Such a clause deprives the court of the advantages of the adversary process.  The source of the proposed payment renders it improbable that class members will come forward to challenge the reasonableness of the requested fee.  Meanwhile, the payor is bound by contract not to contest the application." *Weinberger*, 925 F.2d at 525.

Here, despite the clear sailing provision, the class stands to receive a large and fair monetary award.  As the Ninth Circuit has noted, moreover, the inference of collusion drawn from a clear sailing provision is reduced when the agreement lacks a reversionary or "kicker provision." *In re Bluetooth*, 654 F.3d at 949 ("For this same reason, a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger of collusion already suggested by a clear sailing provision. . . .  The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees").  The

[191]*Id.*

absence of a "kicker provision" in the parties' settlement agreement reduces the likelihood that plaintiffs and defendants colluded to confer benefits on each other at the expense of class members. The fact that the parties agreed to class relief prior to negotiating attorneys' fees and costs also lessens the likelihood that class counsel bargained away class members' rights in order to increase their fee award.

While clear sailing agreements must be scrutinized to ensure that they do not result in unfair awards of attorneys' fees, see *Weinberger*, 925 F.2d at 523 ("[T]he approval function has routinely been extended to embrace fees, whether or not pre-negotiated, in those cases where the plaintiffs' attorneys are to be paid out of a common fund (and where, consequently, there is an inherent tension between the interests of the class and the interests of the lawyers)"), the court concludes that the clear sailing provision in the agreement does not give rise to an inference of collusion that warrants invalidation of the settlement as a whole. This is particularly true given the fact that there is no common fund and that the payment of attorneys' fees and costs will be separate and apart from the payments to the class members. The court will, however, consider the nature of the attorneys' fees provision in evaluating the reasonableness of the fees sought, to ensure that class members are afforded adequate relief, and that the fees their lawyers receive are proportionate to the value of the class recovery.

### k.      Balancing the Factors

"Ultimately, the district court's determination [concerning the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted). "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.* Having considered the relevant factors, the court concludes that the circumstances surrounding the settlement weigh in favor of a finding that it is fair and adequate. Accordingly, the court approves the settlement.

### C.      Objector Michael Ghozland's Motion to Intervene as of Right

Objector Michael Ghozland argues that he is entitled to intervene as of right to protect the interests of a "subclass" of former owners and lessees of class vehicles who did not pay for a service

adjustment out of pocket.[192]   To intervene as of right under Rule 24(a), a party must claim

[192]MTI at 1.  The parties contend the court should deny Ghozland's motion to intervene because he failed to comply with local rules obligating parties to confer with opposing counsel before filing any motion.  (Pl.'s MTI Opp. at 2; Def.'s MTI Opp. at 12.)  Local Rule 7-3 states, in relevant part, that
> "counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution.  If the proposed motion is one which under the F.R.Civ.P. must be filed within a specified period of time . . . , then this conference shall take place at least five (5) days prior to the last day for filing the motion; otherwise, the conference shall take place at least twenty (10) days prior to the filing of the motion."  Ca CD L.R. 7-3.

Local rules have the 'force of law' and are binding upon the parties and upon the court."  *Professional Programs Group v. Dep't. of Commerce* , 29 F.3d 1349, 1353 (9th Cir. 1994).  The court can deny a motion for failure to meet and confer alone.  See *Cucci v. Edwards*, 510 F.Supp.2d 479, 486 (C.D. Cal. 2007).  The failure to comply with the meet-and-confer requirement in this district, however, does not automatically require denial of a party's motion.  See *ECASH Technologies, Inc. v. Guagliardo*, 35 Fed. Appx. 498, 500 (9th Cir. May 13, 2002) (Unpub. Disp.).  Rather, "the district court has broad discretion to depart from the strict terms of the local rules where it makes sense to do so and substantial rights are not at stake." *Professional Programs Group*, 29 F.3d at 1353.

Plaintiffs and defendants assert that "[a]t no time did [Ghozland] offer to meet and confer with the[m] . . . regarding his Motion to Intervene."  (Pl.'s MTI Opp. at 2; Declaration of Jordan Lurie in Opposition to Objector Michael Ghozland's Motion to Intervene ("Lurie MTI Decl."), Docket No. 170-1 (Apr. 13, 2015), ¶ 8; see also Def.'s MTI Opp. at 12 ("Finally, we note that the movant has failed to 'meet and confer' before filing this Motion, in violation of the applicable local rules governing motion practice").)  Ghozland counters that, although he did not seek a formal conference under Rule 7-3 before filing his motion, he made plaintiffs and defendants aware far in advance of filing the motion of the issues it raises, i.e., the settlement's alleged failure to provide any relief to subclass members.  (MTI Reply at 14-15.)  In support, he proffers the declaration of his attorney, Sean K. Collins.  (See Declaration of Sean K. Collins in Further Support of Motion to Intervene ("Collins MTI Reply Decl."), Docket No. 175-1 (Apr. 20, 2015).)  Collins explains that, after intermittently speaking with class counsel in the summer of 2014, he had a telephonic conference with them on October 21, 2014.  (Collins MTI Reply Decl., ¶¶ 5-6.)  During the conference, Collins purportedly advised them of Ghozland's objections to the proposed settlement as it affected the subclass.  (*Id.*)  He also purportedly sent a confirmation email to class counsel following the October 21 conference in which he proposed an amendment to the settlement class definition that would have excluded members of the subclass.  (*Id.*, ¶ 8.)  Collins reports that, after class counsel said they would speak with defense counsel to see if they were amenable to such an amendment, he had no further contact with plaintiffs or defendants.  (*Id.*, ¶¶ 5-8.)  Based on the communications between Collins and class counsel, Ghozland asserts that plaintiffs and defendants were reasonably on notice of his intent to seek leave to intervene on behalf of the subclass when they declined to amend the settlement class definition.  (MTI Reply at 14-15.)

The court finds this explanation reasonable and concludes that the various conferences between counsel for Ghozland and class counsel in the months that preceded the filing of the motion to intervene were sufficient to place plaintiffs and defendants on notice that Ghozland was interested in participating

an interest in the property or transaction that is the subject of the action, protection of which may, as a practical matter, be impaired or impeded if the lawsuit proceeds without him.[193]  The Ninth Circuit utilizes a four-part test to determine when intervention is appropriate:

> "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede [his] ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action." *Sierra Club v. United States EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993).

All four criteria must be met before intervention can be ordered under Rule 24(a).  *Silver v. Babbitt*, 166 F.R.D. 418, 424 (D. Ariz. 1994), aff'd, 68 F.3d 481 (9th Cir. 1995).  The Ninth Circuit interprets the rule broadly in favor of intervention.  See *Sierra Club*, 995 F.2d at 1481.

### 1.     Timeliness

Three factors are relevant in assessing the timeliness of a proposed intervenor's application: (1) the stage of the proceedings at which the motion is made; (2) whether existing parties would be prejudiced; and (3) the reason for any delay in seeking to intervene.  *Northwest Forest Resource v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996); *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990),

---

in the litigation.  Although the communications admittedly did not raise the possibility that he would file a motion to intervene, they did explore at length Ghozland's objections to the definition of the settlement class.  When Ghozland asked that the definition be amended, class counsel and defense counsel were reasonably on notice that absent any agreement to Ghozland's proposal, Ghozland would seek to participate more directly in the litigation.  Although Ghozland's explanation "demonstrates substantial compliance with the spirit of Local Rule 7-3, . . . the [c]ourt urges [Ghozland] to take greater care in the future to comply with the letter of the rule as well." *Sturm v. Davlyn Investments, Inc.*, No. CV 12-7305-DMG (AGRx), 2013 WL 8604661, *1 (C.D. Cal. Nov. 6, 2013).

[193]Rule 24(a) reads:
"On timely motion, the court must permit anyone to intervene who:
(1) is given an unconditional right to intervene by a federal statute; or
(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED.R.CIV.PROC. 24(a).

cert. denied, 501 U.S. 1250 (1991).  "Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive.  Timeliness is to be determined from all the circumstances.  And it is to be determined by the court in the exercise of its sound discretion."  *National Association for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973).

As the Ninth Circuit has observed, "'the relevant circumstance . . . for determining timeliness is when the intervenor became aware that [his] interests would no longer be protected adequately by the parties."  *Morazan v. Aramark Uniform & Career Apparel Group Inc.*, No. 13-cv-00936-YGR, 2013 WL 4734061, *4 (N.D. Cal. Sept. 3, 2013) (quoting *Legal Aid Society of Alameda County v. Dunlop*, 618 F.2d 48, 50 (9th Cir. 1980)).  Ghozland argues that his motion to intervene is timely because he first received class notice forms related to the proposed settlement on February 5, 2015, and moved to intervene within the objection and opt-out deadline of March 23, 2015.[194]  He contends there will be no prejudice to the existing parties if he is permitted to intervene; specifically, he asserts that "permitting intervention will not inject new issues and matters into the litigation that exceed [the] scope reflected by the Fourth Amended Complaint" because "the [s]ub-class's claims directly relate to those of the Settlement Class."[195]  Plaintiffs and defendants counter that Ghozland's motion must be denied as untimely because he knew of the litigation and potential settlement terms months before he received class notice in February 2015, yet failed to file his motion until after the court preliminarily approved the settlement and the claims administrator sent class notice and began processing claims.[196]

As plaintiffs and defendants note,[197] courts in this circuit have concluded that motions to intervene are not timely after the parties to a case have reached a settlement agreement.  *Orange County v. Air California*, 799 F.2d 535, 538 (9th Cir. 1986) ("Although Irvine did intervene before the Stipulated Judgment was officially approved by the district court, the fact that Irvine waited until after all the parties had come to an agreement after five years of litigation should nevertheless weigh

---

[194]MTI at 2-3.

[195]*Id.* at 3.

[196]Pl. MTI Opp. at 3-5; Def. MTI Opp. at 10-12.

[197]*Id.*

1 heavily against Irvine"); see also *California Dept. of Toxic Substances Control v. Commercial Realty*

2 *Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir. 2002) ("[T]he district court, which presided over the

3 complex litigation for more than six years, did not abuse its discretion in finding prejudice to the

4 parties, since intervention by Cities would complicate the issues and upset the delicate balance

5 achieved by the Oil Consent Decree"); *United States v. State of Washington*, 86 F.3d 1499, 1504

6 (9th Cir. 1996) ("The district court found that the other parties would be prejudiced by the requested

7 intervention, because intervention would complicate the issues and prolong the litigation.  This was not

8 an abuse of discretion").

9  This is so because, in most circumstances, a proposed intervenor had notice that the anticipated

10 settlement would likely be contrary to his or her interests prior to the date the settlement was reached.

11 See, e.g., *Morazan*, 2013 WL 4734061 at *4 ("In light of the circumstances in this case, the Court finds

12 that Movants failed to make this Motion in a timely manner.  Movants concede that 'the relevant

13 circumstance . . . for determining timeliness is when the intervenor became aware that its interest would

14 no longer be protected adequately by the parties.'  Here, Movants learned of the settlement on May 7,

15 2013.  While Movants argue that they immediately began settlement conversations with the parties,

16 which lasted until June 27, 2013, this does not excuse waiting two months to file the instant Motion –

17 particularly given the posture of the case" (citation omitted)); *Cohorst v. BRE Properties, Inc.*, No.

18 10cv2666 JM (BGS), 2011 WL 3475274, *6 (S.D. Cal. Aug. 5, 2011) ("Finally, with regard to the third

19 factor, the reasons identified for the delay in seeking to intervene are insubstantial.  Roman does not

20 explain why she delayed moving for intervention.  Rather, she argues, in conclusory fashion, that she

21 did not learn of the 'inadequate terms of the settlement,' until after the entry of the Preliminary Approval

22 Order.  Roman does not explain why she waited from December 9, 2010 (the date she formally learned

23 of the existence of the *Cohorst* action) or from April 11, 2011 (the date Roman was informed that

24 *Cohorst* had settled), until May 19, 2011, the date she filed the motion to intervene, before seeking to

25 assert any claim in this action.  As consumer class counsel know, once a consumer class action reaches

26 a settlement, the court is obligated to diligently implement the procedures identified in Rule 23(e) of the

27 Federal Rules of Civil Procedure"); *In re Charles Schwab Corp. Securities Litigation*, No. C 08-01510

28 WHA, 2011 WL 633308, *3 (N.D. Cal. Feb. 11, 2011) ("Mr. Benson asserts that his motion is timely

because he did not have notice until December 2010 that the federal securities class settlement now includes a release of Section 17200 claims.  But Mr. Benson's other submissions reveal that this was not the first time he felt the settlement would adversely affect his interests.  This class member has felt the class settlement was adverse to his interests since well before December 2010.  At the very least, Mr. Benson knew his interests might be adversely affected over six months ago, when he began objecting to the settlement in this Court.  True, notice regarding Amendment No. 4 to the class settlement agreement was only sent out in November 2010 after the amendment was preliminarily approved.  Yet that does not contravene the other facts in the record concerning Mr. Benson's clear position that he felt the settlement was contrary to his interests before that time.  Mr. Benson did not submit a declaration that would contradict that record.  Moreover, he waited until January 19, 2011, to file his motion, and does not provide any reason for the delay whatsoever").

Nonetheless, courts within the circuit have also concluded that motions to intervene filed after the parties have reached a settlement can still be timely if there is evidence the proposed intervenor first learned that the terms of a settlement were contrary to his or her interests after the settlement was consummated.  See *United States v. Carpenter*, 298 F.3d 1122, 125 (9th Cir. 2002) (concluding that a motion to intervene was timely where the proposed intervenors "acted as soon as they had notice that the proposed settlement was contrary to their interests"); see also *In re Community Bank of North Virginia Mortgage Loan Litigation*, 418 F.3d 277, 314 (3d Cir. 2005) (stating that "[t]he time frame in which a class member may file a motion to intervene challenging the adequacy of class representation must be at least as long as the time in which s/he may opt-out of the class" and concluding that proposed intervenors' motion was "presumptively timely" because it was filed within the opt-out period).

The parties vigorously dispute when Ghozland first became aware that the proposed settlement was contrary to his interests.  As all parties concede, Ghozland's attorney, Sean Collins, first contacted class counsel in July 2014 seeking information regarding the proposed settlement.[198]  Collins also spoke with class counsel on September 3, 2014, regarding the terms of the proposed settlement.[199]  Although

---

[198]Lurie MTI Decl., ¶ 2; Collins MTI Reply Decl., ¶¶ 5-6.

[199]Collins MTI Reply Decl., ¶¶ 8-9.

Collins requested a copy of the proposed settlement, class counsel purportedly refused to give him one or to discuss substantively what former owners or lessees of class vehicles who did not incur out-of-pocket expenses for a service adjustment would receive under the settlement.[200]   Following the September 3 telephone conference, on October 21, 2014 – five days after the court granted plaintiffs' motion for preliminary approval of the settlement – Collins and class counsel had another telephone call. During that call, Collins said he felt the proposed settlement was unfair because it did not provide any compensation for former owners or lessees who did not incur out-of-pocket expenses associated with obtaining a service adjustment.[201]   Collins also proposed an amendment to the settlement class definition that would have excluded the "sub-class" from the settlement; class counsel represented they would raise the matter defense counsel.[202]   Collins sent a confirmation email, but purportedly received no response from plaintiffs or defendants regarding the proposed amendment.[203]

Collins concedes that, at that point, he and Ghozland were "fairly confident" that Ghozland's vehicle was a class vehicle covered by the settlement;they were not certain, however,  he asserts, because Ghozland had sold the vehicle in 2013.[204] As a result, they waited until Ghozland received class notice on February 5, 2015.  Collins then drafted an objection and motion to intervene, which he filed on March 23, 2015.[205]

Plaintiffs and defendants contend that Ghozland could have acted more diligently in bringing his motion to intervene.  They note it is clear Ghozland has known that his interests would be adversely affected since at least July 2014 when Collins first spoke with class counsel.[206]  While it is likely that

---

[200]*Id.*, ¶ 9.

[201]*Id.*, ¶¶ 9-13.

[202]*Id.*

[203]*Id.*, ¶ 13.

[204]*Id.*, ¶ 14.

[205]*Id.*, ¶¶ 14-17.

[206]Pl. MTI Opp. at 3-5; Def. MTI Opp. at 10-12.

Ghozland was reasonably on notice in July 2014 that the proposed settlement implicated his rights, it appears, based on Collins' representations, that class counsel declined to discuss *how* the settlement would affect the rights of former owners and lessees as late as September 2014.  In fact, class counsel apparently rebuffed Collins when he requested a copy of the settlement agreement on September 3, 2014.[207]  It was not until the court had preliminarily approved the settlement in late October that Collins learned the nature of the provisions affecting former owners and lessees.

Thus, it appears that Ghozland was first on notice that the settlement would likely be adverse to his interests on October 21, 2014 – more than five months before he filed his motion to intervene.  Although he argues he did not know that he was a member of the class until he received the class notice on February 5, 2015, because he could not confirm that his vehicle had the internal engine code CAEB, Ghozland could likely have determined this independently had he exercised reasonable diligence.  By the time the court preliminarily approved the settlement, Collins had been in semi-regular contact with class counsel regarding the settlement.  Collins could easily have inquired whether Ghozland was a class member at the same time that he asked questions about and later challenged and sought amendment of the terms of the agreement.

Had Ghozland attempted to intervene within a reasonable time of learning "that the proposed settlement was contrary to [his] interests," *Carpenter*, 298 F.3d at 1125, it would have been possible for the court to hear the motion on an *ex parte* basis and rule on it during the three months preceding the dissemination of class notice to more than 225,000 class members.  This would have conserved the parties' resources and postponed class notice until the court determined whether or not Ghozland was entitled to intervene.  By filing a motion on the last day of the opt-out period, however, after being on notice that the settlement adversely affected his interests in October, Ghozland has created a real possibility of prejudice to the parties and class members.  Although he asserts the parties have not been prejudiced because "the Sub-Class's claims directly relate to those of the Settlement Class,"[208] he misapprehends the standard for judging prejudice.  By filing his motion to intervene after class notice

---

[207]Collins MTI Reply Decl., ¶ 9.

[208]MTI at 3.

1   was sent and claims were filed, Ghozland risked "delay[ing] the claims process for the class members
2   that have returned claim forms thus far." *Morazan*, 2013 WL 4734061 at *5 ("In addition, the Court
3   is simply not persuaded by Movants' argument that there is no prejudice to the parties by permitting
4   intervention. Movants' arguments that 'the settlement is currently unacceptable, and the RSRs['] due
5   process rights are in jeopardy by the Morazan settlement' attempt to intertwine their arguments
6   regarding other requirements for intervention, such as adequacy of representation and whether they have
7   a significantly protectable interest, and miss the point regarding prejudice and timeliness. These
8   arguments ignore the plain fact that intervention will delay the claims process for the class members that
9   have returned claim forms thus far. The Court hereby DENIES Movants' Motion to Intervene as
10  untimely under the circumstances of this case").

11      Allowing Ghozland to intervene at this late date, moreover, risks compromising – or further
12  delaying – a settlement that has been more than a year in the making. *In re Charles Schwab Corp.*
13  *Securities Litigation*, 2011 WL 633308 at *3 ("Courts deny motions to intervene 'where granting
14  intervention [might] compromise[ ] long-litigated settlement agreements," citing *United States v. Alisal*
15  *Water Corp.*, 370 F.3d 915, 923 (9th Cir. 2004)); *id.* ("Lastly and significantly, allowing this
16  intervention would only be aimed at derailing a large $235 million class settlement that has been a year
17  in the making. It has taken great attention by the parties throughout that time to get to this stage, one
18  of near completion, and allowing intervention would undo all of that work. Mr. Benson has felt for quite
19  some time that he disapproved of the settlement as counter to his interests, yet he did nothing until now.
20  For all of these reasons, the motion is untimely"); see also *Oregon*, 913 F.3d at 588-89 ("[T]he
21  possibility of this settlement unraveling is so prejudicial that to allow [intervention] at this late date
22  would be tantamount to disaster"). This prejudice – i.e., delaying claims processing for class members
23  and potentially compromising a settlement that has taken more than a year to bring to the court for final
24  approval and that resolves litigation pending since 2012 – weighs against finding Ghozland's motion
25  timely. Based on the record before the court, Ghozland's motion to intervene is untimely and could be
26  denied for this reason alone. See *Orange County v. Air California*, 799 F.2d 535, 538 (9th Cir. 1986)
27  ("The district court did not abuse its discretion in denying, because it was untimely, Irvine's motion to
28  intervene"); *id.* ("Because we conclude that Irvine's motion to intervene was untimely, we need not

reach the remaining elements of the test").  Other grounds, however, more clearly indicate that Ghozland is not entitled to intervene in this action as of right.  The court turns to the remaining parts of the test.

### 3.     Significantly Protectable Interest

Whether a party seeking to intervene as of right demonstrates a sufficient interest in an action is a "practical, threshold inquiry.  No specific legal or equitable interest need be established."  *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993).  "[A] party has a sufficient interest for intervention purposes if [he] will suffer a practical impairment of [his] interests as a result of the pending litigation."  *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006).

Ghozland argues that he is entitled to intervene as of right because he and the subclass have "protectable interest[s] in the proposed [s]ettlement of the [a]ction."[209]  Specifically, he contends he has a protectable interest in recouping damages for the diminution in value of his vehicle as a result of the purported oil consumption defect, as well as out-of-pocket incidental expenses for the purchase of "extra oil" necessitated by the vehicle's excessive oil consumption.[210]  As Ghozland notes, plaintiffs sought each of these forms of relief in the fourth amended complaint;[211] his interest in securing them is thus directly related to plaintiffs' claims.  This is significant in assessing whether Ghozland satisfies the "significant protectable interest" requirement for intervention as of right.  See generally *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998) (noting that a proposed intervenor has a "significantly protectable interest" if "(1) [he] asserts an interest that is protected under some law; and (2) there is a relationship between [his] legally protected interest and the plaintiff's claims").

Courts have recognized that a proposed intervenor like Ghozland, who is a member of the settlement class, "has a significant protectable interest relating to the subject of the [litigation]" based on his membership in the class.  See, e.g., *Glass*, 2007 WL 474936 at *2 ("As D'Aria is a member of the Glass class, he has a significant protectable interest relating to the subject of the instant action"); see also *In re Community Bank of Northern Virginia Mortgage Loan Litigation*, 418 F.3d at 314 (discussing

---

[209]MTI at 4.

[210]*Id.*; see also MTI Reply at 8-9.

[211]See FAC at 31-32.

a motion by class members intervene in a class action and finding that the significant protectable interest factor was "satisfied by the very nature of class action litigation").  The court thus concludes that this factor favors allowing Ghozland to intervene.

### 4.    Inability to Protect Interest Absent Intervention

"To intervene as a matter of right, [the proposed intervenor] must be 'so situated that the disposition of the action may as a practical matter impair or impede his ability to protect his interest.'" *Stockton v. United States*, 493 F.2d 1021, 1022 (9th Cir. 1974).  A proposed intervenor does not necessarily need to prove that the outcome of the case will legally impair his ability to protect his interest; "[i]t is enough that his interest is practically impaired."  *Id.* at 1023.  "[I]f the intervenor's interest would not even be practically impaired by the judgment in the principal case, [however,] there is no right of intervention under Rule 24(a)(2)."  *Id.* (citing *Edmondson v. Nebraska ex rel. Meyer*, 383 F.2d 123 (8th Cir. 1967)).

Ghozland argues that his legal interest may be impaired if he is not allowed to intervene because he and the subclass he wishes to represent will "receive absolutely nothing from the proposed settlement"[212] but be required to release their claims against defendants.[212]  Plaintiffs and defendants counter that, like all members of the settlement class, Ghozland had alternative means at his disposal to protect interests that are purportedly not redressed in the settlement agreement.[213]  They contend he could have opted out of the settlement if he was dissatisfied with its terms or the fact that it provides, in his view, insufficient benefits for former owners and lessees of class vehicles who did not incur out-of-pocket expenses associated with a service adjustment.[214]  Ghozland does not respond directly to this argument; instead, he asserts that suggesting members of the subclass could simply have opted out ignores the fact that "approximately half" of the members of the settlement class are also members of

---

[212]MTI at 4 ("It is patently unfair for a class action settlement to forever release defendants from any and all claims, yet provide a certain group of class members (i.e. the Sub-Class) with absolutely nothing in return").

[213]Pl.'s MTI Opp. at 7-8; Def.'s MTI Opp. at 5-6.

[214]*Id.*

the subclass who will purportedly receive no benefits.[215]  The court is not persuaded.

As an initial matter, based on the record before the court, it is not at all clear that the "subclass"
is as expansive as Ghozland suggests.  Although he argues that the subclass consists of "approximately
100,000 settlement class members,[216] he does not explain how he reached this conclusion.  Ghozland
may have calculated this number by assuming that the total number of class vehicles – 126,000 –
represents the number of current owners or lessees, and subtracted this number from the total number
of class notices sent – approximately 229,000 – to determine the number of former owners or lessees.
If so, his assumption is not necessarily correct.  As in his own case, there could be multiple owners of
a single vehicle – e.g., a husband and a wife.  Even if one accepts the accuracy of his calculation,
moreover, Ghozland assumes that every former owner or lessee who received a service adjustment
incurred no out-of-pocket expenses associated with obtaining a service adjustment from an Audi
dealership.  The fact that Ghozland, a former lessee, received a service adjustment but incurred no out-
of-pocket expenses as a result does not mean that the same is true of every former owner or lessee in
the class, much less every class member.  There is no evidence in the record, however, supporting such
an assumption; indeed, the evidence shows that more than 60,000 vehicles had received a service
adjustment prior to the date class notice was sent.  Indeed, despite Ghozland's assertion that 100,000
class members who are also in the subclass will receive no benefit from the settlement, the court has
only received two objections from subclass members – one from Ghozland and one from Cirillo – or
a percentage of 0.00002 of the supposed subclass.  In combination, the large number of class vehicles
that had already had a service adjustment before class notice was sent, and the infinitesimally small
number of objections from supposed subclass members give rise to an inference that at least some
members of the subclass – and perhaps a sizeable portion of it – incurred expenses associated with a
service adjustment and are thus eligible to seek reimbursement under the terms of the settlement

[215]MTI Reply at 7 ("The parties suggest that Ghozland does not have a protectable interest
because any Settlement Class Member that is 'unhappy' with the terms of the Settlement can opt-out.
The fact that the parties offer this as a purported solution in a class settlement they support is concerning
because they thus concede that it is perfectly acceptable to define a class in such a way that
approximately half will receive nothing").

[216]MTI Reply at 1.

1   agreement.

2          More fundamentally, Ghozland does not dispute that opting-out of the settlement would have

3   been sufficient to protect his interests.  Given this fact, the court agrees with the parties that Ghozland

4   had the means available to protect his financial interests without intervening.  See, e.g., *Hofstetter v.*

5   *Chase Home Finance, LLC*, No. C 10-01313 WHA, 2011 WL 5415073, *2-3 (N.D. Cal. Nov. 8, 2011)

6   ("Mr. Gibson has not identified any risk that the existing parties may not adequately represent his

7   interests in the action.  He argues that class counsel 'failed to fulfill their duty to provide adequate

8   representation to all Class members by allowing the broad release language to remain in the Settlement

9   Agreement.'  The brief, however, cites no controlling authority on this point.  In reality, the release was

10  limited to claims actually asserted, and class counsel negotiated a second opt-out opportunity to protect

11  class members who disliked the deal.  *Mr. Gibson had an opportunity to opt out of the settlement after*

12  *he read the release of claims printed in the settlement notice.  This opportunity adequately safeguarded*

13  *his rights and interests.  He chose to ignore this opportunity*.  In addition to his own rights and interests,

14  Mr. Gibson's brief also refers to 'the rights and interests of other consumers.'  This vague reference to

15  'other consumers' fails to identify any relevant group.  Non-class members are not bound by the

16  settlement; their rights and interests are not impacted by the release of claims.  *Class members had the*

17  *same settlement opt-out right as Mr. Gibson, and he has not shown that class counsel or the named*

18  *plaintiffs provided inadequate representation in light of this procedural safeguard*," citing *Lockyer*, 450

19  F.3d at 442 ( "Even if this lawsuit would affect the proposed intervenors' interests, their interests might

20  not be impaired if they have 'other means' to protect them" (emphasis added)); *Cohorst*, 2011 WL

21  3475274 at *6-7 ("In her argument, Roman argues that the third factor is satisfied 'in that she has a

22  significantly protectable interest which will be impaired by the disposition of this action.'  Fatal to her

23  claim, however, she fails to identify how resolution of this action will impair or impede her ability to

24  protect her interests.  Roman is able to opt-out of the class and pursue her own damages action against

25  Defendants.  Alternatively, Roman may raise any objections to the settlement at the time of the Final

26  Hearing," citing *Davis v. J.P. Morgan Chase & Co.*, 775 F.Supp.2d 601, 605 (W.D.N.Y. 2011)

27  ("Intervention is not necessary here to protect the proposed Intervenor's or other class members'

28  interests, and there are alternatives open to them which would be less disruptive to these proceedings

and to the interests of the settling parties")).  Accordingly, the court concludes that this factor weighs against permitting intervention.

### 5.    Inadequate Representation of Interest by Parties to the Action

"The burden on proposed intervenors in showing inadequate representations is minimal, and would be satisfied if they could demonstrate that representation of their interests 'may be' inadequate." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972)).  The Ninth Circuit considers three factors in determining the adequacy of representation:

"(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable [of] and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *California v. Tahoe Regional Planning Agency*, 792 F.2d 775, 778 (9th Cir. 1986).

"The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties." *Arakaki*, 324 F.3d at 1086 (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1909, at 318 (1986)).

Ghozland argues it is "evident by the terms of the proposed [s]ettlement" that his significant interests [and those] of . . . the Sub-Class are not being represented by the current named Plaintiffs and their counsel."[217]  He asserts that the named plaintiffs are inadequate class representatives because "none of the[m] [is a] . . . former owner[ ] [or] lessee[ ] of the Settlement Class Vehicles."[218]  Plaintiffs have proffered evidence, however, that three of the five named plaintiffs – Asghari, Dersarkissian, and Kim – are former owners or lessees of a class vehicle.[219]  Ghozland's assertion to the contrary is thus

---

[217]MTI at 5.

[218]*Id.* at 5-6.

[219]See Supp. Asghari Decl., ¶ 6; Supp. Dersarkissian Decl., ¶ 6; Supp. Kim Decl., ¶ 4.

1 unavailing.[220]

2      Ghozland also contends that the fact that the settlement does not provide incidental damages for

3 out-of-pocket oil costs and diminution in value damages is further evidence that the class representatives

4 and class counsel are inadequate.  The court cannot agree.  As discussed, class counsel and the named

5 plaintiffs initially pursued the relief Ghozland identifies in his motion.[221]  Plaintiffs considered the

6 challenges inherent in proving such damages – including, *inter alia*, the difficulty of presenting proof

7 on a classwide basis and defendants' defenses, i.e., that the recovery of incidental damages was barred

8 by each class member's express warranty and that diminution in value damages were speculative and/or

9 attributable to something other than the oil consumption defect.  They also conducted extensive

10 investigation and engaged in arms-length negotiations.  Based on the information they developed and

11 defendants' negotiating posture, class counsel opted for a settlement that provided other forms of relief

12 that did not pose the same type of proof problems as incidental damages.  There is no evidence in the

13 record from which the court can infer that plaintiffs ignored the interests of the supposed subclass in

14 agreeing to the terms of the settlement.

15      Ghozland, of course, has not been vigorously litigating this case as class counsel have and was

16 not involved in the extensive settlement negotiations.  While he argues that the settlement agreement

17 does not adequately compensate him and other class members, he fails to consider the impact that non-

18

---

19    [220]Ghozland argues that, even if several of the named plaintiffs are former owners and lessees

20 that fall within the subclass, the fact that they are seeking an incentive award demonstrates their inadequate representation.  (See MTI at 6 n. 4; see also MTI Reply at 10.)  The payment of incentive

21 awards to class representatives who would not be eligible to receive benefits under the settlement may, as Ghozland asserts, give rise to an appearance that the class representatives agreed to the terms of the

22 settlement – under which they will receive no benefit – because they were going to receive an incentive

23 award.  Nonetheless, as Ghozland himself recognizes, incentive payments for class representatives are fairly commonplace.  (See MTI Reply at 10.)  Ghozland cites no authority suggesting that receipt of an

24 incentive award makes a class representative inadequate.  This is particularly true in this case because,

25 as discussed *infra*, class counsel and the class representatives initially sought the relief Ghozland wishes to receive.  It was only after substantial discovery, investigation, and vigorous arms-length negotiations

26 that plaintiffs concluded resolving the case and providing other immediate benefits for the class was preferable to attempting to recover incidental damages or diminution in value damages given the

27 difficulties inherent in proving entitlement to these forms of relief.

28    [221]See also Pl.'s MTI Opp. at 10.

negotiable demands for the relief he seeks might have had on plaintiffs' ability to arrive at a settlement; had they been unable to do so, of course, this would have affected the class as a whole. Given the difficulty of proving incidental damages on a classwide basis, and the defenses defendants would have raised to the recovery of such relief, it is possible that demanding incidental and diminution in value damages might have compromised the entire settlement.[222] At bottom, Ghozland's challenges to the adequacy of representation boil down to a difference of opinion concerning the benefits provided by the settlement agreement. Where, as here, named plaintiffs share the "same 'ultimate objective' as the proposed intervenor," a presumption of adequate representation arises, *In re Weingarten*, 492 Fed. Appx. 754, 756 (9th Cir. Aug. 21, 2012) (Unpub. Disp.), which cannot be defeated by a proposed intervenor's disagreement with class representatives over the merits of the settlement or the litigation strategy used to reach the settlement. See, e.g., *Yoshioka v. Charles Schwab Corp.*, No. C-11-1625 EMC, 2011 WL 6748984, *14 (N.D. Cal. Dec. 22, 2011) ("Beyond these concerns, Mr. Garmong's remaining arguments amount to disagreements with Plaintiff over the merits of the settlement. 'Where parties share the same ultimate objective, differences in litigation strategy do not normally justify intervention.' Mr. Garmong is free to make his arguments as an objector and to object to any renewed proposed settlement offered by the parties. At the same time, Class Counsel has agreed to establish a communication system (e.g., via a website) to share pleadings and significant developments with interested class members. Accordingly, the Court DENIES the motion to intervene," citing *Arakaki*, 324 F.3d at 1086); *Cohorst v. BRE Properties, Inc.*, No. 3:10-CV-2666-JM-GBS, 2011 WL 3489781, *8 (S.D. Cal. July 19, 2011) report and recommendation adopted, 2011 WL 3475274, *1 (S.D. Cal. Aug. 5, 2011) ("To the extent that Roman is objecting to settlement terms agreed to by *Cohorst* counsel, her objections [are] not a basis for intervention. When a proposed intervenor . . . has vested (her) claim for intervention entirely over litigation strategy or legal tactics, courts have been hesitant to accord the applicant full-party status," citing *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1306 (9th Cir. 1997)).

Because Ghozland's arguments concerning the adequacy of representation amount to nothing

---

[222]See Pl.'s MTI Opp. at 9-10.

more than differences in opinion regarding litigation strategy, the court concludes that he has failed to demonstrate that class counsel and the named plaintiffs are inadequate representatives.  See *United States v. City of Los Angeles*, 288 F.3d 391, 402-03 (9th Cir. 2002) (noting that "differences in strategy . . . are not enough to justify intervention as a matter of right").

### 6.    Conclusion Regarding Motion to Intervene

For the reasons stated, the court concludes that, under the circumstances of the case, Ghozland's motion to intervene is untimely.  Moreover, because the court concludes that class counsel and the named plaintiffs have adequately represented the interests of the class at large – including Ghozland's supposed subclass – and because Ghozland had alternative means available to protect his interests, he is not entitled to intervene as of right.  Accordingly, Ghozland's motion to intervene is denied.[223]

### D.    Motion for Attorneys' Fees, Costs, and Incentive Awards

The court turns finally to class counsel's motion for fees, costs, and incentive payments.  The procedure for requesting attorneys' fees is set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.  While the rule specifies that requests shall be made by motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial," the rule does not itself authorize the awarding of fees.  "Rather, [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award."  *MRO Communications, Inc. v. AT & T*, 197 F.3d 1276, 1281 (9th Cir. 1999).

In class actions, statutory provisions and the common fund exception to the "American Rule" provide the authority for awarding attorneys' fees.[224]  See Alba Conte and Herbert B. Newberg,

---

[223]Although, as noted, Ghozland appeared through counsel at the fairness hearing and argued that the settlement was unfair because it did not compensate former owners and lessees who incurred no expenses associated with a service adjustment, he did not object to the court's conclusion that his motion to intervene was untimely and that he was not entitled to intervene as of right.

[224]The common fund exception recognizes that attorneys' fees can be collected from a fund preserved, protected, collected, or realized by attorneys' efforts on behalf of the class of persons benefitted by or entitled to the fund.  See 38 A.L.R.3d 1384, § 4(a) & (b).

NEWBERG ON CLASS ACTIONS, § 14.1 (4th ed. 2005) ("Two significant exceptions [to the "American Rule"] are statutory fee-shifting provisions and the equitable common-fund doctrine"). Rule 23(h) authorizes a court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED.R.CIV.PROC. 23(h). Under normal circumstances, once it is established that a party is entitled to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The parties' settlement agreement provides that defendants will not oppose the application for, and will pay, attorneys' fees and expenses up to $2.4 million – $2.3 million in fees and $100,000 in expenses.[225]

### 1.    Attorneys' Fees

Courts calculate attorneys' fees using either the lodestar or percentage-of-the-fund method. In a lodestar analysis, the court multiplies the number of hours reasonably expended by counsel on the matter by a reasonable hourly rate and adjusts the result upward or downward depending on a variety of factors. In a percentage-of-the-fund analysis, the court awards a percentage of the class recovery as fees. See *State of Florida v. Dunne*, 915 F.2d 542, 545 n. 3 (9th Cir. 1990). "Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result." *In re Bluetooth*, 654 F.3d at 942 (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997)). As respects selection of the lodestar or percentage-of-the-fund method, the Ninth Circuit has observed:

> "Despite the recent ground swell of support for mandating a percentage-of-the-fund approach in common fund cases, . . . we require only that fee awards in common fund cases be reasonable under the circumstances. Accordingly, either the lodestar or the percentage-of-the-fund approach 'may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund.'"

*Dunne*, 915 F.2d at 545 (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

In cases where courts apply the percentage method to calculate fees, they should use a rough

---

[225]Settlement Agreement, § VIII.C.

calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award.  See *In re Bluetooth*, 654 F.3d at 943 (encouraging "comparison between the lodestar amount and a reasonable percentage award"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award").  By the same token, "a court applying the lodestar method to determine attorneys' fees may use the percentage-of-the-fund analysis as a cross-check."  *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1997)).  "The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible."  *In re Contintental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992).  This is particularly true here, where, as noted, the parties have entered into a clear sailing agreement.

Class counsel ask that the court use the percentage method to calculate fees because "the class benefit [here] can be monetized with a reasonable degree of certainty."[226]  Although plaintiffs assert that "[a]utomobile defect cases of this type are amenable to precise valuation justifying application of the percentage-of-the-award method,"[227] the court cannot agree.  In this case, there is no capped common fund – instead, the relief afforded class members is determined by the number of reimbursement claims submitted and the number of current owners and lessees who choose to request a service adjustment under the settlement.  Under such circumstances, courts use the lodestar method of calculating fees, rather than the percentage-of-the-fund method, because the common fund does not have a certain value. See *Hanlon*, 150 F.3d at 1029 (affirming the district court's choice of the lodestar method where calculation of the common fund was uncertain); *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-cv-05437, 2008 WL 1901988, *1 (W.D. Wash. Apr. 24, 2008) ("Where, as here, Settlement relief will be paid on a claims made basis with no cap to the relief available, consideration of attorneys' fees lends itself more readily to the lodestar method.  Because the attorneys' fees will be

---

[226]Fees Motion at 12.

[227]*Id.*

paid separately by [defendant] without reducing the relief available to the Class, the lodestar method is appropriate"); see also *Kearney*, 2013 WL 3287996 at *13 (using the lodestar method for calculating attorneys' fees where the settlement provided for replacement of allegedly defective air-bag systems); *Browne*, 2010 WL 9499073 at *3 (using the lodestar method to calculate attorneys' fees where the settlement provided for replacement of allegedly defective brake pads and reimbursement of certain expenses related to the replacement of brake pads).

### a.  Whether Class Counsel's Attorneys' Fees Request is Reasonable

As noted, the lodestar is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. The lodestar "presumptively provides an accurate measure of reasonable attorney's fees." See *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986). A court may increase or decrease the lodestar in rare or exceptional cases. See *Blum v. Stenson*, 465 U.S. 886, 898-901 (1984); *Harris*, 24 F.3d at 18; *Clark*, 803 F.2d at 990-91. As the court explained in *In re Bluetooth*:

> "The court may adjust [the lodestar] upward or downward by an appropriate positive or negative multiplier reflecting a host of reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. Foremost among these considerations, however, is the benefit obtained for the class. Thus, where the plaintiff has achieved only limited success, counting all hours expended on the litigation – even those reasonably spent – may produce an excessive amount, and the Supreme Court has instructed district courts to instead award only that amount of fees that is reasonable in relation to the results obtained." *In re Bluetooth*, 654 F.3d at 941-42.

Class counsel contend that the lodestar as of the date they filed their motion was $1,601,509.25;[228] litigation expenses totaled $140,315.79.[229] Class counsel ask, however, that the court award fees of $2,300,000 – a multiplier of 1.40%. This is the amount they can seek under the clear

---

[228]Fees Motion at 16.

[229]*Id.* at 23.

sailing agreement.[230]  Counsel note that they seek reimbursement of only $100,000 of their litigation expenses.[231]

### i.      Reasonableness of Counsel's Hourly Rates

To assist the court in calculating the lodestar, a plaintiff must submit "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum*, 465 U.S. at 895-96 n. 11.  The relevant community is that in which the district court sits.  See *Schwartz v. Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995).  Declarations regarding the prevailing market rate in the relevant community suffice to establish a reasonable hourly rate.  See *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys in the community can provide adequate proof of the reasonableness of counsel's rates).  See also *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing the affidavit of "an attorney practicing in the same region as Earthquake's attorneys," which opined that "Earthquake's attorney rates were reasonable and customary").  Courts can also use survey data to evaluate the reasonableness of attorneys' rates.  See *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one reporting fees received by seven Twin Cities class action firms and the other reporting fees received by sixty-two firms doing a variety of work around the state.  The court set individual hourly rates at the median of the class action survey and near the upper limit of the statewide survey, also taking into account the number of years an attorney had been admitted to practice"); *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners have provided support for the reasonableness of their rates through affidavits and a survey of rates and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama) was found to be $135 to $150 per hour for

---

[230]*Id.* at 17-18.

[231]*Id.* at 23-24.

senior counsel and $105 to $115 per hour for junior counsel").

In calculating the lodestar, courts typically exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of an attorney's overhead and are reflected in his or her hourly rate. See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them"). Where support staff do substantive case-related work, however, fees for such work are recoverable. *Id.* at 285 ("Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client"); *Earthquake Sound Corp.*, 352 F.3d at 1214-15 (affirming a lodestar-based fee award that included work performed by attorneys, paralegals, and clerks); *Grays Harbor Adventist Christian Sch.*, 2008 WL 1901988 at *5 (accepting class counsel's lodestar calculation, which included fees for support staff, and noting that "if [the] recoverable lodestar were limited to attorney time, law firms would be inclined to assign low-level work to attorneys rather than legal support staff. The Ninth Circuit discourages such an inefficient result by recognizing the contributions of attorneys and non-attorneys").

Twenty-one attorneys at seven different law firms represented the class in this case. They seek to have the court calculate fees using the following rates for attorneys at Strategic Legal Practices APC:[232] $595 per hour for partner Payam Shahian (2003 graduate of the University of California, Hastings College of Law); $550 per hour for senior counsel Gregory Yu (2003 graduate of University of Southern California Gould School of Law); $425 per hour for former associate Alison Wilson (2008 graduate of University of the Pacific, McGeorge School of Law); $375 per hour for associate Joshua Valero (2009 graduate of Loyola University Law School ); $375 per hour for former associate Karen Nakon (2010 graduate of DePaul University College of Law); and $325 per hour for former associate Christopher Swanson (2011 graduate of UCLA School of Law).

---

[232]See Shahian Fees Decl., ¶¶ 2, 33-38.

Plaintiffs request that the court use the following rates for work performed by attorneys at Capstone Law APC:[233] $695 per hour for counsel Jordan Lurie (1987 graduate of University of Southern California Gould School of Law); $670 per hour for former senior counsel Robert Byrnes (16 years of experience); $595 per hour for senior counsel Ryan Wu (2001 graduate of University of Michigan Law School); $520 per hour for former senior counsel David Cheng (10 years of experience); $495 per hour for associate Tarek Zohdy (2006 graduate of Boston University School of Law); $470 per hour for associate Eduardo Santos (2007 graduate of Loyola Law School); $445 per hour for associate Lucas Rogers (7 years of experience); and $370 per hour for Cody Padgett (2011 graduate of California Western School of Law).

Plaintiffs request the following rates for work performed by remaining class counsel: $550 per hour for Edward Choi (2000 graduate of UCLA School of Law);[234] $600 per hour for Larry Lee (2003 graduate of Arizona State University College of Law);[235] $475 per hour for Hovanes Margarian (2006 graduate of University of Southern California Gould School of Law);[236] $630 per hour for Mark Yablonovich (1996 graduate of Harvard Law School);[237] $495 per hour for Neda Roshanian (12 years of experience);[238] $365 per hour for Michael Coats (7 years of experience);[239] and $560 per hour for Dana Tabesh (2003 graduate of University of California, Hastings College of Law).[240]

As evidence that these rates are reasonable, class counsel proffer evidence regarding the attorneys' range of litigation and class action experience, and the experience of the law firms at which

[233]See Labat Fees Decl., ¶¶ 10-11.

[234]Choi Fees Decl., ¶¶ 7-9.

[235]Lee Fees Decl., ¶¶ 7-10.

[236]Margarian Fees Decl., ¶¶ 2, 10-18.

[237]Yablonovich Fees Decl., ¶¶ 2, 6.

[238]*Id.*, ¶¶ 5-6.

[239]*Id.*

[240]Tabesh Fees Decl., ¶¶ 2, 7.

they work.[241]  Class counsel also proffer the declaration of William Rubenstein, the Sidley Austin

Professor of Law at Harvard Law School and a national expert on class action law and practice.[242]

Rubenstein's declaration analyzes 2014 attorney billing rates in the Southern California legal

community.[243]  Based on multiple fee petitions, court decisions, and surveys concerning attorneys' fees

charged in Southern California, Rubenstein tracks prevailing hourly rates according to the number of

years an attorney has been in practice.[244]  He concludes that class counsel's respective requested rates

are typical of, and in many cases lower than, typical hourly rates for attorneys in Southern California

with a comparable number of years of practice experience.[245]

Class counsel have many years of experience in consumer class action litigation involving

automobiles, products liability, and the specific causes of action asserted in this case.  Based on

Rubenstein declaration and the court's general knowledge of rates in the Los Angeles legal

community, moreover, it believes the rates are reasonable.  Accordingly, the court determines that

the hourly rates requested for both the partners and associates in this case are reasonable.  See

*Kearney*, 2013 WL 3287996 at *8 (approving hourly rates between $650 and $800 for class counsel

in a class action alleging claims under the CLRA, UCL, and express and implied warranty laws);

*Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172 (C.D. Cal. 2010) (approving

hourly rates of between $445 and $675 for class counsel in a class action alleging CLRA, unfair

business practices, and breach of warranty claims); see also *POM Wonderful, LLC v. Purely Juice,*

*Inc.,* No. CV 07-2633, 2008 WL 4351842, *4 (C.D. Cal. Sept. 22, 2008) (finding rates of $475 to

$750 for partners and $275 to $425 for associates reasonable).

---

[241]See, e.g., Shahian Fees Decl., ¶¶ 6-9; Labat Fees Decl., ¶¶ 4-8; Choi Fees Decl., ¶ 8; Lee Fees
Decl., ¶¶ 8-9; Margarian Fees Decl., ¶¶ 2-6; Yablonovich Fees Decl., ¶ 4; Tabesh Fees Decl., ¶¶ 4-5.

[242]See Expert Declaration of Professor William B. Rubenstein in Support of Plaintiffs' Motion
for Attorneys' Fees, Expenses, and Incentive Awards ("Rubenstein Decl."), Docket No. 159-1 (Feb. 27,
2015).

[243]Rubenstein Decl. at 1-2, 13-14.

[244]*Id.* at 13-16.

[245]*Id.*

### ii.  Reasonableness of the Hours Expended

A court may award attorneys' fees only for the number of hours it concludes were reasonably expended on the litigation. *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary"). "[T]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of th[e] hours worked. . . .'" *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992)); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 870 (E.D. Cal. 1988) ("The cases do not indicate that every minute of an attorney's time must be documented; they do, however, require that there be adequate description of how the time was spent, whether it be on research or some other aspect of the litigation. . .").

In their motion, class counsel report that they have spent 3,051 attorney hours working on this matter since its inception in 2012 through February 23, 2015.[246]  Following the hearing, class counsel submitted supplemental declarations stating that they expended 458.8 hours from February 23, 2015 through the fairness hearing on May 4, 2015.[247]  Class counsel thus billed a total of 3,509.8 hours in connection with the litigation.

Class counsel assert that they performed an enormous amount of work to achieve a successful outcome.[248]  Citing the extensive discovery, use of experts, and motion practice in which they engaged, counsel contend that the number of hours expended are reasonable.[249]  Counsel divided

---

[246]Fees Motion at 16.

[247]See Notice of Filing of Supplemental Declarations in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Supplemental Fees Declarations"), Docket No. 183 (May 14, 2015) at 1; see also Supplemental Declaration of Jordan L. Lurie in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Lurie Supp. Fees Decl."), Docket No. 183-1 (May 14, 2015), ¶ 4; Supplemental Declaration of Payam Shahian in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs ("Shahian Supp. Fees Decl."), Docket No. 183-2 (May 14, 2015), ¶ 9.

[248]Fees Motion at 16.

[249]*Id.*

their work into six separate categories – (1) pre-filing investigation of putative class members and drafting pleadings; (2) post-filing investigation of the putative class and discovery; (3) researching, drafting, and arguing the motion to transfer and motions to dismiss; (4) time spent in mediation and settlement negotiations; (5) researching, drafting, and filing the motions for preliminary approval and final approval of the class action settlement and motion for attorneys' fees; and (6) post-notice communication with class members and supervision of the settlement notice.[250] Based on a review of the hours submitted by counsel,[251] the court has calculated the following number of hours billed for each category from 2012 through February 23, 2015:

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| **Strategic** | 85.6 | 231.3 | 271.9 | 386.5 | 193.0 | 23.8 |
| **Capstone** | 74.8 | 405 | 159.1 | 71.4 | 409.6 | 116.9 |
| **Choi** | 15.0 | 5.0 | 10.0 | 10.0 | 5.0 | 20.0 |
| **Lee** | 10.0 | 26.0 | 18.0 | 18.0 | 18.0 | 19.6 |
| **Margarian** | 47.75 | 15.2 | 3.8 | 21.25 | 18.75 | 27.5 |
| **Yablonovich** | 9.5 | 134.4 | 20.8 | 0.00 | 0.00 | 0.00 |
| **Tabesh** | 0.3 | 1.0 | 136.3 | 0.8 | 10.3 | 0.0 |
| **Total** | 242.95 | 817.9 | 619.9 | 507.95 | 654.65 | 207.8 |
| **Percentage** | 7.9% | 26.8% | 20.3% | 16.7% | 21.5% | 6.8% |

As evidenced by the preceding table, counsel expended a majority of their time on investigation and discovery (34.7%), as well as negotiation of a settlement and preparation of the settlement agreement and motions for preliminary and final approval of the settlement (38.2%).

In their supplemental declarations, counsel state that Strategic and Capstone billed an additional 458.8 hours between February 23 and May 4, 2015.[252] Attorney Payam Shahian of Strategic, states that he and two other attorneys – Gregory Yu and Joshua Valero – billed 140.4

---

[250]See generally Shahian Fees Decl. at 11; *id.*, Exh. 1.

[251]See Shahian Fees Decl., ¶¶ 6-9; Labat Fees Decl., ¶¶ 4-8; Choi Fees Decl., ¶ 8; Lee Fees Decl., ¶¶ 8-9; Margarian Fees Decl., ¶¶ 2-6; Yablonovich Fees Decl., ¶ 4; Tabesh Fees Decl., ¶¶ 4-5.

[252]Supplemental Fees Declarations at 1.

hours (1) finalizing the motion for attorneys' fees and evaluating the settlement with plaintiffs' expert for purposes of the motion for final approval; (2) communicating with class members, the settlement administrator, and opposing counsel regarding various settlement issues; (3) reviewing class member objections; (4) conducting legal research and preparing an outline of plaintiffs' response to objectors, including Ghozland; (5) researching similar consumer defect class action settlements, and preparing plaintiffs' request for judicial notice in support of their response to Ghozland's objection; (6) running a background check on Ghozland and his attorneys; (7) drafting evidentiary objections to Ghozland's declaration and to his reply in support of the motion to intervene; and (8) preparing for and attending the hearing on plaintiffs' motion for final approval and counsel's motion for attorneys' fees, expenses, and costs.[253]  Shahian asserts that he unilaterally cut the supplemental lodestar of $79,034 by "over $27,000."[254]  Although Shahian does not state how many *hours* he cut, based on the hourly rates of the Strategic attorneys who performed work during that period, the $27,000 deduction appears to represent 45[255] to 72[256] hours of work.

Jordan Lurie, an attorney at Capstone, states that the remaining 318.4 hours – which represent a supplemental lodestar of $171,073 – reflects work that he and four other attorneys – Ryan Wu, Tarek Zohdy, Lucas Rogers, and Cody Padgett – performed between February 23 and May 4, 2015.[257]  Lurie and the other attorneys at Capstone state they expended these hours (1) drafting plaintiffs' opposition to Ghozland's motion to intervene; (2) drafting a response to the objections to the motion for final approval of the settlement; (3) drafting a written objection to Collins' declaration in support of Ghozland's motion to intervene; (4) preparing for and attending the fairness

---

[253]Shahian Supp. Fees Decl., ¶¶ 8-9.

[254]*Id.*, ¶ 10.

[255]Of the three attorneys, Shahian's hourly rate of $595 is the highest.  Thus, this approximation represents $27,000 divided by that hourly rate.

[256]Of the three attorneys, Valero's hourly rate of $375 was the lowest.  This number of hours represents $27,000 divided by Valero's hourly rate.

[257]Lurie Supp. Fees Decl., ¶¶ 3-4.

hearing; (5) responding to a "steady stream of inquiries" from class members; (6) resolving disputes between class members and defendants regarding warranty coverage; and (7) conferring with the claims administrator to determine the protocol for auditing claims that had been submitted.[258] Lurie asserts that, in the exercise of billing discretion, Capstone unilaterally reduced its supplemental lodestar by more than $50,000.[259] While he does not indicate the number of hours by which the lodestar was reduced, the court calculates, based on counsel's hourly rates, that the reduction represents approximately 80 hours of attorney work by Lurie, who billed at the highest rate,[260] or 135 hours of attorney work by Padgett, who billed at the lowest rate.[261] Class counsel note in their supplemental declarations that the hours reported do not reflect the number of hours billed by the remaining class counsel – EcoTech Law Group, Diversity Law Group, the Law Offices of Choi & Associates, and the Law Offices of Hovanes Margarian – between February 23 and May 4, 2015.[262]

Although the court appreciates that the case did not move beyond the pleadings stage, it does not find that the hours spent investigating and discovering facts relevant to plaintiffs' claims unreasonable. Indeed, as the court discussed in analyzing the fairness of the proposed settlement, class counsel's extensive investigation and discovery were integral to the parties' reaching an early resolution of the case. By taking discovery early in the ligation, counsel were able to assess the strength of plaintiffs' case, as well as the hurdles they would likely face as the litigation progressed, particularly in connection with class certification, dispositive motions and trial. The court thus concludes that the hours sought for investigation and discovery are reasonable. See, e.g., *Aarons*, 2014 WL 4090564 at *16-17 (concluding that hours spent on "pre-filing investigation," "post-filing

---

[258]*Id.*, ¶ 3.

[259]*Id.*, ¶ 5. Lurie eliminated all time spent preparing the motion for final approval of the settlement and the motion for attorneys fees on the four days prior to February 27, 2015, the date the motions were filed. (*Id.*)

[260]Lurie billed at a rate of $695 per hour. (*Id.*)

[261]Padgett billed at a rate of $370 per hour. (*Id.*)

[262]Shahian Supp. Fees Decl., ¶ 11.

investigation," and "discovery motion practice," which constituted 38.9% of the total hours recorded in litigation that settled at the pleadings stage, was reasonable).

Similarly, the court finds that the hours spent on settlement negotiations are reasonable. Although the description of the category is relatively broad, class counsel note that the tasks performed in category four were more extensive than simply attending mediation sessions. This category also captures time spent in informal settlement discussions; and drafting and revising the settlement agreement, class notice, claim form, and request for exclusion.[263]   Under the circumstances, the court believes that the hours expended by class counsel in connection with settlement – those hours reflected in category four – are reasonable.

Finally, the hours counsel spent communicating with class members following dissemination of the class notice through February 23, 2015 are reasonable.  As Shahian notes, class counsel took an active role overseeing the notice process being implemented by the claims administrator and fielded calls from more than one hundred class members regarding the settlement.[264] Similarly, class counsel contacted Audi dealerships throughout the nation to ensure that they were aware of the terms of the settlement agreement and were complying with them.[265]  As a result, the court need not reduce the hours billed for these activities – which represent 6.8% of total hours reported until February 23, 2015.[266]

The court has a different opinion, however, about the remaining two categories – i.e., hours

[263]See Shahian Fees Decl., Exh. 1.

[264]Shahian Fees Decl., Exh. 1.

[265]*Id.*

[266]Although it is clear that some of the 318.4 hours Capstone reported in Lurie's supplemental declaration were spent communicating with class members and overseeing the claims process (see Lurie Supp. Fees Decl., ¶ 3 (noting that counsel "responded to a steady stream of inquiries from class members," "[r]esolved disputes between class members and Volkswagen regarding warranty coverage," and [h]eld conferences with the C[laims] Administrator to determine [the] protocol on auditing the submitted claims and resolv[ing] claims issues")), the court cannot determine the total number of hours that were expended on these tasks because class counsel do not proffer contemporaneous billing records, or even a *summary* of the number of hours expended on these discrete tasks.  As discussed *infra*, this lack of substantiation and counsel's block-billing supports a reduction of the total lodestar as adjusted to reflect inclusion of the supplemental lodestar reflected in counsel's supplemental declarations.

expended in connection with defendants' motions to dismiss and to transfer (category three) and preparing and filing the motions for approval of the settlement agreement and for attorneys' fees (category five).  Having reviewed counsel's summaries of time and considering the hours billed for the categories of tasks they identify in light of the court's knowledge of the litigation, it concludes that an excessive number of hours were recorded.

The court notes first that, although the case was still in the pleadings stage when it settled, procedural issues expanded the motion practice that one would normally expect to see in a case like this. As noted, the *Asghari* and *Kim* actions were first filed and consolidated in the Northern District of California.  While the cases were pending before Judge Wilken, defendants filed a motion to dismiss and a motion to transfer.  Class counsel responded to both motions and appeared for oral argument before Judge Wilken.  Judge Wilken subsequently granted the motion to transfer and the case was transferred to the Central District.  After the case was assigned to this court, defendants filed a second motion to dismiss, which plaintiffs opposed.  In addition their opposition brief, plaintiffs were required to file a supplemental brief responding to defendants' supplemental brief.  While the court appreciates that this procedural history required that counsel billed more time than would have been required had the case not originated in one district and been transferred to another, it cannot conclude that the motions that were litigated, and nor the complexity of the issues, required the expenditure of 620 hours of attorney time.

Plaintiffs filed six pleadings in connection with the motions to transfer and to dismiss – opposition to defendants' motion to transfer;[267] three briefs in opposition to defendants' motion to dismiss (one of which was one page long);[268] evidentiary objections associated with defendants' motion

---

[267]Response to First Motion to Transfer Case, Docket No. 33 (Nov. 6, 2012).

[268]Response to First Motion to Dismiss First Amended Complaint ("First Opposition"), Docket No. 35 (Nov. 6, 2012); Response to Motion for Hearing on Motion to Dismiss ("Second Opposition"), Docket No. 83 (May 21, 2013); Opposition to Motion to Dismiss Case, Docket No. 102 (July 8, 2013); Statement of Plaintiffs' Response to Defendants' Supplemental Brief, Docket No. 119 (Aug. 19, 2013).

to dismiss;[269] and a request for judicial notice in opposition to the motion to dismiss.[270]   With concurrently filed exhibits, these documents totaled 204 pages. The exhibits comprised 101 pages, leaving 103 pages of substantive content.  The time that class counsel recorded for the preparation of substantive briefing is therefore equivalent to almost six hours per page.[271]  The court cannot conclude that this amount of time is reasonable.  Moreover, the opposition briefs plaintiffs filed to defendants' motions to dismiss, which were by far the longest pleadings (other than requests for judicial notice) that were filed, were in many ways identical; plaintiffs took passages *verbatim* from their first opposition and incorporated them into the second, shorter memorandum.[272]  Thus, class counsel's second opposition brief should have taken substantially less time than the opposition filed in the Northern District.  The issues raised by defendants' motion to dismiss plaintiffs' CLRA, UCL, and warranty claims, moreover, were not particularly complex, especially for class counsel who have extensive experience litigating similar cases.  Given these facts, the court cannot find that counsel reasonably spent 619.9 hours on work related to defendants' motions to transfer and to dismiss.  Indeed, this is the equivalent of one attorney billing eight hours a day, five days a week for almost four months.

Similarly, the court believes that the hours billed in connection with preparation of the motions for settlement approval and attorneys' fees are unreasonable.  As noted, class counsel billed 654.65 hours – or 21.5% of the total hours recorded between the commencement of this litigation and February 23, 2015 – on "settlement/fee motions."  Although counsel do not provide much detail concerning the tasks performed in connection with the motions, Shahian notes that some of the work included "[c]onducting legal research [on] case law re: court approval of auto defect settlements," "[c]onducting legal research into case law on conditional certification of national classes for purposes of settlement," "research[ing] certification in auto defect cases for purposes of discussing the risks of continued

[269]Objections to Evidence, Docket No. 34 (Nov. 6, 2012).

[270]Request for Judicial Notice, Docket No. 103 (July 8, 2013).

[271]619.9 hours /103 pages = 5.82 hours/page

[272]Compare First Opposition at 1-4 with Second Opposition at 1-3; First Opposition at 6-10, 13-14 with Second Opposition at 4-9.

litigation in the motion for final approval," retaining experts to opine on valuation of the settlement and the reasonableness of the attorneys' fees sought, and drafting motions for preliminary and final approval of the settlement and for attorneys' fees.[273]  As class counsel confirmed at the fairness hearing, time spent preparing opposition to Ghozland's motion to intervene and responses to the fifteen class member objections is not included in this 654.65 hour total.[274]  Counsel indicate in their supplemental declarations that some portion of the additional 458.8 hours they report involved preparation of the opposition to Ghozland's motion and responses to class member objections, as well as their reply in support of the motion for attorneys' fees.[275]  It is not clear, however, what portion of the supplemental hours reflect work on the settlement and fee motions because class counsel provide no breakdown of the hours reported in their supplemental declarations.  What is clear, however, is that at least 140.4 hours[276] – and likely a great deal more[277] – were expended on these tasks.  If only 140.4 hours were devoted to these tasks, class counsel billed, *in toto*, at least 795.05 hours – or approximately 22.7% of the total hours billed in this litigation to tasks associated with the motion for final settlement approval and the attorneys' fees motion.[278]

Turning to counsel's specific descriptions of work associated with the motions, while the court appreciates that research is a necessary part of litigation and motion practice, class counsel are all experienced class action litigators; many have previously handled class certification and settlement approval in automobile defect cases such as this one.  Despite their experience, they spent a significant amount of time conducting general research concerning class certification and settlement approval, and

---

[273]See Shahian Fees Decl., Exh. 1.

[274]Supplemental Fees Declarations at 1-2..

[275]*Id.*

[276]See Shahian Supp. Fees Decl., ¶ 9.

[277]See Lurie Supp. Fees Decl., ¶¶ 3-4 (billing 318.4 hours for, *inter alia*, drafting opposition to Ghozland's motion to intervene, drafting a response to class member objections, and drafting a written objection to the declaration of Ghozland's attorney).

[278]795.05 hours / 3509.80 hours

drafting motions for preliminary and final approval of a class action settlement that were undoubtedly similar to motions they had earlier filed in similar actions.  The time counsel spent preparing and drafting the motions for preliminary and final approval of the settlement and for attorneys fees – i.e., 654.65 hours prior to February 23, 2015 – is the equivalent of one attorney working eight hours a day, five days a week for more than four months (nearly 82 days).  The court cannot find this amount of time reasonable.  Similarly, the court cannot find that the time reported in the supplemental declarations for work related to Ghozland's motion to intervene and class member objections was reasonable.  As noted, the court cannot determine the total time spent on these tasks because counsel provide no detail in their supplemental declarations.  It is nonetheless clear that Strategic expended 140.4 hours on this work – as each task they identify was associated with these pleadings.[279]  It is fair to assume, moreover, that Capstone spent one third of the time reported – or approximately 106.1 hours[280] – on work associated with the pleadings, as four of the seven tasks he identifies involved these matters.[281]  Thus, counsel billed at least 246.5 hours to oppose Ghozland's motion to intervene and respond to class member objections.  This is the equivalent of one attorney working eight hours a day, five days a week for more than six weeks (nearly 31 days).  This is not a reasonable amount of time to spend on two pleadings that totaled 36 pages – particularly given the fact that only fifteen class members filed objections, and that there is substantial overlap between plaintiffs' opposition to Ghozland's motion to intervene and their response to his objection.[282]

[279]Shahian Supp. Fees Decl., ¶¶ 8-9.

[280]318.4 hours /3 = 106.1 hours.

[281]See Lurie Supp. Fees Decl., ¶¶ 3-4.

[282]In their supplemental declarations, counsel note that both Strategic and Capstone voluntarily reduced the supplemental lodestar by some $77,000 – as noted, this appears to represent 125 to 207 hours of attorney time.  (See Shahian Supp. Fees Decl., ¶¶ 10-11; Lurie Supp. Fees Decl., ¶ 5.)  Counsel correctly observe that, in calculating the lodestar, courts should consider whether counsel have already exercised their billing discretion to reduce the hours requested.  See, e.g., *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112-13 (9th Cir. 2008) (taking into consideration the fact that counsel had voluntarily reduced her reported hours by nine percent in deciding whether further reduction was appropriate); *Delalat v. Syndicated Office Systems, Inc.*, No. 10cv1273-DMS (NLS), 2014 WL 930162, *3 (S.D. Cal. Jan. 28, 2014) (noting that "additional adjustment [was] unnecessary" in light of the fact that plaintiff's

Some of the excessive hours may reflect the fact that 21 attorneys from seven law firms worked on the case.  This staffing formula likely resulted in duplicative work being performed.  Although this was a nationwide class action involving a large class, the case was not so complex that it required such a large number of attorneys and so many firms.  *Campon v. City of Blue Springs, Missouri*, 289 F.3d 546, 553 (8th Cir. 2002) ("In our view, it should not take four experienced, highly paid attorneys 480 hours to prepare one summary judgment motion and to prepare for and conduct a four-day trial when all pretrial discovery had been completed").  Duplicative billing is unreasonable, and duplicative fees cannot be recovered.  See *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("The court may reduce the number of hours awarded because the lawyer performed unnecessarily duplicative work").

Finally, the court notes that the general billing categories counsel have identified, which are roughly parallel to particular stages of the litigation, encompass many discrete legal tasks.  This is a form of block billing, which makes it difficult for the court to determine how much time was actually

---

counsel voluntarily reduced the requested hours to exclude non-recoverable time).  The fact that class counsel have reduced their requested hours, however, does not relieve the court of its obligation to "determin[e] how many hours were reasonably expended on the litigation," *Moreno*, 534 F.3d at 1111 (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)), nor does it prevent the court from making further reductions if it finds they are warranted.

Here, the court believes that further reduction of the hours reported by counsel is warranted.  Although class counsel have provided no evidence of the actual number of hours by which they reduced their time, nor any evidence that work eliminated involved the settlement motions and post-notice communications with class members, the court accepts the statements in their declarations that the reduction concerned work related to those tasks and totaled more than $77,000 – or between 125 to 207 hours of attorney time.  (See Shahian Supp. Fees Decl., ¶¶ 10-11; Lurie Supp. Fees Decl., ¶ 5.)  This, however, does not mean that the time counsel *do request* is reasonable.  Counsel billed 458.8 hours between February 23 and May 4, 2015 preparing and filing opposition to Ghozland's motion to intervene and responses to class member objections, and responding to class member inquiries and dealing with class member disputes.  That is the equivalent of one attorney working eight hours a day for more than eleven weeks (nearly 58 days).  Given the sparse record, the court cannot find this amount of time reasonable.  The fact that class counsel did not request 583.8 hours or 665.8 hours for these tasks – which would be the equivalent of one attorney working eight hours a day, five days a week for more than 14 to 16 weeks – does not compel the conclusion that 458.8 hours of attorney time was reasonably expended on these tasks.  Accordingly, despite counsel's voluntary reduction of the hours requested, the court concludes that further reduction is warranted.

spent on particular tasks.[283]  It is within a court's discretion to reduce the number of requested hours where block billing makes it difficult easily to identify the hours reasonably expended.  See *Neil v. Commissioner of Social Sec.*, 495 Fed. Appx. 845, 847 (9th Cir. Nov. 9, 2012) (Unpub. Disp.) (holding that it was not an abuse of discretion for the district court to reduce a fee request by ten percent to account for block billing, and citing *Hensley*, 461 U.S. at 437, and *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).

For the reasons stated, the court concludes that the rates requested by class counsel are reasonable but that the total number of hours they expended is not.  This is particularly true of hours billed in categories three and five and hours reported in counsel's supplemental declarations.  Based on the court's review of class counsel's billing entries, its own experience with this litigation, and its concerns regarding duplicative billing and block billing, the court believes that a reduction of the

---

[283]Class counsel identify broad categories of tasks on which they worked between February 23 and May 4, 2015.  (See Shahian Supp. Fees Decl., ¶¶ 8-9 (noting that Strategic's supplemental lodestar reflects time spent (1) finalizing the motion for attorneys' fees and evaluating the settlement with plaintiffs' expert for purposes of the motion for final approval; (2) communicating with class members, the settlement administrator, and opposing counsel regarding various settlement issues; (3) reviewing class member objections; (4) conducting legal research and preparing an outline for plaintiffs' response to objectors – including Ghozland; (5) researching similar consumer defect class action settlement agreements and preparing plaintiffs' request for judicial notice in support of plaintiffs' response to Ghozland's objection;  (6) running a background check on Ghozland and his attorneys; (7) drafting evidentiary objections to Ghozland's declaration and to his reply in support of the motion to intervene; and (8) preparing for and attending the hearing on plaintiffs' motion for final approval and attorneys' fees, expenses, and costs); Lurie Supp. Fees Decl., ¶¶ 3-4 (noting that Capstone's supplemental lodestar reflects time spent (1) drafting plaintiffs' opposition to Ghozland's motion to intervene; (2) drafting responses to class members' objections to the motion for final approval; (3) drafting a written objection to Collins' declaration in support of Ghozland's motion to intervene; (4) preparing for and attending the fairness hearing; (5) responding to a "steady stream of inquiries" from class members; (6) resolving disputes between class members and defendants regarding warranty coverage; and (7) holding conferences with the claims administrator to determine the protocol for auditing the submitted claims)), they do not specify the number of hours expended in each category, much less identify how much time was spent on discrete tasks.  They merely provide a total number of hours that encompasses all of the tasks identified.  (See Shahian Supp. Fees Decl., ¶ 9; Lurie Supp. Fees Decl., ¶ 4.)  As with the original declarations submitted in support of the fees motion, the supplemental declarations reflect block billing, which weighs in favor of a reduction of the supplemental lodestar as well.

lodestar is appropriate.  Accordingly, the court will reduce the lodestar of $1,851,616.25[284] by 10%, resulting in an adjusted lodestar and fee award of $1,666,454.63.

In their supplemental declarations, counsel state that an attorney at each of Strategic and Capstone will likely have to spend additional time following the fairness hearing to monitor and enforce the settlement, respond to class members inquiries, and communicate with Audi dealerships regarding defendants' obligations under the settlement.  Based on their experience in supervising similar settlements and on the volume of inquiries they have received since class notice was disseminated in January, they estimate that a junior attorney at each firm will likely spend approximately fifty hours on such tasks between May 4, 2015 and July 28, 2016 (the final day upon which a class member can make an appointment to have a service adjustment under the terms of the settlement).[285]  Fees associated with the provision of this type of future services are properly awarded.  See, e.g., *Hanlon*, 150 F.3d at 1029 (affirming an award of attorneys' fees in connection with approval of a class action settlement where the award "include[d] all future services that class counsel must provide through the life of the latch replacement program" because class counsel "must remain available to enforce the contractual elements of the settlement agreement and represent any class members who encounter difficulties").  Based on its experience in similar actions and the evidence class counsel have adduced regarding oversight and enforcement of the settlement, the court concludes that one hundred hours of junior attorney time is reasonable under these circumstances.  The court will therefore supplement the lodestar by $37,250[286] to reflect class counsel's continuing obligations to the class during the remainder of the settlement

---

[284]This figure includes the original lodestar of $1,601,509.25 (see Shahian Fees Decl., ¶¶ 6-9; Labat Fees Decl., ¶¶ 4-8; Choi Fees Decl., ¶ 8; Lee Fees Decl., ¶¶ 8-9; Margarian Fees Decl., ¶¶ 2-6; Yablonovich Fees Decl., ¶ 4; Tabesh Fees Decl., ¶¶ 4-5) plus the supplemental lodestar of $250,107 (see Supplemental Declarations at 1; Shahian Supp. Fees Decl., ¶ 9; Lurie Supp. Fees Decl., ¶ 4).

[285]Shahian Supp. Fees Decl., ¶ 13; Lurie Supp. Fees Decl., ¶ 6.

[286]A junior attorney at Strategic bills $375 per hour; this would be $18,750 for fifty hours. (See Shahian Supp. Fees Decl., ¶ 13.)  A junior attorney at Capstone bills $370 per hour; this would be $18,500 for fifty hours.  (Lurie Supp. Fees Decl., ¶ 6.)

period.  With this addition, the final adjusted lodestar is $1,703,704.63.[287]

### iii.    Costs

The district court must also determine an appropriate award of costs and expenses.  See FED.R.CIV.PROC. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement"); *Trans Container Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985).  One court has noted that, in evaluating the reasonableness of costs, "the judge has to step in and play surrogate client."  See *In re Continental Illinois Securities Litigation*, 962 F.2d at 572.  In keeping with this role, the court must examine prevailing rates and practices in the legal marketplace to assess the reasonableness of the costs sought. *Jenkins*, 491 U.S. at 286-87.  "Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, document scanning, and visual equipment are typically recoverable."  *Rutti v. Lojack Corp., Inc.*, No.

---

[287]Based on the 5,974 service adjustments performed between January 28 and April 18, 2015, counsel estimate that a total of 40,922 service adjustments will likely be completed by the end of the settlement period.  (See Second Lurie Supp. Decl., ¶ 6.)  Counsel reached this estimate by extrapolating total service adjustments for eighteen months from the 5,974 adjustments performed in the eighty days between January 28 and April 18.  (*Id.*)  They calculate that the value of the settlement, measured by service adjustments, will likely be $16,176,057.38 (i.e., 40,922 adjustments x $395.29 cost to Audi for performing them).  (*Id.*)

Accepting this figure as the value of the common fund, the adjusted lodestar represents approximately 11.0% of the fund, which is well-below the Ninth Circuit's "benchmark award for attorneys' fees" under the common fund method of calculating fees – i.e., 25% of the common fund. See *Hanlon*, 150 F.3d at 1029.  The common fund cross-check thus demonstrates that the fee award is reasonable.

This conclusion is underscored by the decisions of several courts in other districts that have found attorneys' fees constituting a similar percentage of the fund to be reasonable in automobile defect cases where class members received similar relief – i.e., reimbursements and extended warranties.  See, e.g., *In re Nissan Radiator/Transmission Cooler Litigation*, No. 10 CV 7493 (VB), 2013 WL 4080946, *15 (S.D.N.Y. May 30, 2013) (applying, in an automobile defect case, without discussion, the common fund approach rather than lodestar method, and approving an award of $1,620,000 in attorneys' fees, which "amounts [to] less than ten percent of plaintiffs' estimated settlement fund"); *Alin v. Honda Motor Co., Ltd.*, Civil Action No. 08-4825 (KSH) (PS), 2012 WL 8751045, *22-23 (D.N.J. Apr. 13, 2012) (finding attorneys' fees equal to approximately 6.3% of the value of a settlement providing limited reimbursement for purported automobile defects); *Dewey v. Volkswagen of America*, 728 F.Supp.2d 546, 616 (D.N.J. 2010) (awarding attorneys' fees equal to approximately 13.3% of the estimated value of settlement in an automobile defect case), rev'd on other grounds, *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012).

SACV 06-350 DOC (JCx), 2012 WL 3151077, *12 (C.D. Cal. July 31, 2012).  Courts also have discretion to reimburse consulting and expert witness fees.  *In re Media Vision Technology Securities Litigation*, 913 F.Supp. 1362, 1366-67 (N.D. Cal. 1996).

As noted, plaintiffs seek $100,000, the cap on costs in the clear sailing agreement.[288]  The records provided by class counsel reflect that Strategic incurred expenses of $72,483.94 – $350.91 for transcripts and depositions; $58,883.50 for the retention of experts and storing of evidence; $686.00 for messenger service; $5,000 for mediation expenses; and $7,563.53 for travel, lodging, and a per diem for meals.[289]  Capstone incurred $50,503.61 in expenses – $4.00 for copying and printing; $858.28 for various court fees and filing fees; $241.92 for deposition transcripts and fees; $105.60 for research services; $2,576.31 for travel and lodging; and a total of $46,717.50 for the retention of experts, including Professor Rubenstein and Colin Johns, a certified public accountant employed by Hemming Morse, LLP to provide a report calculating the value of the settlement benefits.[290]  Based on the information provided by class counsel and its knowledge of the history of this litigation and the discovery undertaken by counsel, the court finds the costs are reasonable.

### iv.   Whether an Enhancement of the Lodestar is Warranted

Class counsel contend that a multiplier should be applied to the lodestar.[291]  As discussed, the court finds that the lodestar based on class counsel's reasonable hours and rates is $1,703,704.63.  To award the amount requested by counsel – $2,300,000 – the court would have to find it appropriate to apply a multiplier of approximately 1.4.

To determine whether application of a multiplier is warranted, the court must consider several factors, including the novelty and difficulty of the case, the skill displayed in presenting the case, the extent to which the litigation precluded other employment by the attorneys, and the contingent nature of the fee award.  *In re Bluetooth*, 654 F.3d at 941-42 (quoting *Hanlon*, 150 F.3d at 1029).

---

[288]Fees Motion at 23.

[289]See Shahian Fees Decl., ¶¶ 42-43.

[290]Labat Fees Decl., ¶¶ 25-26.

[291]Fees Motion at 17-22.

The court does not believe that these factors or the circumstances of the litigation warrant a departure from the lodestar. As the Ninth Circuit has made clear, the most important factor is the benefit obtained for the class. *In re Bluetooth*, 654 F.3d at 942; see also *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir.2009) (the ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff"); see also *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1046 (N.D.Cal.2008) ("The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award"). The court agrees with class counsel[292] that the settlement represents a positive result for the class – class members can receive free service adjustments or reimbursement, and will benefit from an extended warranty. Class counsel also took a risk by accepting the case on a contingency fee basis. These factors alone, however, are not dispositive. The court does not believe that the issues raised by the case were particularly novel or difficult, and notes that, although class counsel assert that they were prevented from completing other work, "it is axiomatic that time spent by individual attorneys on one case prevents them from spending time on another." *Parkinson*, 796 F.Supp.2d at 1175. Thus, the fact that counsel may not have accepted other matters does not mandate application of a multiplier particularly where, as here, counsel have not submitted any evidence or declarations substantiating their assertion. "[Defendants'] advance agreement to pay class counsel up to $[2,3]00,000 in attorneys' fees and $100,000 in expenses 'cannot relieve the district court of its duty to assess fully the reasonableness of the fee request.'" *In re Magsafe Apple Power Adapter Litigation*, 571 Fed. Appx. 560, 565 (9th Cir. Apr. 24, 2014) (Unpub. Disp.) (citing *In re Bluetooth*, 654 F.3d at 942). Based on its knowledge of the case and the effort expended by class counsel, and taking into consideration the benefits obtained for class members and the contingent nature of class counsel's work, the court is of the opinion that the lodestar adequately compensates counsel for the work they performed in this litigation.[293] Accordingly it declines to apply a multiplier

---

[292]*Id.*

[293]At the hearing and in their supplemental declarations, make several additional arguments as to why the court should apply a multiplier. First, they assert they will be "punished[ ] for early resolution of a complex litigation that provided class members with the immediate remedy of a service

adjustment" if a multiplier is not applied.  (Shahian Supp. Fees Decl., ¶ 4.)  Counsel argued at the hearing that if the court did not apply a multiplier, it would give lawyers a perverse incentive to avoid early resolution of class actions.  Specifically, they suggested that it would encourage counsel to continue to litigate cases so as to increase the lodestar and thus the fee award.  This argument is not persuasive.  As noted, a court using lodestar methodology to calculate attorneys' fees multiplies counsel's reasonably hourly rates by the *hours reasonably expended on a case*.  While it is true that the lodestar for a case that is only resolved after years of litigation will be higher than that for a case such as this that is settled at a relatively early stage, attorneys who have litigated a case for years will have committed substantially more time to the case and been precluded as a result from accepting other work.  When counsel reach an early settlement, although their lodestar is lower, they are able to take on additional cases and business.  Furthermore, if it is clear that a case could have been resolved at an earlier point in the litigation, but counsel chose not to do so in order to increase the possible amount of a fee award, there would be little *reasonable* about the fees incurred subsequent to the time it became clear that settlement was possible.

The court is also not persuaded by counsel's second argument – i.e., that the court should apply a multiplier and award $2.3 million in attorneys' fees because the settlement agreement provides for such an award.  (Supplemental Fees Declarations at 1-2 ("Even if no multiplier is applied, the full amount of the requested fee should be awarded because the requested fee was an amount that Defendant *agreed to pay* under a Settlement that the Court already has found to be non-collusive, and the requested fee amount does not reduce any benefits to the Class members who are being reimbursed 100% for their out of pocket expenses").)  The court agrees that the settlement provides a benefit to class members; contrary to counsel's suggestion (see Shahian Supp. Fees Decl., ¶¶ 5-6), neither this finding nor the finding that the settlement was not collusive compels the conclusion that the amount of attorneys' fees defendant agreed to pay without objection under a clear sailing agreement was also fair and reasonable.  Clear sailing agreements must be scrutinized to ensure that they do not result in unfair awards of attorneys' fees, see *Weinberger*, 925 F.2d at 523, and the fact that a settling defendant has agreed to pay a particular amount of attorneys' fees without objection does not entitle class counsel to an award in that amount as they suggest (see Supplemental Fees Declarations at 1-2), nor relieve the court of "its duty to assess fully the reasonableness of the fee request," *In re Magsafe Apple Power Adapter Litigation*, 571 Fed. Appx. at 565 (citing *In re Bluetooth*, 654 F.3d at 942); see also *Staton*, 327 F.3d at 963 ("Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is 'fundamentally fair, adequate, and reasonable.'  There is no exception in Rule 23(e) for fees provisions contained in proposed class action settlement agreements.  Thus, to avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement," citing *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 848-49 (5th Cir. 1998); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 819-20 (3d Cir. 1995); *Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884 (2d Cir. 1983) (holding, with regard to attorneys' fees, that "[t]he presence of an arms' length negotiated agreement among the parties weighs strongly in favor of approval, but such an agreement is not binding on the court"); *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980) ("[T]he District Court abdicated its responsibility to assess the reasonableness of attorneys' fees proposed under a settlement of a class action, and its approval of the settlement must be reversed on this ground alone")); *Chehalem*

to the lodestar in this case.[294]

---

*Physical Therapy v. Coventry Health Care, Inc.*, No. 03:09-CV-00320-HU, 2014 WL 4373150, *4 (D. Or. Sept. 3, 2014) ("Here, class counsel are requesting combined attorney fees and costs of $2.6 million, representing 'approximately 21% of the total constructive Common Fund,' and 'approximately 23 percent of the total $11.3 million monetary value of the settlement[.]'  As part of the Settlement, Coventry has agreed to pay up to $2.6 million in attorney fees and costs. Nevertheless, Coventry's advance agreement 'cannot relieve the district court of its duty to assess fully the reasonableness of the fee request.'  The court has 'an independent obligation to ensure that the award [of attorney fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount,'" citing *In re Bluetooth*, 654 F.3d at 941); *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM (RZx), 2013 WL 6531177, *24 n. 130 (C.D. Cal. Nov. 23, 2013) ("[T]he court recognizes that the inclusion of a clear sailing provision requires it to 'scrutinize [the agreement] to ensure that the fees awarded are fair and reasonable," citing *Weinberger*, 925 F.2d at 520; *Nienaber v. Citibank (South Dakota) N.A.*, No. CV-04-4054, 2007 WL 2003761, *2 (D.S.D. July 5, 2007) ("A district court must determine the reasonableness of attorney fee requests notwithstanding the fact that such fees are subject to a clear sailing fee agreement and notwithstanding the fact that the source of payment for the attorney fees does not directly impair the class recovery")); *id.* ("In addition to concerns regarding potential conflicts of interest, close judicial scrutiny of clear sailing fee agreements is appropriate given 'the 'precedential value' set by the award for future class action settlements.'  'When . . . a court is compelled by the nature of the case or statutory mandate to award attorney fees to a party, the determination of such award is not only a matter of public record, it becomes part of the great body of our law.  A court would be shirking its responsibility to render a principled decision were it to accept without scrutiny and close examination the fees agreed upon by client and counsel," citing *Stokes v. Saga International Holidays, Ltd.*, 376 F.Supp.2d 86, 90 (D. Mass. 2005)).  The court accepted that duty here, and considered the reasonableness of counsel's request for attorneys' fees, as well as their request for a multiplier.  For the reasons stated, the court believes that the adjusted lodestar fairly compensates class counsel for their work on this action.

[294]The court is aware the Ninth Circuit has stated that "[i]t is an abuse of discretion to fail to apply a risk multiplier[ ] when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail; (2) their hourly rate does not reflect that risk; and (3) there is evidence that the case was risky." *Fischel v. Equitable Life Assurance Society of United States*, 307 F.3d 997, 1008 (9th Cir. 2002) (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 109 F.3d 602, 609 (9th Cir. 1997); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1301-02 (9th Cir. 1994)).  Even after considering these factors, however, the court is unpersuaded that counsel are entitled to a multiplier in this case.

As the court has noted, like most automotive defect class actions, the class in this case faced risks related to class certification and ultimate success on the merits.  Class counsel have submitted no evidence, however, that they expected to receive a risk enhancement multiplier when they accepted the case, or that their hourly rates did not reflect the risk inherent in the case.  Specifically, despite the fact that they fully briefed the motion for attorneys' fees, and after reviewing the court's tentative ruling, filed unauthorized pleadings that made new arguments in support of their requested fee amount, counsel at no time adduced evidence that when they undertook to represent the class, they did so with the expectation that they would receive a risk multiplier.  See *Frailich v. Zwerling, Schachter & Zwerling*

### 2.   Incentive Awards

An individual who joins his claims with those of a class "disclaim[s] any right to a preferred position in the settlement [of those claims]." *In re Oracle Securities Litigation*, No. C–90–0931–VRW, 1994 WL 502054, *1 (N.D. Cal. June 18, 1994) (quoting *Officers for Justice*, 688 F.2d at 632). Nonetheless, it is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions.  See *In re Mego Financial Corp. Securities Litig.*, 213 F.3d at 463 (holding that the district court did not abuse its discretion in awarding an incentive award to the

---

*LLP*, 480 Fed. Appx. 878, 2012 WL 3245397, *1 (9th Cir. Aug. 10, 2012) (Unpub. Disp.) ("Applied here, *Fischel* does not compel us to find an abuse of discretion. Although the district court made factual findings that the case (prior to settlement) was risky, there is no indication in the record that Zwerling Schachter took the case with the expectation that the firm would receive a risk enhancement or that the firm's hourly rate did not reflect the risk").  Compare *Fischel*, 307 F.3d at 1008-09 ("With regard to the first factor, Plaintiffs' counsel presented evidence that they took this case with the expectation that they would receive a risk enhancement if they prevailed.  Adelman stated: 'In view of the anticipated vigorous and able defense by Equitable, the absence of a mega claim, and Equitable's refusal over the years to reverse its position, I and my colleagues would not have undertaken this litigation on a contingent fee basis had it been thought that there was any likelihood of a fee being restricted to a small percentage of the amounts recovered.  Although I knew that the Court ultimately sets the fee, and that no amount was guaranteed, I was specifically aware in taking the matter on that the usual range of fee awards in common fund cases was 20–30 percent.  Additionally, Michael Malakoff, another one of Plaintiffs' attorneys, explained that he 'd[id] not believe [that his] law firm would have agreed in advance to undertake a complex class action for an aggregate award for all counsel of less then 20% of a common fund where the fund, as here, was not anticipated to be over $20 million'").

Class counsel likewise adduce no evidence that the hourly rates they charged did not adequately reflect the contingent nature of the work.  From the evidence in the record, it seems likely that their standard billing rates – which they charged in this action – reflected the risk inherent in contingency fee work.  This is because lead class counsel – Strategic and Capstone – perform work solely on a contingent fee basis.  (See Labat Fees Decl., ¶ 4 ("Capstone, with twenty-five attorneys, is one of the largest California firms that prosecutes aggregate actions on a wholly contingent basis"); *id.*, ¶ 11 (noting that Capstone's attorneys billed their standard hourly rate); Shahian Fees Decl., ¶¶ 39-41 (noting that Strategic's attorneys billed their standard hourly rate; see also http://strategiclegalpractices.com/about/ (last visited May 29, 2015) (noting that Strategic takes nearly all cases on a contingency basis).)  Given this fact, and the likelihood that not all cases class counsel litigate come to a successful resolution, it is reasonable to assume that class counsel have accounted for the contingency risk in their standard billing rates.  The court need not speculate about this, however, as class counsel *proffered no evidence* that their hourly rates did not account for the risk inherent in contingent fee work.  Counsel have thus failed to show that they are entitled to a multiplier under *Fischel*.

class representatives); *In re Continental Illinois Securities Litig.*, 962 F.2d at 571 (stating that an incentive award in such amount "as may be necessary to induce [the class representative] to participate in the suit" is appropriate).

The settlement agreement provides for incentive payments of $2,500 to each named plaintiff.[295] These proposed awards are consistent with amounts courts typically award as incentive payments. See, e.g., *In re Mego Financial Corp.*, 213 F.3d at 463 (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC*, No. C06–04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.*, No. CV–10–3873–JST (RZx), 2011 WL 320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named plaintiffs); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646–47 (S.D. Cal. 2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.*, No. 09–CV–1786–IEG (WMc), 2010 WL 4285011, *3 (S.D. Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking*, No. F04–6279 AWI LJO, 2006 WL 3020943, *10 (E.D. Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named plaintiff).

Whether to authorize an incentive payment to a class representative is a matter within the court's discretion. The criteria courts consider in determining whether to approve an incentive award include:

"1) the risk to the class representative in commencing suit, both financial and otherwise;

2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation[;] and[ ] 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995).

---

[295]Settlement Agreement, § VIII.C.

### a.       The Risk to the Class Representative in Commencing Suit

When a class representative shoulders some degree of personal risk in joining litigation, such as workplace retaliation or financial liability, an incentive award is especially important.  See *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (noting that fear of workplace retaliation is a relevant factor in evaluating the propriety of an incentive award).  There is no evidence that plaintiffs here risked retaliation or financial liability by filing suit.  Accordingly, the court concludes that this factor is neutral.

### b.       The Notoriety and Personal Difficulties Encountered by the Class Representatives

There is no particular notoriety associated with this litigation, nor is there any indication that the named plaintiffs have been subjected to media attention as a result of their involvement in the case.  See, e.g., *Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008 WL 3854963, *13 (C.D. Cal. Aug. 13, 2008) (finding that the media attention class representatives attracted supported incentive awards).  The fact that there was no media attention, however, does not preclude approval of an incentive payment.  See *Razilov v. Nationwide Mutual Ins. Co.*, No. 01-CV-1466-BR, 2006 WL 3312024, *4 (D. Or. Nov. 13, 2006) (approving an incentive award of $10,000 despite a lack of notoriety or demonstration of personal difficulties).  As no significant media attention or other difficulties have been identified, however, this factor weighs against authorizing a large incentive payment.

### c.       The Amount of Time and Effort Expended by the Class Representatives

An incentive award is appropriate where the "class representatives remained fully involved and expended considerable time and energy during the course of the litigation."  *Razilov*, 2006 WL 3312024 at *4.  Class counsel assert that the class representatives made "invaluable contributions to this action."[296]  They note that "each [p]laintiff supplied his or her experiences and . . . relevant documents to Class Counsel," and expended substantial time "review[ing] the Settlement" and conferring with class

---

[296]Fees Motion at 24.

counsel regarding the proposed settlement terms.[297]

Because plaintiffs expended reasonable efforts on the litigation and were involved in the proceedings, this factor weighs in favor of authorizing incentive awards. See, e.g., *Hartless*, 273 F.R.D. at 547 ("In this case, Plaintiff Hartless requests a service award of $4,000 and Plaintiff Wachowski requests a service award of $2,000. Plaintiff Hartless has protected the interests of the class and has spent the past four years meeting with counsel, supervising counsel's efforts on behalf of the class, participating in discovery and efforts leading to settlement, and approving the amount and type of settlement proposed for the class. The class has benefitted from these actions by receiving a settlement that represents up to 100 percent of the claimed property damage and injunctive relief. Likewise, Plaintiff Wachowski has spent the last year meeting with counsel, supervising counsel's efforts on behalf of the class, participating in discovery and efforts leading to settlement, and approving the amount and type of settlement proposed for the class. . . . Therefore, the Court finds these request for service awards reasonable and GRANTS the requests"); *Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 WL 928133, *10 (N.D. Cal. Apr. 3, 2009) ("Plaintiff argues persuasively that the incentive award is justified. She provided documents from her employment that were instrumental in counsel's understanding of this case, provided contact information for potential Class Members, contacted employees about this case, responded to telephone inquires from counsel, responded to multiple requests for information, reviewed many documents produced by Defendants, authenticated documents, and was a general source of valuable information which assisted the parties in reaching a settlement of this action").

### d.        The Duration of the Litigation

When litigation has been protracted, an incentive award is especially appropriate. See *Van Vranken*, 901 F.Supp. at 299 (finding that a class representative's participation through "years of litigation" supported an incentive award). As noted, the *Asghari* and *Kim* actions were first filed in 2012, and Tran, Dersarkissian, and Noble subsequently joined as plaintiffs in 2013 and 2014. Given

---

[297] *Id.* (citing Asghari Decl., ¶¶ 2-13; Tran Decl., ¶¶ 2-9; Kim Decl., ¶¶ 2-11; Noble Decl., ¶¶ 2-12).

the length of the litigation and plaintiffs' involvement in it, the court concludes that this factor favors an incentive award.

        **e.**     **The Personal Benefit Enjoyed by the Class Representative as a Result of the Litigation**

An incentive award may be appropriate where a class representative will achieve no benefit beyond that he would have received as an ordinary class member. See *Razilov*, 2006 WL 3312024 at *4 (approving the payment of an incentive award where the only benefit a class representative was going to receive from a settlement was the same statutory damages other class members would receive); *Van Vranken*, 901 F.Supp. at 299 (where a class representative's claim made up "only a tiny fraction of the common fund," a substantial incentive award was appropriate). The named plaintiffs in this action will receive no relief beyond that available to members of the class in general. This factor, therefore, also favors approval of an incentive award.

        **f.**     **Weighing the Factors**

Considering all relevant factors, the court concludes that an incentive award of $2,500 for each of Asghari, Tran, Kim Dersarkissian, and Noble is "just and reasonable under the circumstances." *Van Vranken*, 901 F.Supp. at 299.

### III. CONCLUSION

For the reasons stated, the court grants the motion for final approval of the settlement and denies objector Michael Ghozland's motion to intervene. It awards each named plaintiff a $2,500 incentive award, and awards class counsel $1,703,704.63 in attorneys' fees and $100,000 in expenses.

DATED: May 29, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE